73

1    Q   And just to show you what I mean, if we

2 turn to the second page of the packet.

3    A   Okay.

4    Q   This document refers to an incident that

5 happened on March 29 of '17; correct, off to the

6 left --

7    A   Yes --

8    Q   -- of the --

9    A   -- according to the incident date.

10    Q   And the Purpose of Review that we see

11 about a quarter of the way down, the box for Random

12 is checked; correct?

13    A   Correct.

14    Q   Now, the incident that we are here for,

15 January 22nd of '18, that was captured on MVR as

16 well; correct?

17    A   It wouldn't have been captured on MVR, no.

18    Q   It was captured on an MVR of other

19 responding officers; correct?

20    A   Later it was.

21    Q   I think Butschky or someone with a name

22 like that?

23    A   What?

24    Q   Do you recall the names of the officers

25 who responded later whose MVR did capture part of

MARY Q. IRELAN, CCR

---

74

1 the incident?

2    A   I don't recall.

3    Q   You don't know who they were? Has

4 Millville Police Department, to your knowledge, ever

5 done a review of the MVR that was prepared in

6 connection with this incident?

7    A   I have no idea.

8    Q   I'd like to turn to the tabbed page, and

9 you had referred to this page earlier, I believe,

10 and the supervisor's signature at the bottom of this

11 tabbed page is who?

12    A   It looks like Sergeant John Redden.

13    Q   That was someone who was also involved in

14 your training?

15    A   He's a sergeant. They don't -- they will

16 answer questions if you have them, but they're not

17 specifically involved in your training unless you

18 need a sergeant to train you.

19    Q   Okay. So since we know this isn't a

20 training related document, is this page we are

21 looking at part of an annual review?

22    A   Looks like it would be.

23    Q   And feel free to back up if you need to

24 place this in context, and I am showing you the

25 pages in the order that I got them. Returning to

MARY Q. IRELAN, CCR

---

75

CHARD - BY MR. MAURER

1 the tabbed page on 11/9/17, do you know if that was

2 part of a larger document?

3    A   Looks like it would be.

4    Q   Are you subject to annual performance

5 reviews?

6    A   Yes.

7    Q   And when do they take place typically?

8    A   In the fall.

9    Q   In the fall?

10    A   Yes.

11    Q   So if we return, if you wouldn't mind, to

12 the tabbed page -- you're also welcome to page

13 through if you want --

14    A   Uh huh --

15    Q   -- but I am not asking you about those

16 documents. Returning to the tabbed page, you just

17 indicated that annual reviews take place in the

18 fall. Is --

19    A   Okay --

20    Q   -- this tabbed page part of your annual

21 review for 2017?

22    A   Yes.

23    Q   Did you have an annual review for 2018?

24    A   Yes.

25    Q   And have you reviewed a printed document

MARY Q. IRELAN, CCR

---

76

CHARD - BY MR. MAURER

1 that was generated as a result of that review?

2    A   Yes.

3    Q   And you signed off on it?

4    A   Yes.

5    Q   And if you wanted to take a look at that

6 document how would you do it?

7    A   I would ask for it.

8    Q   You would ask for it in hard copy?

9    A   Yeah.

10    Q   Is it --

11    A   I can -- I can either ask for it or log

12 into my account and print it out myself if you want

13 to.

14    Q   Okay. I appreciate that. So your

15 employment related records, such as that tabbed page

16 dated 11/9/17, they are available to you on a

17 server?

18    A   Yes.

19    Q   I just want to focus on a bit of the text

20 on this tabbed page. He handles victims and

21 suspects with respect and I have not received a

22 citizen complaint against him for demeanor, although

23 at times he can have an abrasive manner with

24 truculent suspects.

25    That sentence that I just read to you,

MARY Q. IRELAN, CCR

```
 1   although at times he can have an abrasive manner
 2   with truculent suspects, did you discuss that with
 3   the sergeant?
 4       A   No.
 5       Q   Did you know what he meant by truculent
 6   suspects?
 7       A   Are you asking if I discussed it before he
 8   wrote it or after he wrote it?
 9       Q   Well, I understood from your answer that
10   you never discussed it with him at all; correct?
11       A   No.
12       Q   And I am just asking, since you signed
13   this page, if you knew what he meant by truculent
14   suspects?
15       A   I would -- at the time I think I looked it
16   up; what truculent meant.
17       Q   And what did you learn?
18       A   I don't remember the exact definition, but
19   from -- also from the context it can be from
20   difficult suspects.
21       Q   And --
22       A   Uncooperative, unruly, however you want to
23   describe it, and -- it all fits.
24       Q   And encountering uncooperative and unruly
25   suspects is part of police work; correct?
```

MARY Q. IRELAN, CCR

```
 1       A   Yes.
 2       Q   Something that can happen to you every
 3   day.
 4       A   Yes.
 5       Q   And now that we have talked about this
 6   document and the reference to truculent suspects, do
 7   you have any better or improved recollection of
 8   training you may have received on dealing with
 9   uncooperative and truculent suspects?
10       A   Like I said before, in a subjective
11   manner.  You can use constructive authority, command
12   presence.
13       Q   Constructive authority; what do you mean
14   by that?
15       A   Constructive authority can mean drawing
16   your firearm and pointing it at them.  It can mean
17   raising your voice.
18       Q   So drawing your firearm and pointing it at
19   them --
20       A   That's constructive authority, yes.
21       Q   And that would be appropriate with a
22   truculent suspect?
23       A   Yes.  Sometimes it is.
24           MR. REYNOLDS:   Note --
25           THE WITNESS:   Like I said, it's all
```

MARY Q. IRELAN, CCR

CHARD - BY MR. MAURER                                    79

```
 1   subjective.
 2           MR. REYNOLDS:   Note my objection.  You're
 3   taking the one sentence out of context without
 4   reading the next sentence.  He has a very good
 5   command presence when in a hostile situation
 6   and keeps his composure.
 7           MR. MAURER:   Counsel --
 8           MR. REYNOLDS:   I think, in fairness, that
 9   sentence that you have relied upon has been
10   read out of context.
11           MR. MAURER:   Counsel, what you have just
12   done is a speaking objection and the type that
13   Hall versus Clifton Precision says shouldn't
14   happen, and, as you know, Counsel, I preceded
15   my questioning on that sentence with a sentence
16   referring to Patrolman Chard's treating victims
17   and suspects with respect --
18           MR. REYNOLDS:   Correct, but --
19           MR. MAURER:   -- and I had every intention
20   of moving on, and I can ask about sentences one
21   at a time.
22           MR. REYNOLDS:   No.
23           MR. MAURER:   This isn't trial or the rule
24   of completeness and it's really not appropriate
25   to give a speaking objection, but enough of
```

MARY Q. IRELAN, CCR

CHARD - BY MR. MAURER                                    80

```
 1   that.
 2           MR. REYNOLDS:   I just feel it was read out
 3   of context.  That's all.
 4           MR. MAURER:   I read it verbatim in a
 5   document that Patrolman Chard --
 6           MR. REYNOLDS:   Okay --
 7           MR. MAURER:   -- has had a chance to look
 8   at.
 9   BY MR. MAURER:
10       Q   And so we don't leave anything out at all,
11   the last sentence of the narrative, if I could
12   direct your attention, it says, he is not timid with
13   using force when necessary; correct?
14       A   Correct.
15       Q   You would agree with that?
16       A   Yes.
17       Q   If your lawyer asks you to provide your
18   2018 evaluation would you be able to locate that in
19   the manner you described for us?
20       A   If I wanted to.
21       Q   And if your lawyer asks you to do that you
22   would do it?
23           MR. REYNOLDS:   Well, that goes to --
24           THE WITNESS:   Yes --
25           MR. REYNOLDS:   -- attorney/client
```

MARY Q. IRELAN, CCR

1 communications.

2 THE WITNESS: Yes.

3 MR. MAURER: Well, I didn't ask about

4 communications. We will cross that bridge in a

5 written request.

6 MR. REYNOLDS: Okay.

7 (Discussion off the record.)

8 BY MR. MAURER:

9 Q Patrolman, I want to -- we have been

10 talking a lot about documents and I want to move on

11 to show you one of the videos that has been produced

12 in discovery in this case --

13 A Uh huh --

14 Q -- and, to do that, I just want to fire up

15 this laptop that I showed you earlier and go over to

16 your side of the table. I am going to set up a

17 little post at the corner there, and I'm not going

18 to get in your way, and your attorney is welcome to

19 join me. If you wouldn't just mind moving your

20 water bottle. Thank you. I will stay out of your

21 way, and I am going to be starting and stopping this

22 video.

23 The video has been exchanged in discovery

24 and, obviously --

25 A I can't see it --

MARY Q. IRELAN, CCR

---

1 Q -- we're going to be talking about

2 something that is on a screen. Can you see that?

3 A Yes, I can see that.

4 Q And what we see in the still image is

5 North High Street driving south?

6 A Yes.

7 Q And there's a McDonald's on the left and

8 this is the road that leads to the intersection of

9 Foundry Street?

10 A Yes.

11 Q Okay. I want to, with that as background,

12 start this up.

13 (Video started; video interrupted.)

14 BY MR. MAURER:

15 Q I just stopped the video, Officer, and --

16 Q Okay. And I can't see it so --

17 Q Okay. Well, feel free to adjust it in any

18 way necessary so you can see it.

19 Q Okay.

20 Q And what we see here is the intersection

21 of North High Street and Foundry; correct?

22 A Yes.

23 Q And we see a Rite-Aid on one side of North

24 High and we see a 7/11 on the other; correct?

25 A Yes.

MARY Q. IRELAN, CCR

---

CHARD - BY MR. MAURER                               83

1 Q And we see a parked Millville police car.

2 A Yes.

3 Q That was your patrol vehicle?

4 A Yes.

5 Q And were you with anybody else in that

6 vehicle that day?

7 A No.

8 Q And the officer in the Hi-Vis safety vest

9 is yourself; correct?

10 A Yes.

11 Q And North High Street is closed at

12 Foundry; right?

13 A Yes.

14 Q And why was that?

15 A An officer involved shooting one block

16 south.

17 Q What do you mean by officer involved

18 shooting?

19 A An officer had to exercise the action of

20 shooting a suspect.

21 Q Okay. An officer --

22 A Does that clear it up for you?

23 Q Sure. An officer shot a suspect at a

24 location further south --

25 A Yes --

MARY Q. IRELAN, CCR

---

CHARD - BY MR. MAURER                               84

1 Q -- of High Street.

2 A Yes.

3 Q And, for that reason, the street had been

4 closed --

5 A Correct --

6 Q -- for investigation?

7 A Yes.

8 Q And was that a fatality?

9 A Yes.

10 Q Do you know the name of the suspect who

11 was shot?

