punishments against them under the category of "failure to supervise." Id., par. 226. Fundamentally, none of the Supervisory Defendants, upon information and belief, took any steps to impose meaningful discipline or to remove Dixon from employment as a Millville police officer as a result of his use excessive force. When former Chief of Police Haas commuted Defendant Dixon's seven-day suspension early on in Dixon's career to three days despite engaging in reckless behavior with his police vehicle, and when the Supervisory Defendants made notations in GTS, counseled Dixon, or took any action against him, such actions were taken pursuant to other rules and/or procedural-type violations, but never for Dixon's frequent and unchecked use of force. Id., par. 227.

But in a chilling foreshadowing of what was on the horizon, Internal Affairs observed in February of 2016 that, although Dixon's excessive force complaints resulted in findings of "exonerated" or "unfounded," he was still showing a pattern. Defendant Chief Farabella in March of 2016 concurred with a recommendation made by the Cumberland County Prosecutor's Office's Chief of Detectives and by the Millville Police Department's own Internal Affairs Unit that Dixon should be sent to a training course called "Verbal Judo" due to the excessive force complaints made against him in a two-year period. Id., par. 228. There were three Millville officers sent to that mere four-hour "Verbal Judo" training session in 2016. Two of them were Dixon and now-former Millville Police Officer Jeffrey Profitt. Id., par. 229.

### D. Chief Farabella Acknowledges His Own Authority and Responsibilities For The Running of the MPD and Internal Affairs.

In a strongly worded rebuke to Detective/Sgt. Brian Starcher on October 1, 2015 regarding the seeking of outside legal opinions, Defendant Chief Farabella took complete responsibility for the management of the MPD and of the Internal Affairs Unit, saying: "**Please understand that I am the Chief of Police and I run the day to day operations of this department, including the**

**Internal Affairs Unit that you are currently assigned to. It is my responsibility to make sure this department is run correctly and if there is a problem with any employee, it should be brought to my attention without delay**" (bold added). Id., par. 258. Despite having these responsibilities, Defendant Chief Farabella, upon information and belief, took no steps to discipline Dixon for his use of force and allowed Dixon to remain on the force. Despite awareness of Dixon's pattern of excessive force complaints in early 2016, Defendant Chief Farabella allowed Dixon to remain employed until it became apparent that Dixon would be pleading guilty to criminal charges, discussed below. Id., par. 259. Despite Defendant Chief Farabella's acknowledgement of responsibility for the running of the MPD, and despite also telling Dixon that the type of force he used was not the image of a police officer, Defendant Chief Farabella and the other Supervisory Defendants allowed Dixon to remain employed as a Millville police officer long enough to encounter and injure Plaintiff Capps and Tanika Joyce in February and March of 2018. Id., par. 260.

Defendant Chief Farabella, who was, as he admitted, the person in charge of Internal Affairs and in the running of the Millville Police Department, in ultimately recommending such a useless measure as "Verbal Judo" in 2016 in the face of a pattern of excessive force, was sending a clear message to the Supervisory Defendants and to the MPD's officers in general that excessive force would be tolerated and that no serious disciplinary measures would be taken. Id., par. 230. The City of Millville's own documents conclusively establish that Defendant Chief Farabella knew about Dixon's pattern of excessive force one year and several months prior the Barry Cottman incident in June of 2017, described below and a full two years before the Capps and Joyce incidents in February and March of 2018. They were on notice. Id., par. 231.

**E. The Supervisory Defendants Continue To
Avoid Looking Into Use of Force Incidents in MVR Reviews.**

Defendant Sgt. Harold Duffield made entries in GTS for Dixon in early 2015 without much commentary on instances in which Dixon used force. However, he identified a training issue as to Dixon in some detail that, though the suspect later took responsibility for a theft in April of 2015, Dixon should not have mailed out a summons due to a lack of probable cause, Dixon's reliance on an anonymous witness, and without first reviewing video evidence before mailing out the summons. Id., par. 198.

Defendant Kevin McLaughlin, then a sergeant, conducted a "random" supervisory MVR review for the third quarter of 2015 involving Dixon's alleged excessive speed for a non-life-threatening response. Id., par. 199. Defendant McLaughlin, who is now, upon information and belief a lieutenant, performed an evaluation of Dixon on a sample size of just four weeks, from September 20, 2015 through October 16, 2015, and stated glowingly that "Dixon has unlimited potential." Id., par. 200. Defendant Sgt. Cindi Zadroga also conducted a fourth quarter 2015 "random" supervisory MVR of a motor vehicle stop. Id., par. 201. Defendant Sgt. Redden performed an evaluation for Defendant Officer Orndorf for the period of October 1, 2015 through October 26, 2016, which stated that while Orndorf wanted to be a proactive officer and spent a majority of his time on the road for such purpose, his reports were "lacking." This is consistent with Orndorf's February 25, 2018 report on the Capps incident, in which he omitted certain critical details in not describing Dixon's assault on Plaintiff Capps. Nor was Orndorf, as it turned out, "proactive" in intervening to stop and/or to report a civil rights violation committed by his partner, Defendant Dixon. Id., par. 202.

That aside, in an MVR review for Dixon on December 10, 2015, the "chosen" video for an MVR review of Dixon was a motor vehicle stop, not a use of force incident. Id., par. 203. In the

same month, Defendant Sgt. Cindi Zadroga also noted an incident of Dixon's "unprofessional behavior" in the workplace on December 23, 2015, without specifying what the unprofessional behavior was. Id., par. 204. In records further demonstrating that Defendant Sgt. Cindi Zadroga was acting as Dixon's supervisor, Dixon was counseled on December 10, 2015 and January 20, 2016 for incidents in which Dixon missed a Grand Jury appearance and did not secure property, without much commentary on Dixon's use of force against an alleged shoplifter. Id., par. 205.

Defendant Sgt. Cindi Zadroga also conducted a first quarter 2016 "random" supervisory MVR review of a stop of a pedestrian who had a warrant. Id., par. 206. So-called "random" MVR reviews for the second, third, and fourth quarters of 2016 performed by Defendant Sgt. Cindi Zadroga all involved traffic matters, and not use of force incidents. Id., par. 207. An evaluation for the period of January 1, 2016 through October 1, 2016, also performed by Defendant Sgt. Cindi Zadroga, noted, among other things, Dixon's "poor attitude." Id., par. 208. Defendant Sgt. Cindi Zadroga also made a January 25, 2016 GTS entry regarding Dixon's failure to secure a BB gun in evidence, which resulted in Dixon being counseled. Id., par. 209.

Defendant Sgt. Redden also made an entry that Dixon was counseled, and noted in some detail in GTS how Dixon failed to appear for court, which resulted in the dismissal of a case on February 26, 2018 (the morning after Dixon's assault on Plaintiff Capps on February 25, 2018). However, he provided relatively little narrative information in entries involving the use of force in GTS on the Capps and Joyce incidents. Id., par. 217. Defendant Sgt. Cindi Zadroga conducted a so-called "random" MVR review of a June 10, 2018 "shots fired" incident response involving Dixon, not a use of force encounter. Id., par. 218.

In addition, Defendant McLaughlin entered an oral reprimand for Dixon in GTS on May 1, 2017, which was not the first time Dixon failed to submit evidence in a timely fashion. Id., par.

210. Defendant Sgt. Heger performed a "random" supervisory MVR review for the January 1, 2017 to March 31, 2017 period of an incident involving a domestic violence complaint, and not a use of force incident. Id., par. 211. On December 11, 2017, Defendant McLaughlin, at that point a lieutenant, transferred Dixon from the Neighborhood Crime Prevention Unit ("NCPU") to Squad "A" within the Millville Police Department, just after he led the NCPU in arrests the previous year. Id., par. 212.