12 A Yes.

13 Q And what was it?

14 A Edward Gandy.

15 THE COURT REPORTER: I'm sorry. Gandy,

16 G-A-N-D-Y?

17 THE WITNESS: Yes, ma'am.

18 BY MR. MAURER:

19 Q Were you involved at all in any attempt to

20 apprehend Mr. Gandy?

21 A No.

22 Q You came to the scene afterwards?

23 A Yes.

24 Q And Mr. Carpenter is driving a red pick-up

25 truck at the time this video is shot; correct?

MARY Q. IRELAN, CCR

85

1   A   Correct.
2   Q   And we can see a little bit of a red hood
3   of the vehicle?
4   A   Yes.
5   Q   What's the first thing you remember about
6   Mr. Carpenter's pick-up truck?
7   A   As he approached, I see him holding a cell
8   phone in the window, a very large cell phone.
9   That's all -- that's what I see coming at me.
10  Q   Okay.  Just, for the record, you held your
11  right arm up.
12  A   Yes.
13  Q   And you saw Mr. Carpenter holding a very
14  large cell phone?
15  A   Yes.
16  Q   Now, he wasn't looking at his cell phone;
17  correct?
18  MR. REYNOLDS:   Objection.
19  THE WITNESS:   He was using a cell phone.
20  BY MR. MAURER:
21  Q   Understood.  More precisely, he wasn't
22  texting with it; correct?
23  A   I don't know what he was doing.
24  Q   Well --
25  A   He was holding it up is all I know.

MARY Q. IRELAN, CCR

86

1   Q   Holding it up away from --
2   A   I don't know what he was doing with it and
3   -- continue.
4   Q   Holding it up away from himself?
5   A   As far as I can see, he was holding it up
6   in the window.  I don't know what he's doing.
7   Q   Well, Officer, I realize that motorists in
8   New Jersey are not supposed to text and neither are
9   they in any other jurisdiction.  I am aware of it.
10  You --
11  A   Well, they're not -- let me correct you.
12  They're not supposed to use any handheld electronic
13  device while driving.
14  Q   Understood.  My question, Officer, is you
15  have seen motorists, unfortunately, text while
16  driving; correct?
17  A   Yes.
18  Q   Not a good idea under any circumstances;
19  correct?
20  A   It's worse than drunk driving.
21  Q   As I've heard, and Mr. Carpenter wasn't
22  doing that; correct?
23  A   I don't know what he was doing, like I
24  said already.
25  Q   Well, if he's holding the phone away from

MARY Q. IRELAN, CCR

87

CHARD - BY MR. MAURER

1   him with his right hand he couldn't have been
2   texting; correct?
3   A   Like I said, I don't know what Mr.
4   Carpenter was doing inside his vehicle with that
5   phone.
6   Q   Why don't we go back to the video?  I am
7   going to start it up again and I'll probably -- and
8   I want to make sure you can see it.  Can you see it
9   now?
10  A   No.
11  MR. MAURER:   Respectfully, is there
12  something we can do to turn the lights on, turn
13  them off?
14  MR. REYNOLDS:   Well, he's looking into the
15  sunlight or daylight --
16  THE WITNESS:   Continue, please.  I can see
17  it.
18  MR. REYNOLDS:   Okay.
19  MR. MAURER:   Okay.  My co-Counsel may --
20  THE WITNESS:   Continue.
21  MR. MAURER:   All right.  We will continue.
22  (Video started; video interrupted.)
23  BY MR. MAURER:
24  Q   I want to stop it right there.  You just
25  made a gesture with your right arm and hand?

MARY Q. IRELAN, CCR

88

CHARD - BY MR. MAURER

1   A   Uh huh.
2   Q   What did you intend by that gesture?
3   A   Put the phone down.
4   Q   Put the phone down.  The gesture that you
5   just made, you know, with your right hand and arm
6   going downward, did you learn that in your training
7   as a police officer?
8   A   That's pretty universally used, you know.
9   Q   To mean what?
10  A   Put the phone down.  People understand
11  that.
12  Q   And what do you recall Mr. Carpenter
13  doing, if anything, in response to that?
14  A   Not putting it down.
15  Q   Mr. Carpenter wasn't driving in an unsafe
16  rate of speed; was he?
17  A   From what I recall, no.
18  (Video started; video interrupted.)
19  BY MR. MAURER:
20  Q   You made another gesture, as you can see,
21  with your right hand and arm.  What did you mean by
22  that gesture?
23  A   I believe I repeated the same gesture.
24  Put it down.
25  MR. MAURER:   Play it again --

MARY Q. IRELAN, CCR

89

1    (Video started --
2    THE WITNESS:   Nobody had a problem with
3    that all day --
4    -- video interrupted.)
5    BY MR. MAURER:
6    Q    I just stopped at a point where we can
7    hear a sound on the video.  You tried to open the
8    door of his truck; correct?
9    A    Because he refused to stop and talk to me.
10   He refused to put his window down like I asked him
11   to.  He refused to talk to me.  He said, no, I don't
12   have to.
13   Q    I understand that's what your recollection
14   is, Officer, but it's true that you tried to open
15   the door of his pick-up truck; correct?
16   A    Correct.
17   Q    Is that something you were trained to do
18   as a police officer?
19   A    It's something that happens.
20   Q    So if a vehicle doesn't stop in a manner
21   that you perceive as quick enough, your officer
22   training has instructed you to try to open the door
23   of the vehicle?
24   A    There was more to that communication
25   than -- than you allow.

MARY Q. IRELAN, CCR

90

1    Q    I don't mean to cut anything short and we
2    can watch the entire thing.  Why did you try to open
3    the door of Mr. Carpenter's pick-up truck?
4    A    Because I asked him if the door was
5    unlocked because he refused -- he said he couldn't
6    hear me, for one, and I don't know why it's not
7    captured on this video.
8    Q    What do you say it is not captured?
9    A    He said he couldn't hear me.  I tried to
10   talk to him.  He wouldn't talk to me.  He refused to
11   stop.  He wouldn't talk to me and you can hear him
12   on his video saying he doesn't have to.  I tell him
13   put the window down.  He said no.
14   Q    So, Officer --
15   A    So he refuses to do what I asked him to
16   do.
17   Q    And, because of that, you tried to open
18   the door of the truck?
19   A    I asked him if the door was unlocked at
20   one point.  I don't know why it's not captured on
21   this video.
22   Q    And I'm sorry if I'm not being clear,
23   Officer, but --
24   A    Well, if he's going to refuse to put his
25   window down, then open the door so I can talk to

MARY Q. IRELAN, CCR

91

CHARD - BY MR. MAURER

1    you.  All I wanted to do is talk to the man.  That's
2    it.
3    Q    So your testimony is that you did try to
4    open the passenger side door of the pick-up --
5    A    I think we established that, yes.
6    Q    And you're saying it's because you wanted
7    to him?
8    A    Correct.
9    (Video started; video interrupted.)
10   BY MR. MAURER:
11   Q    Now, I just heard a sound of you pounding
12   on the truck; correct?
13   A    Yes.
14   Q    So after you tried to open the door you
15   then let go of the handle; correct?
16   A    Correct.
17   Q    And then you pounded on the truck.
18   A    I slapped the back window.
19   Q    And your purpose in that?
20   A    Let him know.
21   Q    Let him know what?
22   A    He's, obviously, not listening to reason.
23   He's not listening to verbal commands.
24   Q    His windows were rolled up.
25   A    Yes, his windows were rolled up.  He

MARY Q. IRELAN, CCR

92

CHARD - BY MR. MAURER

1    refuses to do what he's supposed to do.
2    Q    It's January 22nd; right?
3    A    And, obviously, I'm not in a winter coat
4    if that's what you're getting at.
5    Q    Well, sir -- Officer, I apologize.  It's
6    not unusual for people in January to be driving with
7    their windows up.
8    A    Correct.
9    Q    It's not unusual in August.  They could
10   have the air conditioning on.
11   A    Well, it's not unusual for people to put
12   their windows down to speak to an officer either.
13   Q    So your assessment is that during that
14   period of time, and the record will speak for itself
15   how short it is, you would have expected the
16   operator of the pick-up truck to roll his window
17   down?
18   A    Yes.
19   Q    Now --
20   A    People were doing it all day.
21   Q    Okay.  As an officer -- I'm sorry.  Keep
22   going.
23   A    I was at that traffic post for several
24   hours; had no problem communicating with anyone.
25   People's windows don't work we open the door and

MARY Q. IRELAN, CCR

1 speak. It's very easy to do; very reasonable to do.
2 Any reasonable person is going to stop when asked to
3 by a police officer.
4     Q    Now, Officer, at the point you saw Mr.
5 Carpenter holding up his cell phone and not putting
6 it away, your plan at that point was to stop the
7 vehicle?
8     A    Correct.
9     Q    And issue a citation for cell phone use?
10    A    Correct, and explain to him what his
11 mistake is.
12    Q    Now, when you're stopping a vehicle you
13 don't want the vehicle to come to a sudden
14 screeching halt in the middle of the roadway;
15 correct?
16    A    Sir, that's a closed intersection under my
17 control. If I need to stop a vehicle in the middle
18 of that intersection, I will, which I did all day
19 long.
20    Q    I will try the question again. When you
21 form an intention to stop a vehicle --
22    A    Uh huh --
23    Q    -- you want that vehicle to come to a
24 smooth, controlled stop; correct?
25    A    Yes. He was going slow enough to stop

MARY Q. IRELAN, CCR

---

94

1 when I told him to.
2     Q    You don't want him to slam the brakes in
3 the middle of the roadway?
4     A    Correct.
5     Q    You want him to pull over.
6     A    Sir, maybe you don't understand what I
7 just told you. That intersection is under my
8 control. If I tell someone to stop, they can stop
9 right there where I told them to stop.
10    Q    So you're telling us that was your
11 intention --
12    A    Yes --
13    Q    -- to have Mr. Carpenter come to a sudden
14 stop in the middle of the roadway --
15    A    It's a closed intersection. What I need
16 to do is what I need to do.
17    Q    And what is it that you needed to do?
18    A    I think we established that already.
19    Q    You said you need to do what you need to
20 do. What is it?
21    A    Stop the vehicle.
22    Q    I am going to start the tape again.
23         (Video started; video interrupted.)
24 BY MR. MAURER:
25    Q    What we just saw shows Mr. Carpenter