Defendant Sgt. Ayars conducted a "random" supervisory review for the period encompassing October 1, 2017 through December 31, 2017 for an incident involving Dixon's investigation of a domestic violence matter. Again, no use of force incident was used. Id., par. 214. Defendant Sgt. Carl Heger provided an evaluation report for Dixon for the time period encompassing November 1, 2017 through October 7, 2018, the time period that included the incidents involving Audra Capps and Tanika Joyce. Heger's evaluation forms made note of Dixon's traffic stops, pedestrian stops, arrests, and summonses, but not incidents involving the use of force (with the possible exception of commending Dixon on his handling of an officer-involved shooting). Id., par. 215. Defendant Sgt. Ayars conducted a "random" supervisory MVR review of a February 15, 2018 incident for the period of January 1, 2018 through March 31, 2018 for a suspect who failed to observe a stop light. During this same time period, the Capps and Joyce incidents involving excessive force occurred on February 25, 2018 and March 24, 2018, respectively. Id., par. 216.

The tendencies recounted herein, however, were not just limited to the evaluation and supervision of Dixon. Supervisory MVR reviews performed for Defendant Orndorf by Defendant Sgts. Ayars, Redden and Heger and by non-Defendant Sgt. Ramos for various quarters in the years of 2016, 2017 and 2018 involved (1) checking on an improperly parked/disabled vehicle, (2) a dog

struck by a car, (3) a traffic stop for a suspended driver's license, (4) a motor vehicle stop for a warrant, (5) a response to a motor vehicle accident, and (6) an arrest for weapons possession. As with Dixon, Orndorf's supervisors were likewise avoiding using use of force incidents for purposes of their MVR reviews. Id., par. 219.

In an evaluation report of Defendant Orndorf for November 1, 2017 through October 31, 2018, Defendant Sgt. Redden and non-Defendant Sgt. Vinzinski described Orndorf as holding his reports too long and identified difficulties with time management. Id., par. 220. A supervisory MVR review performed by Defendant Sgt. Daniel Ayars on Orndorf for the period of April 1, 2018 through June 30, 2018 involved a motor vehicle stop. Id., par. 221. A supervisory MVR review performed by Sgt. Vinzinski on Orndorf for the period of July 1, 2018 to September 30, 2018 involved a prisoner transport, not a use of force incident. Id., par. 222. "Random" supervisory MVR reviews for Defendant Officer Orndorf for the periods of October 1, 2018 through December 31, 2018 and January 1, 2019 through March 31, 2019 focused not on incidents in which use of force was employed, but on traffic violations. Id., par. 223. Supervisory MVR reviews for both Defendants Dixon and Orndorf reveal that on the MVR review template the box for "incident specific" is virtually never checked. Nor is the "internal affairs" box ever checked. The box that is routinely checked is "random," and never are use of force incidents ever reviewed by supervisors in such MVR reviews. Id., par. 224. Upon information and belief, the practice of reviewing "random" incidents for training and evaluation purposes was not designed to catch those officers who might be using excessive force too frequently. Instead, the practice of "random" MVR reviews for evaluation purposes proved to be a means of studiously avoiding the actual review of use of force incidents, something that might expose a municipality to liability. Id., par. 225.

In an evaluation report for the period of January 1, 2017 through November 1, 2017 naming Defendants Sgt. Redden and Sgt. Ayars, Redden's comments state that Dixon was on NCPU, a proactive patrol unit which worked a different schedule, that Redden had limited interaction with Dixon, but that Redden's evaluation "is based off of having him on my squad in the past." He noted the number of traffic summonses, arrests and reports, but no numbers for excessive force incidents. Quite strikingly, the relatively positive evaluation provided by Defendant Sgt. Redden covered the time period encompassed by the Barry Cottman jaywalking assault captured on video and published by a Philadelphia news station in June of 2017 – an incident about which Redden alerted Defendant Chief Farabella and others before the video was broadcast. Id., par. 213.

Moreover, upon information and belief, the Supervisory Defendants named herein either failed to notice or looked the other way when, as NJ.com reported in connection with its series called The Force Report in late 2018, Dixon posted thoughts and memes to his public Facebook account to defend how other police officers use force, and to disparage critics of police tactics. Id., par. 176. Specifically, and according to emails from an NJ.com reporter to Defendant Chief Farabella seeking comment, Defendant Dixon allegedly made statements on Facebook about police force, about his concern for Islam and for Muslim immigrants destroying the United States. Additionally, and according to this email communication, Dixon in 2016 posted a video depicting a peaceful arrest in Florida with the statement: **"You don't get shot or 'assaulted' when you shut your mouth and use your ears and comply" (bold added).** Id., par. 177. Upon information and belief, and as further reported by NJ.com, approximately three weeks after NJ.com reached out to Dixon about his posts, the privacy settings on Dixon's Facebook account changed, and the posts are no longer visible. Id., par. 178. Likewise, Defendant Officer Orndorf previously had a

Facebook account under his own name, which he deleted once he created a new Facebook account under the name "James May." Id., par. 179.

### F. Dixon Assaults Barry Cottman, a Jaywalking Suspect, in June of 2017.

In 2017, before Defendant Joseph Dixon's incidents with Plaintiff Audra S. Capps and Tanika Joyce on February 25, 2018 and March 24, 2018, respectively, as described below, a passerby filmed a Millville Police Officer -- ultimately identified as Dixon -- repeatedly punching a man in the head. Id., par. 29. In that encounter, Dixon and another MPD Officer stopped Barry Cottman, allegedly for jaywalking. Id. par. 30. Upon information and belief, and as reported by a news organization known as NJ.com, Dixon wrote that Cottman walked diagonally across the street, "failing to use 90-degree turns as required by state law." Id. par. 31.

When Cottman refused to give his name, Dixon tried to place him under arrest and said that Cottman repeatedly pushed him away. Id. par. 32. "I then delivered two closed fist strikes to the face of Cottman in order to gain compliance," Dixon allegedly wrote in his report, as reported by NJ.com. Cottman's arm later hit Dixon's leg, according to Dixon's report, so Dixon struck twice more as Cottman kept his hands tucked under his body. Id., par 33. According to NJ.com's reporting, photos taken the next morning in an emergency room showed Cottman's right eye still swollen, and a line of stitches along his upper lip. Id., par. 34

Importantly, and because it is pertinent to what Defendants knew about Dixon, and when they knew it, the Second Amended Complaint alleges that at about the time of the Cottman incident, Defendant Sgt. Redden of the MPD gave police department personnel, including Defendant Chief Jody Farabella, a warning that a video of the encounter was about to surface. Id., par. 35. Indeed, that video of the Cottman incident involving Dixon became public on or about June 28, 2017, well before the Capps and Joyce incidents in early 2018. That video is available

on the NBC10 Philadelphia website as follows: https://www.nbcphiladelphia.com/news/local/millville-police-punch-video-new-jersey-jaywalking/21024/. Id., par.36. Therefore, it is reasonable to infer that public officials within the City of Millville, and/or certain of the named Supervisory Defendants identified in the Second Amended Complaint, viewed and/or had knowledge of the existence of the public video footage and of the Cottman incident, and allowed Dixon to remain employed by the Millville Police Department and to remain in a position to cause harm to persons such as Capps, Joyce and others. This incident and very public video footage should have placed the Supervisory Defendants on notice of Dixon's use of excessive force – and all over an alleged jaywalking incident. Id., par. 37.

The Cottman encounter resulted in a separate federal civil rights lawsuit, which is pending in the District of New Jersey and captioned as Barry Cottman v. Jody Farabella, Millville Chief of Police, P.O. Joseph Dixon 172, P.O. Robert Runkle 160, and the City of Millville, New Jersey, Civil Action No. 1:19-cv-14122-NLH-AMD (D.N.J.). Id., at 38.