MARY Q. IRELAN, CCR

---

CHARD - BY MR. MAURER          95

1 pulling his truck off to the side as you commanded
2 him to do; correct?
3     A    After he refused.
4     Q    Your perception of what preceded it is
5 your perception, Officer --
6     A    It --
7     Q    -- but you would agree with --
8     A    It's clearly shown he refused.
9     Q    You would agree with me that what we just
10 saw --
11    A    After he refused and realized there was a
12 problem he pulled over.
13    Q    In response to your command; correct?
14    A    I don't know why he pulled over.
15    Q    Well, there wasn't any other officer at
16 the scene; was there? Just you.
17    A    Just me.
18         (Video started --
19    THE WITNESS:  I don't know what his
20 intentions are pulling over --
21         -- video interrupted.)
22    THE WITNESS:  -- there's -- people have
23 other intentions so I don't know if his
24 intention was to pull over because I told him
25 to or to pull over to pull out a gun and kill

MARY Q. IRELAN, CCR

---

CHARD - BY MR. MAURER          96

1 me.
2 BY MR. MAURER:
3     Q    Officer, are you telling us that you were
4 in fear of your life after you gave a command to
5 David Carpenter to pull over?
6     A    I'm telling you anything can happen on a
7 traffic stop. Anything can happen throughout the
8 course of the day as a police officer.
9     Q    Well, Officer, you'd agree that, while
10 anything can happen, certain things are more likely
11 than others to an experienced officer; correct?
12    A    What are your certain things that are more
13 likely? It's already an irregular traffic stop.
14    Q    Officer, as you yourself indicated, you
15 had no issues with any vehicles going through this
16 intersection; correct? The controlled intersection
17 controlled by you.
18    A    Everyone stopped when I asked them to.
19 Everyone spoke to me when I asked them to. Everyone
20 understood what I had to say to them. Everyone else
21 that was holding a cell phone did not -- did not
22 tell me that I don't have the authority or they
23 don't have to put it down like Mr. Carpenter did.
24    Q    I just want to take that part of your
25 testimony, Patrolman. You're telling us that on the

MARY Q. IRELAN, CCR

1 incident date, while this intersection is under your
2 control, sole control, that other motorists had cell
3 phones out as well?
4    A    Correct.
5    Q    And you didn't issue citations for any of
6 those people; did you?
7    A    I don't have to.
8    Q    I understand that you don't have to --
9    A    Most people didn't give me a problem.
10 They were very respectful, courteous, did what I
11 asked them to do, and moved on.  The #1 purpose of
12 having a police controlled intersection with a high
13 traffic area, which the high traffic isn't shown in
14 this area right now, is to keep people moving out of
15 the area.
16    Q    Exactly.
17    A    If there's a problem then we have to deal
18 with it.
19    Q    And to keep the traffic moving you don't
20 want --
21    A    So --
22    Q    -- Mr. Carpenter to come to a sudden stop
23 in the middle of the roadway.
24    A    There was no one behind him, no one else
25 coming through the intersection, so, that being

MARY Q. IRELAN, CCR

1 said, yes, I want him to stop where I tell him to
2 stop.
3         MR. REYNOLDS:  Note my objection to
4    sudden.  He hasn't used that phrase.  You have
5    -- or that term.
6         MR. MAURER:  And I can do that.
7         MR. REYNOLDS:  Well --
8 BY MR. MAURER:
9    Q    Patrolman, we're going to go back to the
10 video.  We have stopped at the point where I believe
11 we agreed that Mr. Carpenter is pulling over, and I
12 am just going to play it again.
13         (Video started; video interrupted.)
14 BY MR. MAURER:
15    Q    That's yourself; correct --
16    A    No, keep going.
17    Q    Well --
18    A    Rewind it and keep going.
19    Q    Patrolman, I will do that, but -- I know
20 you want to take control of this deposition just as
21 you did at that intersection, but the rules of
22 evidence don't allow it, sir.
23         I stopped it simply to establish that
24 that's you in the view --
25    A    Obviously --

MARY Q. IRELAN, CCR

CHARD - BY MR. MAURER                               99

1    Q    -- correct, and at that point the window
2 of Mr. Carpenter's truck is down; correct?
3    A    The driver's side window is down at that
4 point.
5    Q    Right.  Just as it's supposed to be.
6    A    Okay.
7    Q    He didn't hole himself up in his vehicle
8 with the windows closed; correct?
9    A    I asked him to put the window down before
10 and he didn't, and I was at the passenger side of
11 the vehicle, so...
12    Q    And --
13    A    That would have been the reasonable thing
14 to do.  Stop when asked to and speak when asked to.
15    Q    Do you know how old this pick-up truck
16 was?
17    A    Not offhand, no.
18    Q    Did you know if it had power windows or
19 not?
20    A    Nope.
21    Q    You'd agree if it didn't that it takes
22 longer to winch a window down with a manual control?
23    A    That's also why I asked if the door was
24 unlocked.
25    Q    So the window is down and this verbal

MARY Q. IRELAN, CCR

CHARD - BY MR. MAURER                               100

1 discussion, and I --
2    A    Because I can easily speak through an open
3 door as well as an open window.
4    Q    And just, since you want to go back to
5 that, Patrolman, attempting to open the door of a
6 moving vehicle to speak with the operator, is that
7 something that you were taught in police academy?
8    A    Not in the police academy.
9    Q    Were you taught it --
10    A    I was --
11    Q    -- anywhere else?
12    A    I was expecting him to stop when ordered
13 to; okay?
14    Q    Officer, my question --
15    A    That's the bottom line.
16    Q    My question is pretty basic.  Opening the
17 door of a moving vehicle --
18    A    No --
19    Q    -- to speak to the operator you were not
20 taught that at academy?
21    A    No.
22    Q    And you're not aware of any printed
23 material that indicates that's an acceptable police
24 procedure; correct?
25    A    Not that I recall.

MARY Q. IRELAN, CCR

101

1    Q    Let's watch the rest of the vehicle.
2         (Video started; video interrupted.)
3    BY MR. MAURER:
4    Q    I want to play it one more time from the
5    beginning as it sounded like you wanted to do,
6    Patrolman.
7         (Video started --
8    BY MR. MAURER:
9    Q    -- and I just started it from the
10   beginning --
11        -- video interrupted.)
12   BY MR. MAURER:
13   Q    According to the counter, what we just
14   watched was 50 seconds long. I can show you the
15   counter. Can you see it?
16   A    Okay.
17   Q    All right. Patrolman, you claimed after
18   that happened that you were dragged across the
19   intersection; correct?
20   A    Yes.
21   Q    Where in the video that we just saw does
22   it show you being dragged across the intersection?
23   A    The part where I had a hold of the door
24   handle.
25   Q    The part where you had a hold of the door

MARY Q. IRELAN, CCR

---

102

1    handle --
2    A    What do you want? The exact second in the
3    video?
4    Q    Well, we can do that.
5    A    Is that what you want?
6    Q    Sure. We can do that.
7    A    Please.
8    Q    I'm sorry. What did you say? Jesus?
9    A    Let's go. Get on with it.
10   Q    Okay.
11        (Video started --
12        MR. REYNOLDS:  I thought he said please,
13   but --
14        -- video interrupted.)
15   BY MR. MAURER:
16   Q    I just stopped it at the point where we
17   heard the sound --
18   A    Okay --
19   Q    -- corresponding to you trying to open the
20   door; correct? Accurate?
21   A    Should be.
22   Q    Were you being dragged at that point?
23   A    Not at that point.
24   Q    I am going to start that again --
25   A    You can keep --

MARY Q. IRELAN, CCR

---

103

CHARD - BY MR. MAURER

1    Q    -- can you tell me when you started to be
2    dragged, and we're now --
3    A    Well, it should start at exactly this
4    point, actually.
5    Q    Okay. We're at 28 seconds --
6    A    -- I mean.
7         (Video started --
8         THE WITNESS:   And it should have --
9         -- video interrupted.)
10   BY MR. MAURER:
11   Q    Were you being dragged then?
12   A    Yes.
13   Q    Now we're at second 30.
14   A    Okay.
15        (Video started --
16        THE WITNESS:   There it just ended --
17        -- video interrupted.)
18   BY MR. MAURER:
19   Q    Well, Patrolman, this is sec -- this is
20   second 31.
21   A    Okay.
22   Q    You indicated the dragging would have
23   started at 28. What we see in 31 is you're on your
24   feet; correct?
25   A    Yes.

MARY Q. IRELAN, CCR

---

104

CHARD - BY MR. MAURER

1    Q    You're not on your side. You're not on
2    your back. You're standing up.
3    A    Okay.
4    Q    And you were standing during this entire
5    encounter with Carpenter's truck; correct?
6    A    Okay.
7    Q    Correct?
8    A    Yes.
9    Q    But you told the grand jury you had been
10   dragged --
11   A    Yes --
12   Q    -- right? And you indicated in the police
13   reports that you had been dragged?
14   A    Yes.
15   Q    So, according to you, the dragging
16   happened while you were still on your feet?
17   A    Lucky for me I stayed on my feet.
18   Q    While you were being dragged?
19   A    Yes.
20   Q    So your feet are sliding over the road
21   surface?
22   A    The vehicle was dragging me along and I'm
23   keeping up with it with what appears to be -- what
24   -- three or four seconds.
25   Q    Well, we started at 28 and now we're at 31

MARY Q. IRELAN, CCR

1    --
2        A    That would be three seconds.
3        Q    That would be three seconds.
4        MR. REYNOLDS:  Or four.
5        MR. MAURER:  Counsel, I will send you Hall
6    versus Clifton Precision.
7        MR. REYNOLDS:  I've read it.
8    BY MR. MAURER:
9        Q    Three, four seconds, and you're claiming
10   you were dragged while you were still on your feet
11   walking alongside of the vehicle, and that's what
12   drag means to you?
13       A    What else does it mean?
14       Q    As a result of what you say is being
15   dragged did you sustain any injuries?
16       A    Yes.
17       Q    To what parts of your body?
18       A    Shoulder, arm.
19       Q    Shoulder, arm.  Hand?
20       A    Hand, yeah.
21       Q    All in that three or four seconds?
22       A    Yes.
23       Q    And you would agree with me that none of
24   those injuries would have happened if you hadn't
25   grabbed on to the door handle; correct?