The Cottman lawsuit, however, is not the first piece of litigation with which the City of Millville has had to grapple relating to excessive force claims against its police officers. In fact, as alleged in the Second Amended Complaint, the City of Millville has faced other lawsuits in recent years, including but not limited to: (1) a case in which the City of Millville agreed to pay $40,000 in 2015 to settle claims that a Millville officer pointed his gun at a 13-year-old boy after telling him not to ride a dirt bike in the woods; and (2) a case in which the City of Millville in 2010 agreed to pay $100,000 to a woman who claimed she was beaten after being stopped while riding her bicycle on a sidewalk. Despite these and other previous lawsuits alleging excessive force, the City of Millville and/or the Supervisory Defendants failed to learn from them and failed to take

appropriate disciplinary action against Defendant Dixon when they became aware of his pattern of using excessive force early on in his career. Id., at 39. As discussed in more detail below, the events of February and March of 2018 demonstrate that the City and its officers have failed to learn from these experiences.

### G. Dixon Uses Excessive Force Against Audra Capps.

On February 25, 2018, at approximately 8:22 p.m., Defendant Officer Orndorf pulled over Plaintiff Capps, who was driving westbound on state highway 49 in the City of Millville, on suspicion of driving while intoxicated. Id., par. 40. Upon his arrival at the scene, Dixon conducted a motor vehicle stop in front of Clark's Liquor Store, which has, upon information and belief, a parking lot paved with asphalt, or a similar hard surface. Id., par. 41.

During a sometimes heated exchange, Plaintiff Capps told Dixon, among other things, that she wanted to call her husband, Plaintiff Gibson. Id., par. 42. Dixon would not let Capps call her husband. Id., par. 43. Instead, Dixon ordered Capps out of the car. Id., par. 44. In the parking lot attached to or in the vicinity of Clark's Liquor, Dixon began to administer various field sobriety tests. Id., par. 45. A Millville Police Department patrol car's MVR captured audio and video footage of these field sobriety tests, relevant portions of which can be viewed publicly on a link to an NJ.com article as part of its series known as The Force Report: https://www.nj.com/news/2018/12/this-nj-cop-used-more-force-than-anyone-else-is-he-violent-or-just-good-at-his-job.html. Id., par. 46.

It must be remembered that Plaintiff Capps, at the time of the motor vehicle stop, was 50 years old, 5'4" tall and of a slight build, weighing approximately 100 pounds or less. Id., par. 47. As such, she posed no physical threat to Defendant Dixon. Id., par. 48.

After several minutes of Plaintiff Capps performing the field sobriety tests, Dixon determined that she failed them. Id., par. 49.  The MVR captured what happened next, and a portion of the following public video clip demonstrates what happened to Capps, in slow motion: https://www.youtube.com/watch?v=v4vIuoEIfOU . Id., par. 50.  Dixon sought to arrest Plaintiff Capps by attempting to handcuff her behind her back. Id., par. 51.  After Dixon initially took control of Capps's hands, Capps took a step away. Id., par. 52.  Capps looked up at Dixon, who stood approximately a full head taller. Id., par. 53.  As Capps began to back up so as to not be handcuffed, Dixon grabbed hold of her. Id., par. 54.

The MVR revealed Dixon placing his left arm around Capps's head and/or neck in a headlock position. Id., par. 55.  While holding Plaintiff Capps in a headlock, Officer Dixon lifted her off the ground, whirled her around in the headlock, swung Capps over his hip while she was still in a headlock, and violently slammed this much smaller female suspect to the hard pavement below. Id., par. 56.  Dixon fell down on top of Capps with all of his weight. Id., par. 57.

As alleged in the Second Amended Complaints, the MVR footage further showed Defendant Orndorf headed towards Dixon's location, and thereafter on top of Capps, putting his knee and/or his weight on Capps's back, and assisting Dixon in securing Capps in handcuffs. Id., par. 58.  After being lifted up from the pavement, the officers placed Capps in the back seat of a patrol car. Id., par. 59.  The MVR also recorded Plaintiff Capps in the back of the patrol car. Id., par. 60.  During the time she was in the back of the patrol car, Capps made a number of clear requests and statements to the officers:

*      Capps requested that officers call her husband.

*      Capps told the officers that she could not breathe.

*      Capps told the officers that they had slammed her face.

      \*      Capps told the officers that her rib was broken.

      \*      Capps told the officers that she needed to go to the hospital.

Id., par. 61.    Yet Defendants Dixon and/or Orndorf either declined or ignored these requests –

in particular, Plaintiff Capps's immediate and legitimate need for medical treatment. Id., par. 62.

Instead, Dixon and/or Orndorf took Plaintiff Capps to the Millville Police Department, where

police charged her with multiple offenses. Id., par. 63.

### H. Dixon and Orndorf Violated Capps's Constitutional Rights and State and Department Directives.

Plaintiff Capps does not challenge the basis for the motor vehicle stop on February 25,

2018, and does not challenge the probable cause for her arrest. Id., par. 64. However, the force

used on Capps was far out of proportion, and in addition to their violations of federal and state

constitutional protections against unreasonable searches and seizures described herein, Defendants

Dixon and Orndorf violated state and local guidelines governing the use of force by police officers.

Id., par. 65.

The New Jersey Attorney General's Use of Force Policy (revised June 2000) (the "AG

UFP") provides that, among other things:

> ... In situations where law enforcement officers are justified in using force, **the utmost restraint should be exercised. The use of force should never be considered routine.** In determining to use force, the law enforcement officer shall be guided by the principle that **the degree of force employed in any situation should be only that reasonably necessary. Law enforcement officers should exhaust all other reasonable means before resorting to the use of force.** It is the policy of the State of New Jersey that law enforcement officers will use only that force which is objectively reasonable and necessary.

AG UFP at 1, par. 3 (bold and underlining added). Id., par. 66. The AG UFP also provides:

> Deciding whether to utilize force when authorized in the conduct of official responsibilities is among the most critical decisions made by law enforcement officers. **It is a decision which can be irrevocable.** It is a decision which must be made quickly and under difficult, often unpredictable and unique circumstances.

> Sound judgment and the appropriate exercise of discretion will always be the
> foundation of police officer decision making in the broad range of possible use of
> force situations.  It is not possible to entirely replace judgment and discretion with
> detailed policy provisions.

AG UFP at 2, par. 1 (bold added).  Id., par. 67.  The AG UFP further defines "physical force" as

"contact with a subject beyond that which is generally utilized to effect an arrest or other law

enforcement objective.  Physical force is employed when necessary to overcome a subject's

physical resistance to the exertion of the law enforcement officer's authority, or to protect persons

or property.  AG UFP at 3( C)(1).  Id., par. 68.  Examples of physical force include "wrestling a

resisting subject to the ground, using wrist locks or arm locks, striking with the hands or feet, or

other similar methods of hand-to-hand confrontation."  AG UFP at 3( C)(2).  Id., par. 69.  By

contrast, "deadly force" is "force which a law enforcement officer uses with the purpose of

causing, or which the officer knows to create a substantial risk of causing, death or serious bodily

harm."  AG UFP at 3(E)(1).  Id., par. 70.

On the subject of restrictions on the use of deadly force, the AG UFP provides:

> A law enforcement officer is under no obligation to retreat or desist when resistance
> is encountered or threatened.  However, a law enforcement officer shall not resort
> to the use of deadly force if the officer reasonably believes that an alternative to the
> use of deadly force will avert or eliminate an imminent danger of death or serious
> bodily harm, and achieve the law enforcement purpose at no increased risk to the
> officer or another person.

AG UFP at 5( C)(1).  Id., par. 71.  As described elsewhere in the Second Amended Complaints,

Defendant Dixon's use of force became routine.  Id., par. 72.  And as demonstrated on the MVR

footage, Defendant Dixon did not exercise the "utmost restraint" and did not employ only the level

of force that was "reasonably necessary" in his encounter with Plaintiff Capps, a 50-year-old

woman of slight build.  Id., par. 73.  That MVR footage demonstrates that Defendant Dixon

violated the AG UFP, as the amount and type of force used upon Plaintiff Capps was far out of

proportion under the circumstances of the motor vehicle stop which occurred on February 25, 2018. Id., par. 74.