                MARY Q. IRELAN, CCR

1        A    Also, none of those injuries would have
2    happened if your client would have stopped when
3    ordered to, and did what he was told, and wasn't
4    using a handheld electronic device like he wasn't
5    supposed to be.
6        Q    So I appreciate your offering the
7    additional information but, I'm allowed to take this
8    in pieces, and if you hadn't reached out and opened
9    that door handle, none of these injuries that you
10   have claimed would have occurred; correct?
11       A    You don't know that.
12       Q    You don't know that.  Why don't you know
13   that, sir?
14       A    I could have been injured in another way
15   too.
16       Q    You could have been injured in another
17   way.  But were you?
18       A    No.  I was injured then.
19       Q    Injured then.
20       A    Uh huh.
21       Q    Officer, is there anything you can't do
22   today that you could do before the incident date?
23       A    Excuse me?
24       Q    Is there anything you can't do today that
25   you could do before the incident date?

                MARY Q. IRELAN, CCR

                CHARD - BY MR. MAURER                107
1        A    Not to my knowledge.
2        Q    I want to take one more look at this
3    video, and unless your Counsel wants to look at it
4    again, this is probably my last time.
5        Officer, are you familiar with how to
6    operate -- like to operate a laptop like this one --
7        A    Yes --
8        Q    -- and if you want to stop it you just
9    press here in the lower left hand corner?  What I
10   would like you to do, if you don't mind, is stop the
11   video at the point where you believe you told David
12   Carpenter to stop his vehicle.  Would you do that or
13   you can tell me to do it and I'll do it.
14       A    Well, if I could see it.
15       Q    Okay.  Better?
16       A    Go ahead.
17       Q    How about you tell me to stop and I'll
18   stop it at the point where you say you told
19   Carpenter to stop his vehicle.
20           (Video started --
21           THE WITNESS:  It looks like right there.
22           -- video interrupted.)
23   BY MR. MAURER:
24       Q    Right there?  This is second marked 22.
25   Can you tell me what you're doing in that image that

                MARY Q. IRELAN, CCR

                CHARD - BY MR. MAURER                108
1    is conveying a stop command?  When you start it you
2    can just click on --
3        A    I know how to work it.
4        Q    Okay.  Thank you.
5        MR. MAURER:  So, just for the record, we
6    have turned over the controls to Patrolman
7    Chard.
8           (Video started; video interrupted.)
9           THE WITNESS:  Well, he's, obviously,
10   refusing to listen and --
11          MR. REYNOLDS:  Speak up.
12   BY MR. MAURER:
13       Q    Patrolman, just so --
14          (Video started --
15          THE WITNESS:  He's, obviously, refusing to
16   listen and obey my commands --
17          -- video interrupted.)
18   BY MR. MAURER:
19       Q    So, Officer, my question to you was that
20   at what point, and I asked you to stop the video at
21   the point where you told David Carpenter to stop his
22   vehicle.
23          (Video started --
24          THE WITNESS:  Well, for some reason, it's
25   not captured.  I remember telling him verbally

                MARY Q. IRELAN, CCR

1 and I remember him telling me he can't hear me.
2 BY MR. MAURER:
3     Q   Well --
4         -- video interrupted.)
5     THE WITNESS:  So I don't know where that
6 is on this video.
7 BY MR. MAURER:
8     Q   Patrolman, if you -- you can keep running
9 it we can stop and I can ask you more questions.
10 It's up to you.
11     Officer, would you agree with me that a
12 video that was filmed on the date and at the time is
13 a more reliable indicator of what actually happened
14 than somebody's memory?
15     A   May or may not be.
16     MR. REYNOLDS:  Objection.
17 BY MR. MAURER:
18     Q   You don't have any facts in your knowledge
19 that indicate this video was altered in any way; do
20 you?
21     A   Is that what you're suggesting?
22     Q   No, not at all. To my knowledge, it's not
23 altered one bit. I am asking if you think it was.
24     A   To my knowledge, some of it is missing
25 where it didn't get captured, me telling him to stop

MARY Q. IRELAN, CCR

---

1 and him saying I can't hear you, and me saying roll
2 your window down and him refusing, and me asking if
3 the door is unlocked.
4     Q   So your testimony is all of that --
5     A   It happened in a very, very, very quick
6 amount of time.
7     Q   And your belief is that it's somehow
8 missing from this video I just played for you?
9     A   Appears to be.
10     Q   Now, aside from the verbal, did you see in
11 the video we just looked at any signal, any, say,
12 command with your hands or arms that he stop the
13 vehicle?
14     A   I don't see it. Well, actually, it looks
15 like right there.
16     Q   For the record, you're backing up the
17 video and you backed it up -- I'm sorry -- I have to
18 do this. You backed it up to count 16, and you're
19 welcome to go from there, Officer.
20     A   How about we turn up the brightness?
21     Q   I turned it up as high as it would go, I
22 thought.
23     A   That's it.
24     Q   There you go.
25     MR. REYNOLDS:  For the record, he turned

MARY Q. IRELAN, CCR

---

CHARD - BY MR. MAURER    111

1 up the brightness.
2     (Video started --
3     MR. MAURER:  And, for the record, I
4 appreciate him doing that. You learn something
5 every day --
6     THE COURT REPORTER:  I'm sorry, sir. I
7 didn't hear that --
8     THE WITNESS:  -- right there. Right
9 there.
10     -- video interrupted.)
11 BY MR. MAURER:
12     Q   Let's back up to where you think --
13     MR. COANT:  Mary didn't hear the answer.
14     THE COURT REPORTER:  I didn't hear that
15 answer; the very first part prior to right
16 there, right there.
17     THE WITNESS:  I will repeat it again,
18 ma'am.
19     (Video started --
20     MR. MAURER:  For the record, the witness
21 is going back and forth in the video --
22     THE WITNESS:  It appears at the 18th
23 second of this video I'm motioning for
24 Carpenter to turn left.
25 BY MR. MAURER:

MARY Q. IRELAN, CCR

---

CHARD - BY MR. MAURER    112

1     Q   Okay. And now we're at section 20 --
2     A   Section 20 --
3     Q   I'm sorry -- second 20 --
4     A   -- holding both hands, which appears to be
5 a motion to stop and, obviously, I'm approaching his
6 vehicle with more hand signals to put his phone
7 down, which he refuses twice. You can hear him say,
8 no, I don't have to, so, apparently --
9     -- video interrupted.)
10 BY MR. MAURER:
11     Q   So, Officer, with that as background, I
12 just want to back up to the segment of the video
13 that you indicated was you holding both hands up. I
14 just want to do this very slowly here because maybe
15 I'm not seeing what you're seeing, and I appreciate
16 your turning the brightness all the way up.
17 Officer, we are now at 19.
18     A   It looks like 20 to me.
19     Q   20. Thank you. And are you saying you
20 have both hands up in this image?
21     (Video started --
22     THE WITNESS:  That's where I motioned for
23 him to stop.
24 BY MR. MAURER:
25     Q   Officer, the video --

MARY Q. IRELAN, CCR

1    A   Yeah, there's -- there's a section
2  missing.
3          -- video interrupted.)
4  BY MR. MAURER:
5    Q   Officer, you'd agree after having had the
6  opportunity to review this video several times, with
7  the lighting turned all the way up, that it doesn't
8  show you holding both hands up in the air; does it?
9  What you saw may have been a reflection from a sign
10  or something, but it's not --
11    A   Excuse me --
12    Q   -- not both hands up.
13    A   A reflection from a sign?
14    Q   Yes. I'll ask it again. This --
15    A   No --
16    Q   -- video doesn't show you holding --
17    A   It looks like I'm motioning telling him to
18  stop.
19          (Video started --
20        THE WITNESS:  I'm motioning to turn left.
21  I just did that. I just held up both hands.
22  BY MR. MAURER:
23    Q   Show us where --
24    A   That's what it looks like to me.
25    Q   Sir, we have to take turns here.

MARY Q. IRELAN, CCR

---

1    A   Whoops.
2    Q   Stop it where you think it shows you
3  holding up both hands.
4        (Video started; video interrupted.)
5        THE WITNESS:  Right there. I can't really
6  get it.
7        (Video started; video interrupted.)
8  BY MR. MAURER:
9    Q   So around --
10    A   Right there.
11    Q   19 --
12    A   I mean --
13    Q   -- or 20 --
14    A   I mean -- listen. You can, obviously, see
15  the intersection's closed, police officer in the
16  middle. Who are you going to be looking at?
17    Q   Officer, let me just -- I just need to
18  finish up on the issues.
19    A   Please do --
20    Q   -- that we have raised looking at --
21    A   Please do.
22    Q   You indicated that at second 19 or 20 you
23  lifted both arms up into the air.
24    A   That's what it looks like by your video.
25    Q   You didn't hold them above your head;

MARY Q. IRELAN, CCR

---

CHARD - BY MR. MAURER      115

1  correct?
2    A   No.
3    Q   You held both arms up to like waist
4  height.
5    A   It looks like I did this. That's what it
6  looks like on the video.
7    Q   You think you put both hands out facing
8  the vehicle?
9    A   That's what the video portrays.
10    Q   That's your interpretation of it.
11    A   Why else would I do that?
12    Q   We will just have to get this enlarged
13  then and put into still images. I suppose that's
14  the only way to really answer this conclusively.
15  Officer, I'd like to take a short break
16  because I think we've been going for almost two
17  hours and then we will resume.
18        (Short recess taken.)
19  BY MR. MAURER:
20    Q   We are back on the record of your
21  deposition, Patrolman Chard, and we're going to
22  shift gears briefly as far as lawyers. My
23  colleague, Charles Coant, is going to conduct the
24  next portion of your examination because the machine
25  that he's going to be using to show you a video he's

MARY Q. IRELAN, CCR

---

CHARD - BY MR. MAURER      116

1  more familiar with it than I am, so I will just turn
2  this over to Mr. Coant.
3  BY MR. COANT:
4    Q   Okay. This is, Officer, the Rite-Aid
5  video. Have you seen this video, by the way?
6    A   Yes.
7    Q   Okay.
8        MR. COANT:  Let's take a little recess
9  here.
10        MR. MAURER:  All right.
11        (Short recess taken.)
12  BY MR. MAURER:
13    Q   So, Patrolman Chard, what we are going to
14  do -- this is the Rite-Aid surveillance video that
15  you indicated you had seen previously; correct?
16    A   Okay.
17    Q   And, just as background, did you review
18  this video in the process of determining what
19  charges to file?
20    A   No.
21    Q   No? You reviewed this video later on?
22    A   Yes.
23    Q   As of result of this lawsuit being filed
24  that we are here for today?
25    A   Yes.