The AG UFP policy also imposes a duty upon other officers with respect to the use of excessive force. The policy:

> ... reinforces the responsibility of law enforcement officers to take those steps possible to prevent or stop the illegal or inappropriate use of force by other officers. Every law enforcement officer is expected and required to take appropriate action in any situation where that officer is clearly convinced that another officer is using force in violation of state law. Law enforcement officers are obligated to report all situations in which force is used illegally by anyone. This policy sends a clear message to law enforcement officers that they share an obligation beyond the requirements of the law.

AG UFP at 1-2, par. 4. Id., par. 75. Likewise, former Millville Chief of Police Haas's March 18, 2013 Temporary Detention directive (largely adopted with few changes by Farabella on June 6, 2017) similarly provided, among other things, that, "Officers shall respect the civil rights of all detainees and immediately report any violation to their supervisor." Id., par. 76. Furthermore, a September 1, 2014 internal affairs policy issued by former Chief Haas warned that any officer witnessing a civil rights violation shall cause the action to cease and notify a member of the Professional Standards Unit. Id., par. 77.

On the night of February 25, 2018, Defendant Orndorf failed to abide by his responsibility to intervene to prevent and thereafter to report the excessive force used by Defendant Dixon under the AG UFP, under section 4.1.5 of the Millville Police Department's own Rules and Regulations, and under these policy directives. Id., par. 78. Instead, Defendant Officer Orndorf inflicted and/or compounded the injuries sustained by Plaintiff Capps as a result of Defendant Dixon's use of excessive force. Id., par. 79.

On the night of the Capps incident, Defendant Orndorf stood to the side of vehicle, and he moved in close proximity to Dixon. Id., par. 80. Defendant Orndorf also told OPIA, in connection

with its later criminal investigation into Dixon's conduct, that on the night of the Capps incident of February 25, 2018, he was working night shift with Dixon for about a year. He said that Dixon switched squads often, but Orndorf claimed that he was not sure of the exact reason for this. Id., par. 81. Defendant Orndorf told OPIA that he remembered Capps complaining that she could not breathe, and she was placed in a police car. He said he did not remember if she asked to go to the hospital. He also told OPIA that he does not like to be seen on tape. Id., par. 82. Among other possible reasons for not intervening and for not reporting Dixon (as he was required to do) that may be revealed in discovery and investigation, Defendant Orndorf, prior to joining the Millville Police Department, knew personally or was socially acquainted with Dixon for 11-12 years. Id., par. 83.

### I.   **Dixon Also Did Not Follow Police Academy Training.**

Police academy training which, upon information and belief, Defendant Officer Dixon received, further demonstrates that he failed to use a degree of force a reasonable police officer would use under the circumstances. Id., par. 84. Effective in January 2009, and prior to Dixon becoming a Millville Police Officer in 2012, the New Jersey Police Training Commission put into effect a new Defensive Tactics Curriculum for police academy instructors teaching defensive tactics to student officers in the Basic Course for Police Officers (the "DTC"). Id., par. 85.

In connection with the concept of "unarmed defense," the DTC differentiated between different types of resistance by a suspect, such as (1) "preventative resistance" which is defined as physical action that prevents an officer's control without attempting to harm the officer, such as a subject walking away or pulling away (resisting handcuffing), DTC pars. 3.4.1, 3.4.2, and (2) "active aggression," a physical assault/action on an officer using personal weapons of the body, other than deadly force, DTC 3.5.1. Id., par. 86. As demonstrated by the MVR footage, and

notwithstanding Defendants' description of the footage, Plaintiff Capps did not engage in "active aggression" or "active resistance" (as it also may be called), against an officer, but rather engaged in "preventative resistance" by attempting to move away from Dixon, who was trying to handcuff her. Id., par. 87.

The DTC material further recognized five "takedown techniques," including: (1) the straight arm takedown; (2) the wrist turnout takedown; (3) the bar hammer takedown; (4) a chest grab to the inside; and (5) a chest grab to the outside. Id., par. 88. As demonstrated by the MVR footage, and in response to Plaintiff Capps's "preventative resistance" of attempting to avoid being handcuffed, Dixon did not use the standard DTC takedown maneuvers. Id., par. 89.

Separately, section 4.10.1 ("Courtesy") of the Millville Police Department's own Rules and Regulations further requires officers to, among other things, "always remain calm regardless of provocation." Id., par. 90. But rather than remaining calm in the face of Plaintiff Capps's preventative resistance, Defendant Dixon abandoned the standard DTC takedown maneuvers taught in police academy training, and instead applied a whirling headlock takedown maneuver on a much smaller suspect. Id., par. 91.

Moreover, with his whirling headlock takedown maneuver, Dixon knew or should have known that he was placing Capps in a situation that would create a substantial risk of causing her death and/or causing her serious bodily harm. Id., par. 92. This is because the 2009 DTC material described numerous vulnerable parts of the human body, including the temples and the neck. Id., par. 93. Dixon's whirling headlock takedown maneuver, aside from putting pressure on Plaintiff's temples about her head, could have broken her neck. Id., par. 94. And by lifting a subject off of the ground, with more room to fall before hitting a hard surface on the way down, Dixon's whirling headlock takedown of Capps increased the likelihood of serious bodily injury. Id., par. 95.

Separate and apart from, and/or as a result of the violations of the AG UFP, Millville Police Department Directives, and police academy training, Defendants Dixon and Orndorf used excessive force against Capps in effecting her arrest, resulting in a violation of her rights under the Fourth and Fourteenth Amendments to the United States Constitution to be free from unreasonable searches and seizures. Id., par. 97. Defendants' "irrevocable" decision to use excessive force against Plaintiff Capps resulted in very serious and permanent injuries, as described more fully below, id., par. 98, and as recounted in Plaintiffs' response to Defendant Dixon's Statement of Material Facts.

### J.   Defendants Dixon and Orndorf Failed to Attend to Plaintiff Capps's Medical Needs.

Defendant Dixon wrote in his investigation report regarding the February 25, 2018 incident that he asked Plaintiff Capps if she needed EMS to respond. Id., par. 99. Yet Officer Dixon's report did not completely and accurately detail Plaintiff Capps's statements and requests for medical attention immediately after being slammed to the pavement at the Clark's Liquor Store parking lot:

> Capps was picked up from the ground and walked into the back of my patrol vehicle. Capps stated that I had to call her husband as she could not breathe. Capps appeared to breathing [sic] fine at this time. Capps stated she needed to go to the hospital. Capps then stated she wanted to call her husband. Capps was advised she could call her husband once we were at the Police Department. [bracketed material added].

Id., par. 100. Noticeably absent from Dixon's report, and which was clear from the MVR footage, was Plaintiff Capps's statement that her rib was broken. Id., par. 101. The fact that Plaintiff Capps knew immediately that her rib was broken and promptly said something about it lends credence to her complaint about not being able to breathe. Id., par. 102. But Dixon ignored Plaintiff's complaint that her rib was broken, and left it out of his report. Id., par. 103. Of critical importance,

Dixon also falsely did not mark the box on the standard UOF form  he filled out on February 25, 2018 that Plaintiff Capps sustained injury. Id., par. 104.

Dixon's actions violated the Millville Police Department's Rules and Regulations, section 4.3.3, updated on November 22, 2016, which provided that, "No employee shall knowingly falsify any official report or enter or cause to be entered any inaccurate, false or improper information on records of the department." Moreover, "Employees are required to be truthful at all times whether under oath or not." Section 4.12.6. Id., par. 105. And under a July 30, 2001 Standards of Conduct policy, officers shall be accurate and truthful in all matters, and shall accept responsibility without attempting to conceal, divert, or mitigate their culpability. Dixon failed to follow this standard of conduct as well. Id., par. 106.