MARY Q. IRELAN, CCR

117

1  Q   So since you have seen it, bear with us.
2  Mr. Coant is going to start it up and, first of all
3  --
4       MR. COANT:   This is Mr. Carpenter's
5  pick-up truck right here; all right?
6       THE WITNESS:   Okay.
7  BY MR. MAURER:
8  Q   And the count is 15:15.05 at the top.
9  We're going to roll this for awhile.
10      (Video started; video interrupted.)
11      MR. MAURER:   Stop it here.
12 BY MR. MAURER:
13 Q   Officer, if we look to like the top middle
14 and a little bit to the right of the middle, would
15 you agree that that shows Mr. Carpenter's pick-up
16 turning left onto Foundry?
17 A   Yes.
18 Q   And that the figure we see in the Hi-Vis
19 safety vest is you?
20 A   Yes.
21 Q   The view that we are looking at
22 15:15.16, does that show you being dragged through
23 the intersection?
24 A   Well, currently the video is stopped --
25 Q   Okay --

MARY Q. IRELAN, CCR

118

1  A   -- so I don't know what it's exactly
2  showing.
3  Q   All right.
4       MR. COANT:   Are you ready?
5  BY MR. MAURER:
6  Q   We'll play it some more then.
7       (Video started; video interrupted.)
8       MR. MAURER:   Stop it here.
9  BY MR. MAURER:
10 Q   Now, Officer, I know the video --
11 A   It shows the event.
12 Q   I'm sorry?
13 A   I said, yes, it showed the event.
14 Q   It showed the event, and the last few
15 moments we saw before stopping the camera showed you
16 positioned at some distance away from Carpenter's
17 truck; correct?
18 A   After he pulled away.
19 Q   And what we just looked at did that show
20 you getting dragged through the intersection?
21 A   Yes.
22 Q   But you would agree with me that in this
23 view as in the one we looked at previously there's
24 no indication that you fell off your feet; correct?
25 A   Correct.

MARY Q. IRELAN, CCR

CHARD - BY MR. MAURER                    119

1       MR. MAURER:   Why don't we back this up one
2  more time?
3  BY MR. MAURER:
4  Q   I am going to ask you to take one more
5  look at this.
6       (Video started; video interrupted.)
7  BY MR. MAURER:
8  Q   Now, we're looking at a still image of
9  15:15.12. Do you see yourself? I realize it's not
10 the best image up there on top.
11 A   I have to position this so my attorney can
12 see as well.
13 Q   Very good.
14      MR. COANT:   Yes.
15 BY MR. MAURER:
16 Q   Do you see yourself in the Hi-Vis vest off
17 to the side of Carpenter's truck?
18 A   Yes.
19 Q   And, to your recollection, does that show
20 you before the claim that you were dragged or after?
21 A   It looks like before.
22 Q   Before. Okay.
23      MR. MAURER:   Why don't we play it from
24 here?
25      (Video started; video interrupted.)

MARY Q. IRELAN, CCR

CHARD - BY MR. MAURER                    120

1       MR. MAURER:   And stop it.
2  BY MR. REYNOLDS:
3  Q   We are now at 15:15.21. Tell us what you
4  saw in that sequence; just the few seconds we just
5  looked at.
6  A   I saw the described event take place.
7  Q   And what we just looked at in your version
8  of -- well, I'm sorry. According to you, what we
9  just saw shows you being dragged?
10 A   Yes. It showed the event take place.
11 Q   And at this point, 15:15.21, the incident
12 of you being dragged is over and done with; correct?
13 A   Correct.
14 Q   You didn't have any cuts or scrapes as a
15 result of this; correct?
16 A   Correct.
17 Q   You didn't get any medical attention on
18 scene from a brother officer?
19 A   Correct.
20 Q   All right. And, aside from this -- I'll
21 call it the Rite-Aid video -- have you taken a look
22 at any other videos related to this incident?
23 A   Yes.
24 Q   And what video was that?
25 A   From the adjacent store.

MARY Q. IRELAN, CCR

121

1     Q    From the 7/11?

2     A    7/11.

3     Q    We may or may not get to that, but I think

4 we're done for this video for now.

5     MR. MAURER:  We are up to Chard-5?

6     THE COURT REPORTER:  We are.

7     (Qual-Lynx Discovery Documentation Packet

8 marked as Exhibit Chard-5 for identification.)

9 BY MR. MAURER:

10     Q    Officer, we are back on the record, and we

11 have handed you a packet of documents that we have

12 labeled Chard-5. We got these in discovery from a

13 provider called Qual-Lynx, Q-U-A-L dash L-Y-N-X. I

14 just want to ask you about a few of these pages.

15 We're not going to talk about the entire packet, and

16 I want to start by focusing on the first two pages,

17 and I wrote page numbers in for reference. You will

18 see them at the bottom of the second page.

19     This first page is on the letterhead of

20 Premier Orthopaedic Associates; correct --

21     A    Yes --

22     Q    -- at the top of the page --

23     A    -- that's what it says, yes.

24     Q    All right. And you recognize that name as

25 a medical provider for you?

MARY Q. IRELAN, CCR

122

1     A    Yes.

2     Q    And your name is on the upper right hand

3 side of the page?

4     A    Yes.

5     Q    And under your data it says, PROGRESS

6 NOTE: Fred McAlpin, DO, and some other letters. Do

7 you recall seeing a Doctor McAlpin?

8     A    Where does it say that? Oh, I see it.

9     Q    To the right of PROGRESS NOTES.

10     A    Yes. It's hardly legible, but I see it.

11     Q    I can't control the quality of the

12 documents.

13     A    All right.

14     Q    Do you recall --

15     A    Yes. I saw Doctor McAlpin for my

16 shoulder.

17     Q    And are you still under his care?

18     A    No.

19     Q    The date of this document off to the left

20 is February 2nd of '18. Do you see that?

21     A    Uh huh. Yes, I see it.

22     Q    A year and a month ago, give or take.

23     A    Okay.

24     Q    And working down the document, the reason

25 for the appointment is right shoulder pain. Do you

MARY Q. IRELAN, CCR

CHARD - BY MR. MAURER     123

1 see that?

2     A    Yes.

3     Q    And under his History of Present Illness

4 -- I'll read this into the record. Albert presents

5 today for a follow up evaluation of his right

6 shoulder. He states the shoulder is feeling a

7 little sore. He is working full duty.

8     Accurate that you were working full duty

9 as of February 2nd of '18?

10     A    Yes.

11     Q    And that would have been 11 days after

12 this incident?

13     A    Correct.

14     Q    Did you ever not work full duty after the

15 incident occurred?

16     A    No, not to my knowledge.

17     Q    You stayed on full duty?

18     A    Correct. After being cleared, of course.

19     Q    After being cleared.

20     A    Uh huh.

21     Q    And you were cleared to remain on full

22 duty the date of the incident; correct?

23     MR. REYNOLDS:  Say that again, please.

24 BY MR. MAURER:

25     Q    You were cleared to remain on full duty on

MARY Q. IRELAN, CCR

CHARD - BY MR. MAURER     124

1 the day of the incident?

2     MR. REYNOLDS:  By whom?

3     MR. MAURER:  He said he was cleared and I

4 will ask for clarification.

5 BY MR. MAURER:

6     Q    Who cleared you, Patrolman Chard?

7     A    Premier Orthopaedic Associates. Doctor

8 McAlpin.

9     Q    The same provider that we see here?

10     A    Apparently, according to the paperwork.

11     Q    We may have a little confusion here,

12 Patrolman. It could be the questions that I am

13 asking you.

14     A    Okay.

15     Q    The incident we know is January 22nd of

16 '18; correct?

17     A    Correct.

18     Q    And you say you were dragged across the

19 intersection. We've talked about that.

20     A    Yep. We have talked about it.

21     Q    After that incident was your duty status

22 changed?

23     A    Well, technically, I was removed from

24 duty, but I was cleared the next day. I showed up

25 for work as normal with shoulder pain.

MARY Q. IRELAN, CCR

125

1 Q   All right.
2 A   As I have previously described, somewhere
3 in the records.
4 Q   Okay.
5 A   I couldn't tell you where it is.
6 Q   Briefly, Patrolman, your recollection is
7 that you were removed from duty after the incident
8 on the 22nd; is that accurate?
9 A   Correct. Yes.
10 Q   And what was the reason for your removal
11 from duty?
12 A   You have to be cleared by occupational
13 health before you can be returned to full duty and
14 be put on the road again.
15 Q   And your recollection is you were cleared
16 the following day.
17 A   The following day.
18 Q   January 23rd?
19 A   Yeah. Yes. It would have been the 23rd.
20 That's after the 22nd.
21 Q   And then the document we're looking at
22 here, Chard-5, is the record of a follow-up visit
23 with Doctor McAlpin?
24 A   It appears to be.
25 Q   All right.

MARY Q. IRELAN, CCR

126

1 A   It's dated several days later.
2 Q   And let's just turn to page 2. There's a
3 section that says Treatment, and I just want to read
4 the note into the record. He demonstrates trace
5 residual symptoms. The he is yourself; correct?
6 A   Well, should be.
7 Q   And the trace residual symptoms; do you
8 have any understanding of what Doctor McAlpin meant
9 by that phrase?
10 A   You would have to ask him.
11 Q   Very well.
12     MR. REYNOLDS:   And it does say I will
13 clear him for regular work duties on the
14 sentence after you read --
15     MR. MAURER:   I'm happy to ask that as well
16 --
17     MR. REYNOLDS:   Okay --
18     MR. MAURER:   -- since the witness directed
19 me towards Doctor McAlpin. I can do that.
20 BY MR. MAURER:
21 Q   The next sentence, I will clear him for
22 regular work duties. If I understand your
23 testimony, Patrolman, you were already cleared for
24 regular work duties before this February 2nd of '18
25 date?

MARY Q. IRELAN, CCR

127

CHARD - BY MR. MAURER

1 A   Well, if this is a follow-up, then that
2 would be after the initial visit; wouldn't it?
3 Q   And you agreed with me that this is a
4 follow-up visit; correct?
5 A   According to the date, yes.
6 Q   All right. Now, the next sentence. He
7 will be seen on an as needed basis only if the pain
8 persists beyond March.
9     Did you see Doctor McAlpin again, to your
10 knowledge, after this February 2nd visit?
11 A   Not that I remember.
12 Q   The last sentence. He'll be placed at
13 maximal medical improvement.
14     Do you have any understanding of what that
15 phrase means?
16 A   Well, without knowing what Doctor McAlpin
17 means by it, my interpretation would be I wouldn't
18 improve anymore. I have improved the most that I
19 can be improved.
20 Q   And just so I am certain, you are not
21 under the care of any orthopedic doctor for a right
22 shoulder injury as of today; correct?
23 A   Correct.
24 Q   Are you right handed or left handed?
25 A   Right handed.