In addition, Defendant Dixon's ignoring of Plaintiff Capps's pleas that she needed to go to the hospital, that she could not breathe, and that her rib was broken, was in violation of the Millville Police Department's own Use of Force policy, which, upon information and belief, provided that:

> ... Any person requesting and/or deemed in need of medical attention shall be transported to Regional Medical Center (Vineland) or nearest available emergency medical treatment center or hospital.  Personnel shall contact EMS to request such transportation assistance. [emphasis added].

Id., par. 107.  Under the circumstances presented, and the injury and breathing difficulty she reported, Plaintiff Capps's request for medical attention would trigger a trip to the hospital under this policy directive. Id., par. 108.  Furthermore, according to the Millville Police Department's July 23, 2003 Use of Municipal Detention Facility, all injured or ill detainees will be transported by EMS to an appropriate medical facility for treatment without delay. Id., par. 109.

In contrast to the MPD's policy directives on medical care, Defendant Orndorf later told OPIA that typically if someone is injured, the person is brought back to the police station,

processed, and then EMS is called to respond to the station, unless it is a serious injury. He further told OPIA that it would be up to the arresting officer to make this call. Id., par. 110.

Moreover, Millville's Use of Force policy, upon information and belief, also contained additional reporting and investigatory requirements:

> ... The extent of the injury and the treatment offered/provided shall be documented in the body of the Investigation Report.
>
> When necessary, especially in a deadly force incident, notify the appropriate support staff, e.g., Detective Bureau, Cumberland County Prosecutor's Office, and/or Cumberland County Sheriff's Office, who should respond to the scene and cause the appropriate level of investigative and support services, including, but not limited to: photographs, measurements, diagrams, statements, etc. When an injury or complaint of pain exists, supervisors should obtain photographic documentation to the extent possible (person upon which force was used and any affected officer).
>
> Any employee [w]hose action(s) or use of force in an official capacity results in death or serious bodily injury to any person shall be removed from line-duty assignment pending a meaningful review.
>
> The Chief of Police or designee and the Cumberland County Prosecutor's Office shall be immediately notified when the use of physical, mechanical, or deadly force results in death or serious bodily injury, or when an injury of any degree results from the use of a firearm by agency personnel.

Id., par. 111. Upon information and belief, neither Dixon, Orndorf, Chief Farabella, nor the Supervisory Defendants abided by the various requirements of this departmental policy in connection with the February 25, 2018 Capps incident. Id., par. 112.

Whether the force used could be characterized as "physical force" or "deadly force," this was clearly a case involving serious bodily injury – as can be seen from the actions taken by Dixon and Orndorf, and as can be heard in the statements and complaints made by Plaintiff Capps, all captured on MVR footage. Id., par. 113. However, Defendant Sgt. Redden of the MPD told OPIA as part of the subsequent Dixon criminal probe that he did not know the standard operating procedure when a person is injured, but he said that EMS is usually called when someone is

injured, with EMS meeting the person at the station or at the scene. Redden stated that the policy left the officer little to no discretion about when EMS should be called. Id., par. 114.

Defendant Redden was, upon information and belief, one of Dixon's supervisors on the night of the Capps incident. In his OPIA interview, Redden stated that he was under the impression that the arrest was a normal DWI but nothing out of the ordinary. Redden claimed that he watched the MVR – without specifying when he reviewed it – and claimed that Dixon just reacted to Capps. Id., par. 115. As to Dixon's failure to mark the box on the standard UOF form that Capps was injured, Defendant Sgt. Redden told OPIA that Dixon should have checked the box for "injured" on that form. Redden further informed OPIA that Defendant Sgt. Ayars did the first review on Dixon's UOF form and that Ayars only checked the form for completeness. Yet Sgt. Ayars's name appears nowhere on the Dixon UOF form relating to the February 25, 2018 Capps incident. Redden further conceded that, on the bottom of the UOF report in Box E, he never read that block prior to the OPIA investigator pointing it out to him. Defendant Sgt. Redden claimed he never had formal training on how to check the UOF report until there was a policy change, which did not take place until 2019. Id., par. 116. Defendant Chief Farabella further described to OPIA in the Dixon criminal investigation described elsewhere herein that if an arrestee is injured or complains of pain, EMS must be called no matter what, and that it was not up to the officer to determine if anyone should or should not receive medical attention. Defendants Dixon and Orndorf did not comply with this directive. Instead, they decided what was or was not medically necessary. Id., par. 117.

Finally, Defendants Dixon and Orndorf, in using excessive force, and in failing to attend to Plaintiff Capps's expressed medical needs in light of the severity of her injury, and in not properly documenting the extent of her injury, violated Millville Police Department Rules and

Regulations, including but not limited to 4.1.11 (Use of Force), 4.3.3 (Reports), 4.10.1 (Courtesy),

and 4.12.6 (Truthfulness), among other Rules and Regulations and/or departmental directives

which may be revealed in discovery. Id., par. 118.

### K. Capps Sustained Multiple Broken Rib Fractures and Underwent Two Surgeries.

After Defendants refused to take her to the hospital, or to properly attend to her medical

needs when requested, and after being processed at the Millville Police Department, Plaintiff

Capps presented to the hospital on February 25, 2018 and again on February 26, 2018 with

shortness of breath, pain located primarily at the left lateral chest wall, and, as Plaintiff Capps

reported, a "rib sticking out." Id., par. 119. Initial hospital diagnoses included a chest wall

contusion (which Plaintiff Capps knew immediately was not correct), and alternatively of one left

side rib fracture. Id., 120. Imaging studies, however, later revealed healing fractures of the left

*third through eighth* ribs, meaning that the force of Dixon slamming Capps to the pavement, and/or

of Orndorf applying his knee to her back, and/or the application of Dixon's and Orndorf's weight,

resulted in Capps sustaining multiple broken ribs. Id., par. 121.

Plaintiff Capps treated regularly, but the injuries did not heal properly, resulting in a

"nonunion" of certain of her ribs. Id., par. 122. Plaintiff Capps, diagnosed at the time with

intercostal neuropathy, underwent a left T5 through T8 intercostal block procedure on October 31,

2018, which resulted in no pain relief. Id., par. 123. Plaintiff thereafter had left chest wall

reconstruction surgery on or about January 16, 2019. Id., par. 124. Among other things, that

surgery resulted in the removal of one of Plaintiff Capps's ribs, and nerve blocks being placed on

multiple other ribs in an effort to relieve her pain. Id., par. 125.

On or about March 22, 2019, Plaintiff received a steroid pain injection, which had little to

no effect. Id., par. 126. On April 17, 2019, Plaintiff underwent surgery again, for what was to be

major chest wall reconstruction. Id., par. 127. The April 17, 2019 surgery revealed the full extent of this gruesome injury. Id., par. 128. Rather than Plaintiff's initial thought that she had another rib sticking out, the April 17, 2019 surgery revealed that cartilage had been ripped away from her bones, and nerves were tangled around the cartilage, causing severe pain to Plaintiff Capps. Id., par. 129. As part of the April 17, 2019 surgery, the surgeon had to cut the nerves completely, and cut cartilage as well. Id., par. 130. As a result of the two surgeries Plaintiff Capps endured, she received scarring about her back and torso, which added an unfortunate element of significant cosmetic injury. Id., par. 131.