MARY Q. IRELAN, CCR

128

CHARD - BY MR. MAURER

1 Q   We're done with that exhibit for now, and
2 I just want to move on to a few other questions so,
3 if you'd like, we can put that aside.
4 A   Go ahead.
5 Q   If you want to keep reading the document
6 while I ask you questions that's fine with me as
7 well.
8     Officer, is there any part of your duties
9 as a patrolman that you can't do today that you
10 could do before the incident date?
11 A   Not to my knowledge.
12 Q   Do you have any plans to change your
13 employment or your residence at any point later this
14 year in 2019?
15 A   Not that I know of.
16 Q   Your plan is to stick around and continue
17 to be a Millville police officer?
18 A   Yes. Is that okay with you?
19 Q   Absolutely. I'm just asking, and the
20 reason I'm asking, Officer, is that this case is on
21 the track to go to trial, and I'm just trying to
22 make sure that you are going to be around when that
23 happens.
24 A   Okay.
25 Q   Officer, you would agree with me that as a

MARY Q. IRELAN, CCR

1   result of this incident, Mr. Carpenter was charged
2   with aggravated assault of a police officer?
3       A   Yes.
4       Q   And he was indicted for that offense?
5       A   Yes.
6       Q   And on April 2nd of 2018 that indictment
7   was dismissed; correct?
8       A   I don't know the exact date, but it was
9   dismissed.
10      Q   And --
11      A   Unknown to my knowledge why.
12      Q   Well, you would agree that the Cumberland
13  County Prosecutor dismissed the indictment because
14  they found there was no factual support for the
15  charge of aggravated assault on a police officer.
16      A   I was not given an explanation.
17      Q   You don't have any understanding sitting
18  here today as to why that indictment was dismissed.
19  Is that what you're telling me?
20      A   I was never sent official notice why it
21  was dismissed.
22      Q   That being the case, Officer, we'll take a
23  look at another document.
24          MR. MAURER:   We're going to mark this as
25  Chard-6.

                 MARY Q. IRELAN, CCR

---

1           (4/2/18 Plea Hearing and Sentence
2   Transcript marked as Exhibit Chard-6 for
3   identification.)
4   BY MR. MAURER:
5       Q   And, Officer Chard, I apologize. I don't
6   have extra copies of this document. However, your
7   lawyer is welcome to look on with you --
8           MR. REYNOLDS:   I have it here.
9           MR. MAURER:   All right. Very good. And
10  my colleague should have one and, if not --
11          MR. COANT:   I have it --
12          MR. MAURER:   -- I'll show it to him later.
13          THE WITNESS:   What document?
14  BY MR. MAURER:
15      Q   The document that is in front of you.
16      A   This document here?
17      Q   Yes. We've marked it as Chard-6.
18      A   We were looking over other papers so I
19  didn't know if you meant this document or another
20  document.
21      Q   I did mean that document. As we can see
22  here, it's a transcript from Superior Court of New
23  Jersey, Cumberland County, proceedings on the
24  indictment that was filed against Mr. Chard;
25  correct?

                 MARY Q. IRELAN, CCR

---

                 CHARD - BY MR. MAURER                131

1       A   Can you repeat that?
2       Q   Sure. You're seeing on the very first
3   page, upper right hand corner, confirmation that
4   this is a transcript of proceedings in the State of
5   New Jersey versus David Carpenter; correct?
6       A   Okay. Yes.
7       Q   And we can further see, in the upper right
8   hand corner, this is relating to the indictment that
9   had been filed against Mr. Carpenter?
10      A   That's what it says. I don't know the
11  indictment number by heart.
12      Q   You're not aware of any indictment against
13  Mr. Carpenter other than the one that was filed
14  based on the incident; are you?
15      A   No.
16      Q   I want you to turn, if you would, to page
17  4 and 5 of this record, and I am showing you what it
18  looks like just for your reference. There's a 4 at
19  the top and there's a 5 halfway down, and I'd ask
20  you to just take a glance at that.
21          You've had a chance to look through that?
22      A   Are you aware that the original charges
23  were not indictable charges?
24      Q   I am, Officer, and --
25      A   Okay --

                 MARY Q. IRELAN, CCR

---

                 CHARD - BY MR. MAURER                132

1       Q   -- they became indicted charges; correct?
2       A   Correct.
3       Q   They became indicted charges after you
4   testified to the grand jury on February 7th --
5       A   They became indictable charges before I
6   testified because they were upgraded by the
7   prosecutor's office, as far as I know.
8       Q   And you testified in support of those
9   charges on February 7 of 2017; correct?
10      A   Correct.
11      Q   Now, we've fast forwarded to April 2nd,
12  and you've had a chance to review page 4? That's
13  the tabbed page.
14      A   Okay.
15      Q   And, Officer, I just want to read one part
16  of this into the record; a statement by Prosecutor
17  Hernon.
18          "I believe he was indicted for aggravated
19  assault on a law enforcement officer as one of the
20  offenses and, again, there was, in the State's view,
21  no factual for that."
22          Now, the sentence I just read to you, the
23  reference to law enforcement officer is a reference
24  to you; correct?
25      A   Yeah. Yes, I guess it would be. In the

                 MARY Q. IRELAN, CCR

133

1    State.

2    Q   And in the State's view means in the view

3   of the State of New Jersey; correct?

4    A   That's what it should mean.

5    MR. REYNOLDS:   Again, I am going to

6   object. You're reading a sentence out of

7   context with the entirety of the paragraph

8   where the prosecutor states there was a basis

9   to arrest --

10    MR. MAURER:   Counsel --

11    MR. REYNOLDS:   -- Mr. Carpenter.

12    MR. MAURER:   Counsel, the document speaks

13   for itself and you are engaging in a behavior

14   that Hall versus Clifton Precision says you're

15   not supposed to.

16    MR. REYNOLDS:   Well, I am trying to make

17   the record fair for the officer. You're

18   pulling out bits and pieces of documents that I

19   think are not --

20    MR. MAURER:   Counsel, that's why --

21    MR. REYNOLDS:   -- completely in context.

22    MR. MAURER:   That's why the entire

23   document is being made an exhibit. Nothing is

24   hidden. Nothing is kept under the carpet.

25   It's all in front of this witness.

MARY Q. IRELAN, CCR

---

134

1    MR. REYNOLDS:   Well, I'm referencing

2   questions; not the documents.

3    MR. MAURER:   Counsel, my questions don't

4   have to incorporate questions that you think

5   are appropriate. That's why you're here.

6   BY MR. MAURER:

7    Q   Officer, we can agree that in the State's

8   view there was no factual support for the charge of

9   aggravated assault on a law enforcement officer --

10    MR. REYNOLDS:   Objection --

11   BY MR. MAURER:

12    Q   -- correct --

13    MR. REYNOLDS:   -- calls for speculation.

14   He said he wasn't consulted. He doesn't know.

15    MR. MAURER:   Counsel, I'm going to move --

16   I may move to strike your objections and bring

17   this witness back because you're going beyond

18   the scope.

19    MR. REYNOLDS:   Well, I do believe this

20   last question was particularly objectionable

21   based on his prior answers.

22   BY MR. MAURER:

23    Q   Officer --

24    MR. REYNOLDS:   He -- go ahead --

25   BY MR. MAURER:

MARY Q. IRELAN, CCR

---

CHARD - BY MR. MAURER    135

1    Q   -- Dennis Hernon is the person who made

2   that statement that I just read into the record;

3   correct? And we can see his name on the very first

4   page of this exhibit --

5    A   I see a Dennis Hernon --

6    Q   -- identified as attorney on behalf of the

7   state --

8    A   Okay --

9    Q   -- of New Jersey; correct?

10    A   That's what it says.

11    Q   And you have no reason to believe that's

12   not true.

13    A   Not today.

14    Q   Officer, you didn't have any disagreement

15   with the decision to indict Mr. Carpenter; correct?

16    A   It wasn't my decision that was made.

17    Q   Whoever ultimately made that decision,

18   sir, you didn't --

19    A   I was just asked to come and I testified

20   according to the questions that were asked of me.

21    Q   And you had no objection to Mr. Carpenter

22   being indicted; correct?

23    MR. REYNOLDS:   Objection.

24   BY MR. MAURER:

25    Q   You can answer.

MARY Q. IRELAN, CCR

---

CHARD - BY MR. MAURER    136

1    MR. REYNOLDS:   He already has, but go

2   ahead.

3   BY MR. MAURER:

4    Q   You had no problem with that; did you?

5    A   No, I didn't.

6    Q   You thought he deserved it.

7    A   Well, this case went up to the

8   prosecutor's office and they made their decisions.

9    Q   Based, at least in part, on testimony that

10   you gave; correct?

11    A   They made the decision before my

12   testimony.

13    Q   Okay. So, Patrolman, your under --

14    A   Maybe --

15    Q   If I could just ask the question.

16    A   Go ahead.

17    Q   Your understanding is that the decision to

18   indict Mr. Carpenter had been made regardless of

19   your testimony?

20    A   The charges were upgraded without my

21   knowledge; okay? I was asked to come and testify.

22   I testified, answered the questions, which were

23   true.

24    Q   And I believe you just indicated you were

25   fine with him being indicted.

MARY Q. IRELAN, CCR

137

1　　　　MR. REYNOLDS:　Objection; irrelevant.　You
2　can answer.
3　　　　THE WITNESS:　I believe I already answered
4　you.
5　BY MR. MAURER:
6　　　Q　Officer, we'll look at one more exhibit.
7　Officer, we are moving on to a different exhibit --
8　　　　MR. MAURER:　-- and this one is going to
9　be marked as Chard-7.
10　　　(6/22/18 Civil Cover Sheet w/ Attached
11　　　Complaint and Jury Demand marked as Exhibit
12　　　Chard-7 for identification.)
13　BY MR. MAURER:
14　　　Q　Officer Chard, I am showing you what's
15　been marked as Chard-7, and I am showing you a page
16　from one of the exhibits to Chard-7, the complaint
17　in this action, and you will see it's page 31 of 35.
18　　　　I'm sorry, sir.　I know you're still
19　looking at the previous exhibit, but I would like to
20　move on to the next one.　Are you okay with that?
21　　　A　Well, seeing this is the first time I'm
22　seeing this exhibit I want to look at it.
23　　　　MR. REYNOLDS:　He's referring to the grand
24　jury transcript.
25　BY MR. MAURER:

MARY Q. IRELAN, CCR

138

1　　　Q　So sticking with that testimony,
2　Officer -- I'm sorry.　If you wouldn't -- given your
3　testimony, we can stick with Chard-6 for awhile.
4　Patrolman, I'd like you to put Chard-7 away and look
5　at Chard-6 --
6　　　A　Didn't you just tell me wanted me to look
7　at Chard-7?
8　　　Q　Right, but then your lawyer had something
9　to say and so did you, and I'd like to explore that.
10　　　A　Go ahead.
11　　　Q　Chard-6 is a transcript of grand jury
12　testimony; correct -- I'm sorry.　It's a transcript
13　--
14　　　A　Incorrect.
15　　　Q　As I was about to correct myself, it's a
16　transcript of proceedings in Superior Court before
17　Judge Silvanio on April 2nd of 2018, at which point,
18　the charge of aggravated assault of a police officer
19　was dismissed by the state, and you're saying you've
20　never seen this document before?
21　　　A　This document right here?
22　　　Q　The transcript, April 2nd of 2018 --
23　　　A　Correct.　I've never seen it.
24　　　Q　You never saw it before?
25　　　A　I've established that already.