Plaintiff Capps had a follow-up appointment with her doctor on May 1, 2019. Id., par. 133. She thereafter underwent pain injections and physical therapy for her injuries, with little or no relief for her symptoms. Id., par. 134. As such, more than two years after Defendants' assault on her on February 25, 2018, Plaintiff is still receiving treatment for her permanent physical injuries. Id., par. 135. As a result of the excessive force inflicted upon her, Plaintiff Capps also experienced and continues to experience emotional trauma, including but not limited to a fear of driving, fear whenever she sees a police officer or an emergency vehicle, and nightmares, and Plaintiff Capps is undergoing treatment for the same. Id., par. 136. The numerous doctor visits, surgical procedures, and the damaged state of her physical and mental health, which is believed to be permanent, likewise caused stress and anxiety in the marriage of the Plaintiffs. Id., par. 137. Plaintiff Capps lost time from her employment, sustained a loss of wages, lost vacation and sick time due to doctor visits, surgeries, hospital stays and recovery time, incurred medical expenses unreimbursed by insurance, and had to discontinue her employment at multiple jobs. She is currently able to be employed in jobs which require no physical activity. Id., par. 138.

On or about May 24, 2018, Plaintiffs Capps and Gibson served upon Defendants a Tort Claim Notice pursuant to the New Jersey Tort Claims Act, N.J.S.A. 59:1-1, et seq. Id.., par. 348. And the MPD was aware at least as of April 3, 2019 that the OPIA was reviewing all use of force incidents involving Dixon, following the publication of NJ.com's series entitled The Force Report, which was published in or about November or December of 2018. Id., par. 155. Plaintiff Capps filed her original Complaint on May 1, 2019, and served Defendants at the City Clerk's Office on May 8, 2019. Id., par. 156. Shortly thereafter, on May 10, 2019, Defendant Chief Farabella wrote to Dixon in a memorandum that "effective immediately" he was assigned to administrative/desk duties until further notice. Under this directive, Dixon would have no contact with the public other than answering phone calls. Id., par. 157.

### L.  One Month After Assaulting Audra Capps, Dixon Assaults Tanika Joyce.

On March 24, 2018, Defendant Dixon responded to a Shop Rite store, located at 2130 North Second Street in Millville, in response to an alleged shoplifting complaint. See Joyce Second Am. Compl., par. 56. Upon information and belief, upon Dixon's arrival at the Shop Rite in Millville, there was a juvenile in custody for allegedly opening food items inside the store and eating the items without paying. Id., par. 57. Upon information and belief, the juvenile's mother, Plaintiff Joyce, allegedly refused to provide identification to another Millville officer. Id., par. 58. The second Millville officer, upon further information and belief, did not wish to charge the juvenile, but claimed that he needed Joyce's identification in order to release the juvenile to her. Id., par. 59.

While at the Millville Shop Rite, Dixon asked Joyce for identification. She told him that she did not have it, and Dixon then threatened her with being placed under arrest for not providing identification. Id., par. 60. Dixon then told Joyce she was under arrest and grabbed her arm. She

pulled away and asked why she was being arrested since she paid for her groceries, and no store items were removed from her person.   Id., par. 61. At that time, Dixon slammed Joyce to the ground, causing her to land on her hip and hit her head on the floor.  She was sprayed with OC spray. Id., par. 62. Joyce's daughter, who was present at the Shop Rite, tried to record the incident, but an officer prevented her from doing so. Id., par. 63.

Plaintiff Joyce complained that she could not breathe, and that her hip was injured. Id., par. 64. Dixon and Millville Police Officer Albert Chard got on her back and handcuffed her.  The officers placed Joyce in the rear of a patrol car, and she asked for medical attention. Id., par. 65. Officers transported Joyce to the police station, and she was met outside by EMS personnel who transported her to the hospital. Id., par. 66.  After this incident, Plaintiff Joyce received treatment at Inspira Hospital in Vineland, New Jersey. Id., par. 67.

Officer Chard later told OPIA as part of its criminal investigation into Dixon's conduct, that the maneuver Dixon used to take Plaintiff Joyce to the ground was a "hip toss."  Chard said that he learned this maneuver through jiu jitsu. Id., par. 68.  In addition, and according to OPIA's investigation, Defendant Sgt. Redden told Dixon to retrieve the Shop Rite store surveillance video in connection with the Joyce incident, so that Dixon would be justified in using force. Id., par. 69.

### M. NJ.com Discovers Large Numbers of Use of Force Incidents By the MPD and By Dixon.

In or about 2017 and 2018, NJ.com began to compile data based on New Jersey police use of force reports received through public records requests.  Its 16-month-long investigation led to a series of articles originally published in November and December of 2018, collectively referred to as The Force Report. Id., par. 287.  As part of its investigation, and based on the records obtained and analyzed, NJ.com determined that during his first three-plus years as a police officer for the City of Millville, Defendant Dixon reported using force more than any other police officer in the

State of New Jersey. Id., 288. NJ.com also reported that, over the studied five-year period of 2012 through 2016, Dixon's 58 instances in which he reported using force ranked him third statewide behind two other officers from different police departments who had 62 and 59 such instances of reported use of force, respectively. Id., par. 289. NJ.com reported that Defendant Dixon's 58 use of force incidents in his first four years after completing police academy training yielded an average of more than one incident per month. Id., par. 290. By contrast, NJ.com reported that the more than 17,000 New Jersey officers who reported using force over a similar period averaged less than one incident per year. Id., par. 291.

According to NJ.com's reporting and investigation, Dixon himself accounted for a full one-tenth of the entire Millville Police Department's use of force incidents reported, and none of the other 70-plus officers came close to his share. Id., par. 292. Moreover, as related by NJ.com's reporting and investigation, with 58 reported instances of the use force during the period studied, Dixon far eclipsed the second-place finisher in the Millville Police Department, Officer Jeffrey E. Profitt, who reported using force 36 times during the same period. Id., par. 293.

NJ.com's reporting and investigation showed that Defendant Dixon reported more injured subjects than all but one other officer in the state, despite the fact that he was on the police force for only four of the five years covered by The Force Report. Id., par. 294. In      response      to NJ.com's reporting and investigation, and as described in the Second Count, Chief Jody Farabella nevertheless called Dixon "an example of a fine officer" who was never the subject of a sustained excessive force complaint. Id., par. 295.

Chief Farabella, however, and according to NJ.com, declined to say how many excessive force complaints in total had been filed against Dixon. Id., par. 296. Chief Farabella commented further to NJ.com by referring to Dixon's duty assignment: "He's in the worst areas ... so he's

gonna see more than a regular patrolman." Id., par. 297. Upon information and belief, however, the incident involving Plaintiff Capps occurred on a state highway across the street from a cemetery. Id., par. 298. Moreover, Millville Police Officer Antonio Delfinado, when interviewed later as part of OPIA's criminal probe of Dixon, undercut Chief Farabella's "worst areas" theory when he told investigators that the MPD does not have assigned zones. Instead, an officer can be dispatched to any call in any section of the city at any given time. Id., par 299. That aside, NJ.com also has reported on irregularities with some of Dixon's use of force reports. Id., par. 300.

In addition, NJ.com has reported that, of the 39 excessive force complaints filed against police officers in the City of Millville from 2012 through 2016, not one complaint was sustained. Id., par. 301. NJ.com also reported that from 2012 through 2016, Millville's Police Department recorded 665 total uses of force, for 46.7 incidents per 1,000 arrests, and concluded that the City of Millville's Police Department used force at a higher rate than 394 other police departments in the State of New Jersey. Id., par. 302. NJ.com's analysis additionally revealed that 74 officers in the Millville Police Department used force over five years, an average of 9.0 incidents per officer who used force over that five-year period, which exceeded the statewide average of 4.1 incidents per officer. Id., par. 303.

Chief Farabella's statement that Dixon was not previously the subject of a sustained excessive force complaint suggests that neither Defendant City of Millville, nor Chief Farabella, nor any of the Supervisory Defendants, have imposed discipline on Dixon for previous instances of excessive force. Id., par. 304. These facts are evidence of deliberate indifference on the part of the City of Millville and its policymakers to the pattern and use of excessive force by Dixon, to the frequent use of excessive force by officers of the Millville Police Department, and to the questionable process employed by the Millville Police Department of investigating internal affairs

complaints and as to officer discipline, among other deficiencies which may be revealed in discovery and investigation. Id., par. 305. Defendant, City of Millville, allowed Defendant Dixon's behavior to go unchecked, and this is reflected in the fact that Dixon is the subject of two other known excessive force lawsuits now pending in the District of New Jersey, the Cottman and Joyce cases. Id., par. 306.