MARY Q. IRELAN, CCR

CHARD - BY MR. MAURER　　　　139

1　　　　MR. REYNOLDS:　I'm sorry.　I misspoke when
2　I made a prior comment about what he was
3　reviewing.
4　BY MR. MAURER:
5　　　Q　That's not a document that you reviewed
6　after you were named a defendant in this action?
7　　　A　No.
8　　　Q　You never saw it before today?
9　　　A　Like I already said several times, I've
10　never seen this document before today and before you
11　handed it to me.　Actually, before she handed it to
12　me; okay?
13　　　Q　We can agree on its content, though?
14　　　A　According to what?
15　　　Q　According to what it says on the printed
16　page.
17　　　A　That's what it says.
18　　　Q　Thanks.　We can now move on to the next
19　exhibit.
20　　　A　Okay.
21　　　Q　Patrolman Chard, since you seem to have
22　some reluctance to move on to the next exhibit, I'll
23　pull the exhibit.　Let's not even worry about it.　I
24　will withdraw the exhibit.
25　　　A　Let's go.

MARY Q. IRELAN, CCR

CHARD - BY MR. MAURER　　　　140

1　　　Q　I withdraw the exhibit.
2　　　A　Let's go.
3　　　Q　Officer, I'm not going to ask you
4　questions --
5　　　A　Listen.　If you don't want to give me time
6　to review a document I've never seen before, that's
7　fine.　Let's move on.
8　　　Q　Are you saying you need more time to
9　review Chard-6?
10　　　A　No, I'm good.　Let's move on.
11　　　Q　All right.　And we will move on with
12　questions that actually don't depend on that
13　exhibit, which is why I'm withdrawing it.
14　　　　You testified in front of the grand jury;
15　correct?
16　　　A　That would be correct.
17　　　Q　And as we -- as you have agreed, the date
18　of your testimony was February 7th of 2018?
19　　　A　I don't know the date.
20　　　Q　Okay.　Since, apparently, we're sticking
21　with Chard-7, and I can do that too, Officer, let's
22　back up a few pages from what I tabbed.
23　　　A　I'm just reading what you wanted me to
24　read originally --
25　　　Q　Officer --

MARY Q. IRELAN, CCR

141

```
1    A    -- but now, apparently, you don't.
2    Q    Right, because in response to your
3  questions I'm trying to move this along.
4         Officer, I'm going to show you what I want
5  to ask you questions about, and I'll do it at a
6  distance so I don't bother you or your lawyer.
7         Officer, would you mind looking at what I
8  am showing you?  What I am showing you is a face
9  sheet of grand jury testimony.
10   A    Okay.
11   Q    It's a few pages back in the packet from
12 the page that I have tabbed.  Please turn to this
13 page.
14   A    In this packet?
15   Q    Correct.  Thank you.  The page we are
16 looking at here is dated February 7 of 2018;
17 correct, about 18 days after this happened?
18   A    Yes.  It says February 7th, 2018.
19   Q    And the testimony that is recorded in this
20 transcript is yours; correct?
21   A    That's what it says.
22   Q    And you've seen this document before
23 today.
24   A    No, I have not.
25   Q    Have you reviewed the complaint that was
```

MARY Q. IRELAN, CCR

142

```
1  filed against you in this action?
2    A    I believe I received it and I don't
3  remember if I went through it or not.
4    Q    You do remember being placed under oath
5  and testifying before the grand jury?
6    A    Yes, I do.
7    Q    And you would agree with me that what you
8  said is accurately recorded in the transcript that's
9  in front of you?
10   A    I haven't read through it so...
11   Q    Well, to move this along, Officer, if we
12 could simply go to the tabbed page, which is page 5,
13 I'm just going to read a few of these sentences into
14 the record.
15        The first one at the bottom half of page 5
16 is a question.  While you were holding the door
17 handle, did he drive which dragged you across the
18 street?
19        That's a question you were asked by the
20 prosecutor; correct?
21   A    Yes.
22   Q    And your answer was?
23   A    Yes.
24   Q    And you were then asked were you directing
25 him to stop?
```

MARY Q. IRELAN, CCR

CHARD - BY MR. REYNOLDS                                    143

```
1    A    Yes.
2    Q    That was your answer?
3    A    Yes.
4    Q    The next question.  Were you able to stay
5  on your feet and keep up with the car?  Your answer
6  was?  What was your answer?
7    A    It says here, yes, I was.
8    Q    All right.  So your testimony, Officer,
9  today and back on February 7 of last year, is that
10 even though you were on your feet and keeping up
11 with the truck, that you were still, in your words,
12 dragged?
13   A    Yes.
14        MR. MAURER:  I have no further questions.
15 Your lawyer may have.
16        MR. REYNOLDS:  I do have a few questions
17 to clarify.
18 BY MR. REYNOLDS:
19   Q    Officer Chard, you never stated to anyone
20 that as a result of this incident you left your feet
21 and, otherwise, fell down when the truck was moving;
22 is that correct?
23        MR. MAURER:  Objection --
24        THE WITNESS:  That's correct --
25        MR. MAURER:  -- leading.  You can't lead
```

MARY Q. IRELAN, CCR

CHARD - BY MR. REYNOLDS                                    144

```
1  your own witness even in a deposition.
2        MR. REYNOLDS:  Well, I am just clarifying
3  instances that you were asking about.  In
4  fact --
5        MR. MAURER:  You still can't lead your
6  witness in a deposition.
7  BY MR. REYNOLDS:
8    Q    I refer you to the exhibit, Chard-5, that
9  you were handed by plaintiff's counsel, the pack of
10 medical records.  If you refer to page 13 on the
11 bottom, please.  Do you see that document, Officer?
12   A    Page 13?
13   Q    Yes.
14   A    Yes, I have page 13.
15   Q    Is this a record of your emergency room
16 record that same day?
17        MR. MAURER:  Counsel, I'm going to
18 position myself so I can see the document
19 because I gave all my copies up during this --
20        THE WITNESS:  Well, you handed it to me.
21        MR. MAURER:  Exactly.  Now you have it; I
22 don't.
23        THE WITNESS:  Sir, what was your question
24 again?
25 BY MR. REYNOLDS:
```

MARY Q. IRELAN, CCR

145

```
1      Q     Okay.  Is this record, page 13, to your
2   knowledge, a record of your emergency room visit on
3   the date of the accident, January 22nd?
4      A     It appears to be.
5      Q     Now, looking at the full paragraph towards
6   the bottom of the page --
7      A     23:12 --
8      Q     -- can you read into the record the
9   sentence after HPI:, which I believe stands for his
10  history of present illness?  Read the next three
11  sentences, please.
12     A     HPI:  Patient is a 37 year old male who
13  presents to the ER status post right arm injury.  He
14  states that he grabbed onto a car door handle and
15  began moving -- and the car began moving.  Sorry.
16  He states the car pulled his arm.  However, he was
17  on his feet the whole time.  He did not hit his head
18  or lose consciousness.  He did not fall directly to
19  the ground.  He is complaining of right shoulder,
20  right elbow, right forearm and wrist pain.  He did
21  not take anything prior to arrival for pain.  He
22  denies, numbness, tingling -- tingling, cyanosis,
23  decreased range of motion, swelling, ecchymosis,
24  erythema, chest pain, shortness of breath, abdominal
25  pain, nausea, vomiting.  The patient has not
```

MARY Q. IRELAN, CCR

146

```
1   experienced similar symptoms in the past.  The
2   patient has not recently seen a physician.
3      Q     Thank you.  Is that description of how
4   this incident occurred accurate; that you grabbed
5   onto a car door while the car was moving or began to
6   move?
7      A     Yes.
8      Q     And that's how you injured your arm by the
9   fact that the car pulled your arm; correct?
10           MR. MAURER:  Objection; leading --
11           MR. REYNOLDS:  Well --
12           MR. MAURER:  -- you can't lead your own
13     witness.
14  BY MR. REYNOLDS:
15     Q     You did state that sentence in your
16  document to the doctor; correct?
17     A     I can read it right here too, which I've
18  already read aloud.
19           MR. MAURER:  Patrolman, you can do
20     whatever you want --
21           THE WITNESS:  I know --
22           MR. MAURER:  -- but I am instructing your
23     lawyer, as he knows, that he can't ask you
24     leading questions.
25           MR. REYNOLDS:  Okay.
```

MARY Q. IRELAN, CCR

CHARD - BY MR. REYNOLDS                           147

```
1   BY MR. REYNOLDS:
2      Q     Now, Officer, you were shown a
3   surveillance video of a store that showed the
4   incident; correct?
5      A     Correct.
6      Q     Have you also seen a second store
7   surveillance video that showed the incident?
8      A     Correct.
9      Q     Did the second video, to your
10  recollection, also show the incident with you
11  holding onto the -- grabbing onto the handle of the
12  door?
13     A     Yes.
14     Q     Officer, you filed your complaint in this
15  case that you read; correct?
16           MR. MAURER:  Objection; leading.  He
17     indicated he hadn't read it.
18  BY MR. MAURER:
19     Q     Did you prepare the complaint in this
20  matter or --
21     A     Yes --
22     Q     -- the charges against Mr. Carpenter?
23     A     Yes.
24     Q     Did you charge him with an indictable
25  offense?
```