### N. MPD Officers Talk to OPIA In Connection With The OPIA's Criminal Investigation of Dixon.

As part of a criminal investigation into Dixon's conduct as a police officer, Defendant Lt. McLaughlin told OPIA's investigators in connection with the 2019 Dixon criminal probe that it was the responsibility of the patrol sergeant to review all UOF forms and investigation reports. Id., par. 232. But he described in his July 2019 OPIA interview that recently that year there was a change to the August 2016 updated Use of Force policy to review UOF reports. Id., par. 233. Under the new 2019 policy, Defendant Lt. McLaughlin said, every UOF report must have a two-tier comprehensive review done by both the sergeant and the lieutenant. This review includes reviewing not only an investigation report but also any MVR and 9-1-1 recordings in reference to a call. The review is then added to GTS by the sergeant and the lieutenant. However, prior to this 2019 policy change, the sergeant would only check the UOF form for accuracy and completeness, but the sergeant did not do any audio or video review. Id., par. 234.

The prior policy outlined by Defendant Lt. McLaughlin could not, as described, be meaningful or geared toward catching officers like Dixon engaging in the improper use of force. That is because a standard UOF report is a one-page template that is filled in by the officer involved in a particular incident. Since a supervisor reviewing such a document more likely than not would not be expected to be out at the scene of the incident, and would not have firsthand knowledge of

the incident, a supervisor would have no way of actually knowing that a UOF form was accurate and complete just by looking at the document prepared by the submitting officer.  Id., par. 235.

When OPIA asked Defendant Lt. McLaughlin why the review policy changed in 2019, he told OPIA he was not sure, but that he believed it was because of OPIA's investigation and the release of The Force Report.  This demonstrates that the MPD only changed its policy in favor of additional supervisory audio and video review of a use of force incident when it was exposed in public by the media and when one of its own officers was the subject of a criminal investigation.  Id., par. 236.  Defendant Lt. McLaughlin also told OPIA about an additional use of force incident occurring on May 2, 2019, when Dixon was still on the police force, and which McLaughlin described in a May 20, 2019 letter.  McLaughlin told OPIA that after his review of the 9-1-1 tape, he concluded that Dixon should have been aware that he was responding to a mentally disturbed individual, and that he should not have used a closed fist strike to gain compliance.  He said OC spray should have been used in that instance.  Id., par. 237.  Defendant Lt. McLaughlin claimed in his OPIA interview that he did not pay attention to the news, but he was aware of The Force Report and possibly recalled looking at the numbers for his officers.  He claimed that he did not read any of the articles.  Id., par. 238.

Defendant Lt. McLaughlin also told OPIA that he has not worked with Dixon and did not believe he has ever directly supervised him.  In fact, however, Defendant Lt. McLaughlin did review three of Dixon's UOF reports, he performed a "random" MVR review of Dixon in 2015, prepared an evaluation of Dixon that same year, and orally reprimanded him in 2017.  Id., par. 239.  Upon information and belief, Defendant Lt. McLaughlin took no steps to discipline Dixon for his use of force or to remove him from employment with the Millville Police Department.  Id., par. 240.

According to a February 24, 2018 daily activity log, Defendants Sgt. Redden and Sgt. Ayars were Dixon's and Orndorf's sergeants on Alpha Squad at the time of the Capps incident. Id., par. 241.  Defendant Sgt. Redden, in his interview in July of 2019, likewise told OPIA that, approximately six months prior, the Millville Police Department's Use of Force policy changed. Before the change, it was his responsibility to check for completeness and compare a UOF report to the investigation report.  Defendant Sgt. Redden thus described the 2019 policy change in somewhat different terms from the description provided by Defendant Lt. McLaughlin.  Id., par. 242.  Nevertheless, Defendant Sgt. Redden said that under the new 2019 policy, if there was any complaint of pain, there must be a full investigation done of the incident, including review of MVR footage, including speaking to the injured individual and responding to the scene.   After the completion of this investigation, the results must be entered into GTS, stating if the use of force was justified or not.  Id., par. 243.

Defendant Sgt. Redden told OPIA that he supervised Dixon for a few months prior to Dixon's involvement in an unrelated police-involved shooting, and at another occasion during Dixon's career.  Redden told OPIA that Dixon left Redden's squad to go to another squad to work with a friend.  It can be assumed that this friend was Defendant Orndorf, who apparently knew Dixon for 11-12 years before Orndorf joined the MPD.  Id., par. 244.  Defendant Sgt. Redden described Dixon as wanting to be proactive and aggressive, and noted that because of this Dixon caused more work for him and for other supervisors.  Id., par. 245.  Remarkably, Defendant Sgt. Redden told OPIA that Dixon punches people in the face, and that he addressed his actions.  In fact, Sgt. Redden referred to Dixon with the nickname of "glass hands," because Dixon broke his hand on numerous occasions.  Id., par. 246.

Defendant Sgt. Redden also related to OPIA that he told Dixon that the use of force gives the public a poor perception of the police. Id., par. 247. According to Defendant Sgt. Redden, Dixon's response to this was, "If I'm justified to use force, I'm going to use force." Dixon's attitude about the use of force stands in contrast to the Attorney General's Use of Force Policy, which states that an officer should use the "utmost restraint" in connection with the use of force, even though it may be "justified." Id., par. 248.

Importantly, Defendant Sgt. Redden was Dixon's supervisor on the night of the Capps incident. (He is also listed as the supervisory officer on the UOF form for the Joyce incident on March 24, 2018.) In his OPIA interview, Defendant Sgt. Redden stated that he was under the impression that the Capps arrest was a normal DWI, but nothing out of the ordinary. Defendant Sgt. Redden claimed that he watched the MVR – without specifying when he reviewed it – and claimed that Dixon just reacted to Capps. He told OPIA quite remarkably that he was glad that Dixon did not punch Capps because Dixon is known for punching people. Despite the fact that Redden knew Dixon was known for punching people, and gave Dixon the nickname of "glass hands," Dixon remained on the police force. Id., par. 249.

Additionally, Defendant Officer Orndorf, interviewed as part of the Dixon criminal probe, further told OPIA that the MPD reviews the Use of Force policy when officers go to the range -- presumably meaning, the gun range. He believed that this was done once a year, but said that the training was very repetitive and he did not recall the exact procedure. Id., par. 320. Officer Chard further informed OPIA that supervisors have spoken to him about using force, but that this was a rare occurrence. He said that Defendant Sgt. Redden spoke to him only once when he was a new officer about the use of force, and that Defendant Sgt. Redden told Chard he should have used force sooner during the incident discussed so that it would be more effective. Id., par. 321.

41

The OPIA also interviewed Defendant Chief Farabella in September 2019 as part of its criminal probe into Dixon's conduct. Farabella told OPIA that the recent Use of Force policy change occurred as a result of the "ACLU or Star Ledger" report that came out and also from talking to other area chiefs of police. Id., par. 250. Defendant Chief Farabella said that under the new policy, a UOF form would go from the sergeant to the lieutenant for review, after which it would not be seen by him unless an internal affairs investigation is generated. Furthermore, under the new policy, on all use of force incidents, an MVR review must be done. Supervisors are told to inform Internal Affairs if any excessive use of force is observed. Id., par. 251. Defendant Chief Farabella did not issue his memorandum regarding the new use of force policy change until March 15, 2019. A new General Order on the Use of Force became effective on June 4, 2019. This was, unfortunately, too little too late to prevent what happened to Barry Cottman, Audra Capps and Tanika Joyce. Id., par. 252.