MARY Q. IRELAN, CCR

CHARD - BY MR. REYNOLDS                           148

```
1      A     No.  They should have been all DP
2   offenses.
3      Q     Why do you say that?
4      A     Because that's how it -- he was charged as
5   the incident happened to the severity that it
6   happened.
7      Q     And that charge was assault by auto;
8   correct?
9      A     Correct.
10     Q     That is a disorderly person's offense;
11  correct?
12     A     Correct, to my knowledge.
13     Q     Were you notified by the prosecutor before
14  your grand jury testimony that they wanted -- strike
15  that.  Who elevated the charge to an indictable
16  offense?
17     A     To my knowledge, I don't know, other than
18  the AP in charge of the case.
19     Q     It wasn't your decision to make it an
20  indictable --
21     A     It was not --
22     Q     -- offense; correct?
23     A     Correct.  It was not my decision.
24     Q     Okay.  Based on your recollection of this
25  incident, did you have reasonable or probable cause
```

MARY Q. IRELAN, CCR

```
 1    to charge Mr. Carpenter with the offenses he was
 2    charged with that day?
 3          MR. MAURER:  Objection.  Probable cause is
 4    a legal conclusion.
 5    BY MR. REYNOLDS:
 6       Q   Did you have just cause?
 7       A   Yes.
 8          MR. MAURER:  That is too.  Same thing.
 9    BY MR. REYNOLDS:
10       Q   Well, from your perspective as a police
11    officer, did you have sufficient cause to charge Mr.
12    Carpenter for all of the charges that were filed
13    against him that day?
14       A   Yes --
15          MR. MAURER:  Objection.  That's another
16    take at probable cause, which is a legal
17    conclusion.
18    BY MR. REYNOLDS:
19       Q   As a police officer, do you have authority
20    to charge individuals who commit offenses in your
21    presence?
22       A   Yes.
23       Q   Did that occur in this case?
24       A   Yes.
25       Q   And do you stand by the three disorderly
```
```
                MARY Q. IRELAN, CCR
```

```
                                              150
 1    person's charges and the four traffic summonses that
 2    you issued to Mr. Carpenter as legitimate and
 3    appropriate charges based on your position and
 4    experience as a police officer?
 5       A   Yes --
 6          MR. MAURER:  Objection; leading.
 7          MR. REYNOLDS:  No further questions.
 8    BY MR. MAURER:
 9       Q   Patrolman Chard, you would agree with me
10    that all of the charges against David Carpenter were
11    withdrawn except the cell phone charge; correct?
12       A   That's what I was told.
13       Q   Officer, since your lawyer has mentioned
14    some other videos, in the interest of completeness,
15    I would like to take a look at some of those videos
16    now.
17          We are going to start with another video
18    that was provided in discovery.  We are going to use
19    my machine, as before the light is turned up, and I
20    am going to start it and on occasion I am going to
21    stop it and ask you questions.
22          The still image, and this is image
23    2196.MOV, begins with a still image.  We see Inspira
24    Medical Center in the back, the sign.
25       A   That's not what it says.
```
```
                MARY Q. IRELAN, CCR
```

```
                CHARD -  BY MR. MAURER
                                              151
 1       Q   There's a sign depicted in the back --
 2       A   It says Inspira Health Network Imaging
 3    Center; not Inspira Medical Center.
 4       Q   I appreciate the clarification.
 5          MR. REYNOLDS:  For the record, I did
 6    mention another video.  I didn't mention
 7    another --
 8          MR. MAURER:  Well, Counsel --
 9          MR. REYNOLDS:  -- video, plural, but I am
10    not objecting to you going through this --
11          MR. MAURER:  -- in the interest of
12    completeness, we will take a look at all the
13    videos.
14          MR. REYNOLDS:  That's fine.
15    BY MR. MAURER:
16       Q   And we see here a still image of Sergeant
17    Hoydis; correct?
18       A   Correct.
19       Q   And he was -- he had supervisory authority
20    over you on the incident day?
21       A   That's correct.
22       Q   And sergeant, as you indicated, is a
23    position that one can qualify for with a longer time
24    on the force?
25       A   Correct.
```
```
                MARY Q. IRELAN, CCR
```

```
                CHARD -  BY MR. MAURER
                                              152
 1       Q   And let's just watch a bit of Sergeant
 2    Hoydis's interactions with David Carpenter.
 3          (Video started; video interrupted.)
 4    BY MR. MAURER:
 5       Q   Now, based on what we've looked at so far,
 6    Patrolman, Sergeant Hoydis isn't yelling at David
 7    Carpenter; is he?
 8       A   No.
 9       Q   But that's the first thing you did when he
10    rolled his window down.  You yelled at him.
11       A   Okay.
12       Q   You would agree?
13       A   Yes.
14       Q   Patrolman, isn't a goal of any interaction
15    with, as you said, an uncooperative suspect -- isn't
16    a goal to de-escalate the situation?
17       A   It can be.
18       Q   Well, isn't that what the officer should
19    be trying to do?
20       A   Well, first you have to meet the situation
21    head-on.
22       Q   And you met the situation head-on by
23    yelling at Mr. Carpenter and asking if he wanted to
24    be arrested?
25          MR. REYNOLDS:  Objection --
```
```
                MARY Q. IRELAN, CCR
```

153

```
1        THE WITNESS:  Well --
2        MR. REYNOLDS:  -- it's not the foundation
3   or facts of this case.
4        MR. MAURER:  That's -- okay.  We've got
5   more standing, speaking objections.  That was
6   the witness's own testimony, meet the situation
7   head-on, so I asked him --
8   BY MR. MAURER:
9        Q   -- do you meet the situation head-on by
10  yelling at the suspect and asking if he wants to be
11  arrested?  That's how you met the situation head-on?
12       A   At this time I did.  He asked me if I
13  wanted a lawsuit so, apparently --
14           (Video started; video interrupted.)
15  BY MR. MAURER:
16       Q   I just stopped the video.
17       A   There you go.
18       Q   We watched a short portion --
19       A   It's pretty self-explanatory right there.
20       Q   Well, you would agree with me, Patrolman,
21  that at no point does Sergeant Hoydis raise his
22  voice to David Carpenter?
23       A   He doesn't have the first interaction with
24  him.
25       Q   But you would agree --
```

MARY Q. IRELAN, CCR

154

```
1        A   And he didn't feel threatened by him
2   because the vehicle was already stopped and he
3   wasn't being told no by him.
4        Q   Patrolman, you would agree --
5        A   So --
6        Q   -- you would agree with me that at no
7   point does Sergeant Hoydis raise his voice to David
8   Carpenter; correct?
9        A   That's correct.
10       Q   His responses to him were primarily the
11  word okay.  You heard that; right?
12       A   Yes.
13       Q   That's an experienced police officer we
14  just saw; correct?  Do you know how long Sergeant
15  Hoydis has been with the force?
16       A   Roughly I do.
17       Q   How long?
18       A   At least 15 years.
19       Q   You told us at the beginning of the
20  deposition that you began your training on March 4
21  of '16?
22       A   That's correct.
23       Q   Less than two years before this incident?
24       A   That would be correct.
25       Q   And, finally, Patrolman, why don't we move
```

MARY Q. IRELAN, CCR

155

```
           CHARD - BY MR. MAURER
1   on to the final video that your lawyer mentioned?
2           (Discussion off the record.)
3   BY MR. MAURER:
4        Q   Now, back on the record, as before --
5   Patrolman, this is a different machine.  We are
6   going to start with the still image of the video.
7        For the record, we are looking at a still
8   image of the video that on the left says 7/11,
9   1/22/18 --
10       A   It's turned to you and I can't see it.
11       Q   I am doing my best, Officer.
12       A   You always --
13       Q   Move it up then.
14       A   Okay.  Continue.
15       Q   Better?
16       A   Yes, I can see it now.
17       Q   And you have seen this video before?
18       A   Briefly.
19       Q   What do you mean by briefly?  More than
20  once?
21       A   I have seen it maybe twice.
22       Q   Okay.
23       A   I wasn't counting.  I mean...
24       Q   And at the bottom we see a date of 1/22/18
25  and a stopped time of 3:15.04; correct?
```

MARY Q. IRELAN, CCR

156

```
           CHARD - BY MR. MAURER
1        A   That's what it says.
2        Q   I just need to establish that.
3        MR. MAURER:  And why don't we start the
4   video running?
5        MR. COANT:  There's his pick-up truck.  We
6   will stop it there.
7   BY MR. MAURER:
8        Q   Now, Officer, in the last few seconds
9   we've looked at, and we're now at 3:15.11, you can
10  see David Carpenter's red 1994 pick-up truck
11  approaching the intersection of High and Foundry
12  Streets; correct?
13       A   Correct.
14       Q   And, now, it's at this point starting to
15  turn left.
16       MR. MAURER:  Let's roll the video some
17  more.  Stop the video.
18  BY MR. MAURER:
19       Q   Officer, we are now at a time mark of
20  3:15.18, approximately three seconds after where we
21  stopped before.  What you just looked at; did that
22  show you being dragged?
23       A   Yes.
24       Q   And you would agree at the point we are
25  now looking at, 3:15.18, this dragging had come to a
```

MARY Q. IRELAN, CCR

1  stop?
2  A    Yes.
3       MR. MAURER:   Nothing further.
4       MR. REYNOLDS:   Thank you.
5       MR. MAURER:   Anything further?
6       MR. REYNOLDS:   I am done.  Thank you.
7       MR. MAURER:   All right.  Patrolman, thanks
8  for coming in.
9       (Deposition concluded at 1:50 p.m.)
10            ********
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

            MARY Q. IRELAN, CCR

---

1              C-E-R-T-I-F-I-C-A-T-I-O-N
2  STATE OF NEW JERSEY  :
3  COUNTY OF CUMBERLAND  :
4       I, MARY Q. IRELAN, Certified Court
5  Reporter, Registered Professional Reporter and
6  Notary Public, do hereby certify that I reported the
7  deposition in the above captioned matter; that
8  the said witness was duly sworn by me; that the
9  foregoing is a true and correct transcript of the
10  stenographic notes taken by me in the above
11  captioned matter.
12       I further certify that I am not an
13  attorney or counsel of any of the parties, nor a
14  relative or employee of any attorney or counsel
15  connected with this action, nor financially
16  interested in the action.
17
18            MARY Q. IRELAN, CCR-RPR
19            License CCR #X100515
              License RPR #008090
20  MARCH 22, 2019
21  DATE
22       (This Certification does not apply to any
23  reproduction of this transcript, unless under the
    direct supervision of the certifying reporter.)
24
25

            MARY Q. IRELAN, CCR

# EXHIBIT 6
**(Confidential – Copy Sent on Flash Drive to Chambers)**

# EXHIBIT 7
### (Confidential – Copies Sent on Flash Drive to Chambers)