Defendant Chief Farabella told OPIA that when the use of force article came out – meaning The Force Report – (in late 2018) he observed that Officer Dixon had the most use of force in the state. Id., par. 253. Defendant Chief Farabella also told OPIA in September 2019 that when the Capps arrest video was released to the public, he had concerns with Dixon using excessive force. He did not feel that Dixon's "hip throw" would have been the force he would have used in the same scenario. Id., par. 254. Following Dixon's participation in an officer-involved shooting in April 2018, a captain at the time said that Defendant Chief Farabella should write a letter of valor for Dixon's actions. Defendant Chief Farabella confirmed to OPIA that he wrote this letter and that if Dixon were selected, he would have an opportunity to meet the President of the United States. Id., par. 255.

Even when The Force Report came out, and Dixon knew he was the highest ranking officer, Dixon was still using force, according to Defendant Chief Farabella's interview with OPIA. Defendant Chief Farabella further stated that, since becoming aware of Dixon's use of force, he did not agree with a lot of the use of force actions Dixon performed, and said that he believed that many were excessive. Id., par. 256. Importantly, however, Defendant Chief Farabella also told OPIA that he spoke to Dixon a few times about his use of force and told Dixon that using the type of force he used was not the image of a police officer. Id., par. 257.

It should be remembered that, in addition to the Supervisory Defendants looking the other way on Dixon's continued and routine use of excessive force as detailed herein, and as further evidence of acquiescence, Defendant Chief Farabella, instead of simply declining to comment in the face of NJ.com's damning reporting about Dixon's use of force numbers, went out of his way to defend Dixon by calling him "an example of a fine officer," and by making other reported comments to excuse or to justify Dixon's conduct. Id., par. 269.

**O. Dixon Pleads Guilty to Assaulting Plaintiffs Capps and Joyce.**

By letter dated September 5, 2019, the OPIA notified Dixon that he was the target of a State Grand Jury investigation into allegations of official misconduct, assault and falsifying or tampering with public records relating to his conduct occurring during the course of his employment as a Millville police officer. Id., par. 158. OPIA's investigation revealed, in fact, that Dixon prepared eighty (80) UOF reports during his time as a Millville police officer. Id., par. 159.

Dixon resigned from his employment with the City of Millville in an October 19, 2019 email, and when he did so, he told Defendant Chief Farabella: "… As we last spoke about my current in going [sic] the deal offered to me is much worse than I could have imagined. **I want to**

43

**thank you for <u>always having my back</u>** and being a great Chief." <u>Id.</u>, par. 270 (bold and underlining added).

On November 20, 2019, Dixon entered guilty pleas on a pre-indictment Accusation in Superior Court, Cumberland County, to two counts of third-degree aggravated assault based on the conduct committed against Joyce on March 24, 2018 and against Plaintiff Capps one month earlier on February 25, 2018. <u>Id.</u>, par. 160. At his plea hearing on November 20, 2019, Dixon admitted under oath, among other things, that he used excessive force against Joyce and Capps, and that his actions were reckless. <u>Id.</u>, par. 161. As part of his guilty pleas, Dixon agreed to a lifetime ban on public employment, and he will never be able to serve as a police officer in the State of New Jersey ever again. <u>Id.</u>, par. 162. Dixon's pleas of guilty for his assaultive conduct as to Joyce and Capps came with a recommended and negotiated sentence of probation, conditioned upon serving 364 days in the Cumberland County Jail. <u>Id.</u>, par. 163.

Following Dixon's guilty plea on November 20, 2019, New Jersey's Attorney General announced that, "When officers use force that has no reasonable relationship to any resistance or threat they face, as Dixon did, they not only injure and traumatize those involved, they do a tremendous disservice to all of their fellow officers who uphold the highest law enforcement standards and work hard to secure the trust of the communities they serve." <u>Id.</u>, par. 164. Following Dixon's guilty plea, OPIA Director Thomas Eicher further announced: "Nobody is above the law, and if we have sufficient proof that an officer has committed a crime, we will prosecute that officer as we would any other individual. This former officer will rightly carry a felony record for the rest of his life." <u>Id.</u>, par. 165. At sentencing on January 17, 2020, the Superior Court enforced the negotiated plea agreement entered by Dixon and the OPIA, placed Dixon on two years of probation, but the Court suspended Dixon's county jail sentence. <u>Id.</u>, par. 166.

As it turned out, Dixon was not the only Millville officer whose behavior was allowed to go unchecked.  The City of Millville also permitted the conduct of former Millville Police Officer Jeffrey Profitt to go unchecked.  Ultimately, however, on January 10, 2020, Profitt pleaded guilty in the Superior Court of New Jersey, Cumberland County, to third-degree aggravated assault charge in connection with a police-citizen encounter.  Id., par. 307.  Profitt's plea agreement also required him to resign from the Millville Police Department, and to agree to a lifetime ban on public employment.  He received a sentence similar to the sentence handed down in Dixon's criminal case.  Id., par. 308.  Thus, separate and apart from the use of force statistics identified by NJ.com in The Force Report, the City of Millville's Police Department has now had two police officers become convicted felons for committing aggravated assaults upon arrestees within a span of a few months.  Id., par. 309.

### P.  MPD's Internal Affairs Unit Sustained Investigations Against MPD Officer For Some Types of Violations, But Not When Excessive Use of Force Was Alleged.

Dixon joined the MPD in or about August of 2012.  Preliminary Internal Affairs indexes demonstrate the following: (1) for the 2013 calendar year, not one of the approximately 23 internal affairs investigations was sustained against a Millville officer for excessive force; (2) in 2014, of the apparent seven excessive force investigations, only two were sustained and against the same officer, Edmund Ansara, who was terminated for a variety of reasons; (3) in 2015, there appear to be six excessive force investigations, with none marked as sustained, but with a negative outcome relating to the arrest of Officer Jeffrey Profitt; (4) in 2016, there apparently were no sustained excessive force investigations out of six cases; (5) the 2017 index reveals only one out of five sustained cases, giving Defendant City of Millville the benefit of the doubt that a case characterized as "simple assault" might have involved the use of force by an officer; (6) Millville's 2018 index,

which interestingly changed its linguistic terminology from "excessive force" to "use of force," revealed only one out of six sustained police officer use of force investigations; and (7) the 2019 index appears to demonstrate zero out of four possible use of force cases sustained. Id., par. 310. Thus, giving Defendant City of Millville the benefit of favorable inferences, it can be said that, according to its Internal Affairs indexes, in seven years (2013 through 2019), only four (4) out of a possible fifty-seven (57) excessive force investigations were sustained (about seven percent of the cases), with two of those four being attributed to one terminated former officer. Id., par. 311.

Defendant Millville's indexes for these seven years reveal 10 internal affairs investigations against Defendant Dixon for what appear to be instances of excessive force, with not one investigation determined to be "sustained." Dixon, however, had sustained findings against him as to other non-force-related violations during his tenure with the MPD. Id., par. 312. Millville internal affairs indexes for the years 2013 through 2019 further demonstrate that the MPD's Internal Affairs Unit often sustained minor or other types of regulatory violations against officers, but rarely made "sustained" findings in cases of excessive force, which could subject its officers and the City to civil liability and monetary damages. Id., par. 313. This stands to reason when one considers that in a September 13, 2019 letter to Commissioner James Parent, Defendant Chief Farabella asked for an additional $16,200 to be added to the 2020 budget for body worn cameras. Id., par. 314.

Indeed, in connection with the 80 use of force forms filled out by Dixon, and the times in which Dixon and other officers were investigated by the Internal Affairs (or Professional Standards Unit) for excessive use of force, the Millville Police Department did not have any means of corroborating or challenging the officers' version of events unless the incident was captured on MVR or on a bystander's cell phone because the police department did not obtain body-worn