cameras ("BWC") until the summer of 2020. This limitation allowed a supervising officer and/or an internal affairs investigator to choose to credit an officer's account of what transpired over that of a citizen complainant or a suspect. Id., par. 315.

**Q. Defendants Did Not Make Policy Changes Until it Was Too Late.**

On or about December 4, 2019, New Jersey's Attorney General announced sweeping statewide reforms regarding, among other things, the use of force by police officers, the conduct of internal affairs investigations, and the identification of at-risk police officers, known collectively as the "Excellence in Policing Initiative." Id., par. 323. In a particularly noteworthy letter dated December 4, 2019, the Attorney General notified Chief Farabella and five other New Jersey Chiefs of Police that, among other things, he was "…writing to recognize your police departments as the six New Jersey law enforcement agencies that will participate" in a pilot program for the State of New Jersey's new Police Use-of-Force Portal for obtaining statewide use-of-force data. Id., par. 324.

As reflected in the various Defendants' OPIA interviews, Defendant, the City of Millville, made changes to its Use of Force policy in 2019, all too late to save Barry Cottman, Audra Capps, and Tanika Joyce from the misconduct of Joseph Dixon. Fundamentally, this 2019 change recognizes that the City's prior policies and procedures plainly were inadequate, and were put into place only after NJ.com exposed the City's and Dixon's use of force numbers and/or in the wake of OPIA initiating a criminal probe of Dixon. Id., par. 325.

Ultimately, Defendant Chief Farabella did not place Dixon on administrative/desk duties after the publication of The Force Report in late 2018, nor after it was apparent that the OPIA was investigating Dixon in early April of 2019, but on May 10, 2019, nine days after the filing of the original Complaint in the Capps case, and a mere two days after the service of that Complaint. Id.,

par. 342.  In addition, as of September 14, 2020, Defendant, City of Millville, still has Defendant Dixon listed as a patrolman on its website's "staff directory," along with Colt Gibson, who, upon information and belief, also is no longer employed by the Millville Police Department and employed with a different police department.  This continued failure to manage even a website available to the public on the internet is reflective of the Defendants' overall inability to manage the larger problem of supervising its own police officers who come into contact with members of the public.  Id., par. 343.

By way of summary, as described in the Second Amended Complaints, the Supervisory Defendants, upon information and belief, implemented and/or allowed improper policies or procedures to exist and/or acquiesced in the violations of their subordinates, in that they:

(1)     knew or should have known about the frequency of their own departmental use of force reports which were filled out by their officers, including but not limited to Defendant Dixon;

(2)     knew or should have known that their officer training and evaluation programs were ineffective in stemming the tide of unconstitutional uses of excessive force by their officers;

(3)      knew or should have known that state and departmental guidelines regarding the use of force were not being adhered to;

(4)     knew or should have known that appropriate procedures regarding the conduct of internal affairs investigations and officer discipline for the use of excessive force were not being followed and/or misused to create biased outcomes, with the ultimate result that dangerous officers were being permitted to remain employed,

undisciplined and unpunished, to the detriment of the public and Plaintiffs in this case and in other cases;

(5)     knew or should have known that the high frequency of certain officers' (including, but not limited to, Dixon) use of force reports was evidence of a larger problem which was not being addressed and/or which was being overlooked in an effort to support the officers of the Millville Police Department; and/or

(6)     knew or should have known, based on previous instances of Dixon's use of force, and at least as early as the June 27, 2017 incident in the Cottman case, that Dixon exhibited the propensity to use excessive force, such that he should not have been permitted to remain on duty prior to the February 25, 2018 incident involving Plaintiff Capps and the March 24, 2018 incident involving Joyce.

Id., par. 281.

### III.    LEGAL ARGUMENT

**A. Defendant Joseph Dixon's Motions to Dismiss, For Judgment on the Pleadings, and Alternatively For Summary Judgment As To Plaintiff Audra Capps (1:19-cv-12002-RMB-AMD, ECF Doc. 64) And As to Plaintiff Tanika Joyce (1:20-cv-01118-RMB-AMD, ECF Doc. 52)**

1. The Standards of Review.

Defendant Dixon moves alternatively under Federal Rules of Civil Procedure 12(b)(6), 12(c ), and 12(d) in an effort to dismiss the rather strong civil case against him. It appears that Dixon invokes Rule 12(d) in order to attach police reports he thinks are favorable to him, but also so he can justify attaching various Superior Court transcripts in an effort to reimagine reality with respect to his own felony convictions. As discussed below, this is not helpful to his position in this case.

Under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal,

556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 662. "[A]n unadorned, the defendant-unlawfully-harmed-me accusation" does not suffice to survive a motion to dismiss. Id. at 678. "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)). See Dixon Br. at 3. Moreover, argues Dixon, in reviewing a plaintiff's allegations, the district court "must accept as true all well-pled factual allegations as well as all reasonable inferences that can be drawn from them, and construe those allegations in the light most favorable to the plaintiff." Bistrian v. Levi, 696 F.3d 352, 358 n.1 (3d Cir. 2012); see Dixon's Br. at 3.

As described above, the Second Amended Complaints in both cases contain sufficient factual matter. It is one thing for a moving defendant to simply say that a complaint does not allege enough factual matter to warrant the drawing of reasonable inferences in a plaintiff's favor. But such an assertion would not apply to the Second Amended Complaints filed in the Capps and Joyce actions. They are far more detailed than mere "unadorned" pleadings that just allege that an actor harmed them. They demonstrate it, with video evidence, references to documents (mostly from the Defendants), and Dixon's own guilty pleas, which are discussed in more detail below. And although there are the required formulaic and required recitations of the elements of the offenses in the various counts of the Second Amended Complaints, they are bolstered and informed by a historical factual recitation of Dixon's conduct, and of his supervisors' and the MPD's tolerance of his behavior and that of other officers. Viewing the allegations contained in the Capps and

Joyce Second Amended Complaints in a light most favorable to the Plaintiffs, it is clear that Plaintiffs vault the pleading standards under Federal Rule of Civil Procedure 12(b)(6).

Additionally, Plaintiffs are pleased that Dixon has cited the case of Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1384 n. 2 (3d Cir. 1994) (citation omitted) for the proposition that, on a motion to dismiss the court may consider only the allegations in the complaint, and "matters of public record, orders, exhibits attached to the complaint and items appearing in the record of the case." See Dixon Br. at 3-4. That authority opens the door to an examination of the documents Dixon attaches – which undercut his legal position – and to other matters the Court ought to consider that are not contained within the four corners of the Second Amended Complaints. See also generally Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007) (court in reviewing a motion to dismiss may also consider those "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."). In addition, when considering a motion to dismiss under Rule 12(b)(6), a court may "consider only the complaint, exhibits attached to the complaint, [and] matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) (citation omitted).

In a related vein, Dixon cites Mitchell v. Forsyth, 472 U.S. 511, 526 (1985) to suggest that, "Even if the plaintiff's complaint adequately alleges the commission of acts that violated clearly established law, the defendant is entitled to summary judgment if discovery fails to uncover evidence sufficient to create a genuine issue as to whether the defendant in fact committed those acts." See Dixon Br. at 5. Here, although Dixon personally has provided no documents in discovery at this point, and he has provided incomplete answers to interrogatories, discovery has commenced. No depositions have been taken. The discovery obtained thus far from other

Defendants, though not yet complete, is fairly revealing and has informed the content of the Second Amended Complaints.

To the extent that Dixon seeks judgment on the pleadings, a motion seeking that relief, based on a theory that the plaintiff failed to state a claim, is reviewed under the same standards that apply to a motion to dismiss under Rule 12(b)(6). <u>Revell v. Port Auth. of N.Y. & N.J.</u>, 598 F.3d 128, 134 (3d Cir. 2010). A district court may not grant judgment under Rule 12(c) "unless the movant clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law." <u>Jablonski v. Pan Am. World Airways, Inc.</u>, 863 F.2d 289, 290 (3d Cir. 1988) (internal quotation marks and citations omitted). In reviewing a decision granting a Rule 12(c) motion, a court must "view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the nonmoving party." <u>Society Hill Civic Ass'n v. Harris</u>, 632 F.2d 1045, 1054 (3d Cir. 1980) (internal quotation marks and citation omitted), <u>overruled on other grounds by</u> <u>Martin v. Wilks</u>, 490 U.S. 755 (1989).

Finally, to the extent that Dixon's motion requests conversion to summary judgment, it is well known that such relief shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it will "affect the outcome of the suit under the governing law . . . ." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). A dispute is "genuine" if it could lead a "reasonable jury [to] return a verdict for the nonmoving party." <u>Id.</u> When deciding the existence of a genuine dispute of material fact, a court's role is not to weigh the evidence; all reasonable "inferences, doubts, and issues of credibility should be resolved against the moving party." <u>Meyer v. Riegel Prods. Corp.</u>, 720 F.2d 303, 307 n.2 (3d Cir. 1983). However, a mere "scintilla of evidence," without more, will not give rise to a genuine dispute for trial. <u>Anderson</u>, 477 U.S. at

252. Summary judgment still appropriate "where the record . . . could not lead a rational trier of fact to find for the nonmoving party . . . ." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

A movant seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). Then, "when a properly supported motion for summary judgment [has been] made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" Anderson, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)). The non-movant's burden is rigorous: it "must point to concrete evidence in the record"; mere allegations, conclusions, conjecture, and speculation will not defeat summary judgment. Orsatti v. N.J. State Police, 71 F.3d 480, 484 (3d Cir. 1995); Jackson v. Danberg, 594 F.3d 210, 227 (3d Cir. 2010) (citing Acumed LLC v. Advanced Surgical Servs., Inc., 561 F.3d 199, 228 (3d Cir. 2009)) ("[S]peculation and conjecture may not defeat summary judgment."). For the reasons described below, Dixon's motions fail under all three of these standards.

2.   Dixon Is Not Entitled to Qualified Immunity.

a.   *Dixon Violated Plaintiffs' Clearly Established Rights.*

The doctrine of qualified immunity shields officials from civil liability so long as their conduct " 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). A clearly established right is one that is "sufficiently clear that every reasonable official would have understood that what he is doing

violates that right." <u>Reichle v. Howards</u>, 132 S.Ct. 2088, 2093 (2012) (internal quotation marks and alteration omitted). While it is the case that "clearly established law" should not be defined "at a high level of generality, <u>White v. Pauly</u>, 137 S.Ct. 548, 552 (2017) (citing <u>Ashcroft v. al-Kidd</u>, 563 U.S. 731, 742 (2011)), the Supreme Court has also said: "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." <u>al–Kidd</u>, 563 U.S. at 74. Put simply, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986). With all respect, Dixon would seem to fit within either of these exceptions that would remove him from the friendly confines of qualified immunity.

Importantly, the U.S. Supreme Court has rejected the idea that "an official action is protected by qualified immunity unless the very action in question has previously been held unlawful." <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987). Instead, the crux of the qualified immunity test is whether officers have "fair notice" that they are acting unconstitutionally. <u>Hope v. Pelzer</u>, 536 U.S. 730, 739 (2002). Dixon cites <u>City of Escondido v. Emmons</u>, 139 S.Ct. 500 (2019), but the case is unavailing to him, as the authorities cited therein bolster Plaintiffs' position on qualified immunity. The <u>Escondido</u> Court cites to and distinguishes <u>Gravelet-Blondin v. Shelton</u>, 728 F.3d 1086, 1093 (9th Cir. 2013), which described a right to be "free from the application of non-trivial force for engaging in mere passive resistance." That is precisely the concept that Plaintiff Capps alleges in her Second Amended Complaint, before she was subjected to Dixon's UFC-style whirling headlock takedown.

Speaking of "takedowns," <u>City of Escondido</u> also takes down Dixon's argument that the constitutional right needs to be specific and clearly established, as this argument may be applied

to the Capps and Joyce actions.  That is because City of Escondido cites to District of Columbia

v. Wesby, 138 S.Ct. 577 (2018), which instructs as follows:

> …[W]e have stressed the need to identify a case where an officer acting under similar circumstances was held to have violated the Fourth Amendment … While there does not have to be a case directly on point, existing precedent must place the lawfulness of the particular [action] beyond debate … **Of course, there can be the rare obvious case, where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances** … But a body of relevant case law is usually necessary to clearly establish the answer . . . .

Wesby, supra, 138 S.Ct. at 581 (internal quotation marks omitted; bracketed material by Escondido

Court; bold supplied).  See also Brosseau v. Haugen, 543 U.S. 194, 199 (2004) (noting that "in an

obvious case … the Graham [v. Connor, 490 U.S. 386 (1989) factors] can 'clearly establish' the

answer, even without a body of relevant case law.") (bracketed material added); see also Deorle v.

Rutherford, 272 F.3d 1272, 1286 (9th Cir. 2001) (When "the defendant's conduct is so patently

violative of the constitutional right that reasonable officials would know without guidance from

the courts that the action was unconstitutional, closely analogous pre-existing case law is not

required to show that the law is clearly established") (citation and internal quotation marks

omitted).

Dixon's misconduct was so "rare" and "obvious" that he was successfully prosecuted by

OPIA to a standard "beyond a reasonable doubt" as to the assaultive conduct Plaintiffs allege in

their Second Amended Complaints.  A case involving a police officer's guilty pleas to offenses

committed against the parties bringing suit under 42 U.S.C. section 1983 is almost never seen in

the state of nature.  Indeed, Dixon's misconduct presented such a "rare" and "obvious case" that

he folded … quickly.  He pled guilty less than three months after receiving a target letter from

OPIA.  Anyone with extensive experience in state court criminal defense knows that in the real

world criminal defendants simply do not plead guilty that quickly.  His quick capitulation says something.

Dixon complicates matters by inventing what he thinks is Plaintiff Capps's position on the clearly established right at play here in an attempt to deny liability:

> … Applying these principles to the instant matter, it is clear that Plaintiff Capps has not met and cannot meet, under the particularized circumstances of this case, the threshold showing of a deprivation of a 'clearly established' constitutional right.  Plaintiff's argument appears to be that she had a constitutional right that Officer Dixon could not effect an arrest with a take-down maneuver, to overcome her resistance, in these circumstances.  This claim does not represent a clearly established constitutional violation, and under the Supreme Court's prevailing analysis, Officer Dixon is entitled to qualified immunity.

Dixon Br. at 7 (emphasis added).  This straw man argument, which Dixon attempts to knock down, fails to do justice to the video evidence referred to in the Second Amended Complaint.  It is as if Dixon is briefing someone else's case, not the case before this Court.

In addition, it cannot be said that Dixon had no notice that his use of overwhelming force would violate a "clearly established right."  The late Chief Judge Simandle, in denying qualified immunity to certain defendants in <u>Castellani v. City of Atlantic City</u>, Civil Action No. 1:13-cv-05848-JBS-AMD (D.N.J. July 21, 2017), which the other Defendants in these cases rely upon in their motions, cited a number of cases, including <u>Hanks v. Rogers</u>, 853 F.3d 738, 747 (5th Cir. 2017) ("[C]learly established law [in February 2013] demonstrated that an officer violates the Fourth Amendment if he abruptly resorts to overwhelming physical force rather than continuing verbal negotiations with an individual who poses no immediate threat or flight risk, who engages in, at most, passive resistance, and whom the officer stopped for a minor traffic violation.") (bracketed material by the <u>Castellani</u> court) and <u>Champion v. Outlook Nashville, Inc.</u>, 380 F.3d 893, 903 (6th Cir. 2004) ("[I]t is also clearly established that putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued

and/or incapacitated constitutes excessive force."). See also generally Goodwin v. City of Painesville, 781 F.3d 314, 328 (6th Cir. 2015) (affirming denial of summary judgment on excessive force claim where, in 2010, "Mr. Nall had a clearly established constitutional right not to be tasered when he was at most offering passive resistance").[5]

Jackson v. Tellado, 236 F. Supp.3d 636 (E.D.N.Y. 2017) is further instructive. There, the district court granted in part and denied in part defense motions for judgment as a matter of law and/or for a new trial under Federal Rules of Civil Procedure 50 and 59. Id. at 642 and n.2. After a seven-day trial in a case involving a police melee at the home of an off-duty police officer, id. at 642, 643, the jury awarded plaintiff $12,500,000 in compensatory damages and various amounts of punitive damages against the various officers in a total amount of $2,675,000. Id. at 642 and n.1. Jackson is a fairly lengthy opinion, in no small measure because the decision deals with post-trial motions, several different issues, a large verdict, and multiple defendants. But the opinion refers to several cases that bear mentioning here. See id. at 663-664 (citing, inter alia, O'Hara v. City of New York, 570 Fed. App'x. 21, 23-24 (2d Cir. 2014) (summary order) (concluding that, where officers were arresting plaintiff for a "relatively minor matter," no reasonable officer … could have thought that the law authorized him repeatedly to punch an unarmed, non-menacing 17-year-old in effecting an arrest")(see Exhibit 1); see also Davis v. Clifford, 825 F.3d 1131, 1137

---

[5] It also should be noted that members of the Supreme Court have recognized that qualified immunity represents a departure from the customary approach to interpreting statutes. See Ziglar v. Abbasi, 137 S.Ct. 1843, 1871 (2017) (Thomas, J., concurring in part and concurring in the judgment) ("In further elaborating the doctrine of qualified immunity … we have diverged from the historical inquiry mandated by the statute."); Crawford-El v. Britton, 523 U.S. 574, 611 (1998) (Scalia, J., dissenting) ("[O]ur treatment of qualified immunity under 42 U.S.C. sec. 1983 has not purported to be faithful to the common-law immunities that existed when sec. 1983 was enacted, and that the statute presumably intended to subsume."); Wyatt v. Cole, 504 U.S. 158, 170 (1992) (Kennedy, J., concurring) ("In the context of qualified immunity … we have diverged to a substantial degree from the historical standards.")

(10th Cir. 2016) ("[I]t is ... clearly established law that the use of disproportionate force to arrest an individual who has not committed a serious crime and who poses no threat to herself or others constitutes excessive force.")). And with respect to the protestations and alleged verbal disrespect exhibited by Plaintiffs Capps and Joyce in their encounters with Dixon, there is case law on what is clearly established in the context of verbal objections to police actions. See id. at 667 (citing, inter alia, Lustig v. Mondeau, 211 Fed. App'x. 364, 371-72 (6th Cir. 2006) (finding that passive resistance and yelling while detained did not justify arm twisting and jerking that caused injury, and thus amounted to a clearly established constitutional violation)(see Exhibit 2); Meredith v. Erath, 342 F.3d 1057, 1061 (9th Cir. 2003) (finding clearly established violation when an agent grabbed a woman by her arms, forcibly threw her to the ground, and, twisting her arms, handcuffed her, after she "loudly asked several times to see a search warrant"); Aldrich v. City of Columbus, 2016 WL 6084570 (S.D. Ohio 2016) (stating that "[a] simple refusal by an unthreatening suspect to comply with an officer's commands does not warrant the use of significant force") (see Exhibit 3).

The district court in Jackson also made mention that courts in the Eastern District of New York have observed that when a jury has awarded punitive damages, an assertion of qualified immunity "seem[s] especially hollow." Jackson, 236 F. Supp.3d at 672 n. 33 (citing Harewood v. Brathwaite, 64 F. Supp.3d 384, 401 (E.D.N.Y. 2014), appeal withdrawn (April 2, 2015) (quoting Adedeji v. Hoder, 935 F. Supp.2d 557, 571 (E.D.N.Y. 2013)). "The jury having found that [the defendant's] conduct was malicious or wanton cuts deeply against [the defendant's] argument that the Court should find him immune on the ground that he acted in [an] objectively reasonable manner." Id. See also Robertson v. Sullivan, 07-CV-1416, 2010 WL 1930658, at *4 (E.D.N.Y. 2010) ("The jury having found that each defendant deserved to be punished for engaging in such behavior, it is

difficult to fathom the defendants' post-verdict claim that [the Court] should find them immune on the ground that [they] acted in an objectively reasonable manner." …) (bracketed material in original)(see Exhibit 4).  While a jury has not yet awarded punitive damages in these cases, the analogy is instructive to the uncontroverted facts of the case known thus far.  Dixon has already been punished by being prosecuted and convicted by the State of New Jersey for the conduct aimed at Plaintiffs in these cases.  Dixon admitted under oath that his conduct was reckless.  He admitted that he used excessive force as to both Plaintiffs.  He has two felony convictions for third-degree aggravated assault.  See generally by analogy Leang v. Jersey City Bd. of Educ., 198 N.J. 557, 591 (2009) ("A person is subject to liability for the common law tort of assault if: "(a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) the other is thereby put in such imminent apprehension … The tort of battery rests upon a nonconsensual touching" (citations omitted). Since the State has seen fit to punish him for his conduct, to which he quickly pleaded guilty without so much as putting up a fight in criminal court, it is similarly difficult to fathom how Dixon should be found immune on the basis that he somehow acted in an objectively reasonable manner as to Plaintiffs Capps and Joyce.

Dixon, in attempting to redefine his conduct as involving a mere "takedown" in an effort to feed a false narrative, refers to the use of force necessary to overcome a subject's physical resistance, and the examples of the five recognized "takedown techniques" that are expressly authorized for officers to subdue resisting suspects.  See Dixon Br. at 8.  The problem is, however, that the MVR footage reveals that Dixon did something quite separate and apart from those recognized takedown techniques.  Simply put, qualified immunity was not meant to protect the

likes of former officer Joseph Dixon.  His request that the doctrine be applied to his case is without any arguable merit.

### b.  Dixon Ignores the "Heck Doctrine"

Dixon makes a remarkable assertion.  He claims that his "… negotiated plea agreement involving guilty pleas to reckless conduct during arrests of Capps and Joyce does not eliminate Dixon's qualified immunity defenses."  See Dixon Br. at 10.  What is missing is anything resembling a citation to support this rather extraordinary proposition.  Id.  And while not providing any case law whatsoever in which a federal court granted qualified immunity to a police officer convicted of felonies regarding the exact same conduct sued upon by his victims, Dixon argues that:

> Plaintiff has proffered no evidence, authority, or legal precedent, to prove that one who is lawfully resisting an arrest, that is based on probable cause, has a right to be free from a law enforcement officer's takedown maneuver to apply handcuffs and effectuate an arrest. Similarly, Plaintiff has not shown evidence that a law enforcement officer would clearly believe that his conduct in using a takedown maneuver, lasting two seconds, to arrest a resisting suspect, was unlawful or a violation of clearly established statutory or constitutional rights.

See Dixon Br. at 7-8.  Dixon makes a very similar argument in his brief in support of his motions in the Joyce case.  See Dixon Br. in Joyce case, at 6, 7.  He seems to suggest that the act of resisting arrest, or of being convicted of it in municipal court for that matter, would nullify an excessive force claim.  The argument emerges as misplaced when one considers the authorities on the viability of excessive force claims in the context of probable cause or resisting arrest scenarios. See Holmes v. Cushner, Civil Action No. 10-5384, at *9 (D.N.J. Dec. 19, 2012) (Rodriguez, J.) (finding excessive force claim not precluded despite resisting arrest conviction) (see Exhibit 5) (citing Garrison v. Porch, 376 Fed. App'x. 274, 277-78 (3d Cir. 2010) (see Exhibit 6) (citing Nelson v. Jashurek, 109 F.3d 142, 146 (3d Cir. 1997) ("[A] reasonable juror, considering the

totality of the circumstances, could find that the arrestee resisted arrest, but was still subjected to an unreasonably excessive level of force by the police officer in response.")).

Dixon's argument is further misplaced when one considers that this Court rejected a similar argument. In <u>Davis v. Egg Harbor Twp.</u>, Civil No. 14-4213 (D.N.J. June 5, 2017) (Bumb, J.) (<u>see</u> Exhibit 7), this Court granted in part and denied in part a motion for summary judgment in a case arising from a traffic stop, where plaintiff pled guilty to a fourth degree charge of "obstructing the administration of law" – more serious than the charges leveled against either Audra Capps or Tanika Joyce here – and where plaintiff was required to make factual admissions that he refused to get out of his vehicle or roll down his window when asked to do so by police. <u>Id.</u>, slip op. at 2, 10. Unlike in Dixon's case where the state court denied the requested civil reservation, plaintiff's civil reservation in <u>Davis</u> was granted, <u>id.</u> at 10, as was Plaintiff Capps's civil reservation in Millville Municipal Court.

Pertinent to the Plaintiffs' cases here, this Court in <u>Davis</u> analyzed <u>Heck v. Humphrey</u>, 512 U.S. 477 (1994). The applicable theory is known as the "<u>Heck</u> Doctrine":

> The <u>Heck</u> Doctrine precludes a plaintiff from pursuing a civil claim under 42 U.S.C. § 1983 that would directly contradict a previous holding in criminal court. <u>Heck v. Humphrey</u>, 512 U.S. 477 (1994). Recognizing that "civil tort actions are not appropriate vehicles for challenging the validity of outstanding criminal judgments," the Supreme Court in <u>Heck</u> held that if "a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction . . . [the] complaint must be dismissed." <u>Id.</u> at 485-87.

> Nevertheless, Fourth Amendment claims under § 1983, such as claims of excessive force and unreasonable search and seizure, do not automatically "demonstrate the invalidity of [an] outstanding criminal judgment." <u>Id.</u> at 487. See also <u>Gibson v. Superintendent of N.J. Dep't of Law & Pub. Safety Division of State Police</u>, 411 F.3d 427, 449 (3d Cir. 2005) (holding that the court should use a fact-based inquiry to determine if a particular Fourth Amendment claim would necessarily undermine a plaintiff's outstanding conviction, based on footnote seven of <u>Heck</u>), <u>overruled on other grounds by</u> <u>Dique v. New Jersey State Police</u>, 603 F.3d 181, 188 (3d Cir.

2010); <u>Flood v. Schaefer</u>, 367 F. App'x 315, 319 (3d Cir. 2010)[6] (holding that <u>Heck</u> doctrine did not preclude a § 1983 action because "it [was] analytically possible for [the plaintiff] to claim that [the defendants] subjected him to unconstitutional conditions even if a statement he made during the same time period was voluntary"). In the context of excessive force, this is because "law enforcement officers can effectuate a lawful arrest in an unlawful manner." <u>Suarez v. City of Bayonne</u>, 566 F. App'x 181, 185 (3d Cir. 2014)[7] (internal alterations and quotation marks omitted); <u>see also</u> <u>Lora Pena v. F.B.I.</u>, 529 F.3d 503, 505-506 (3d Cir. 2008) ("We are not suggesting that [the plaintiff] will be able to recover damages, only that the rationale of <u>Heck</u> does not present an absolute bar to his [excessive force] claim."). Likewise, in the context of illegal searches under § 1983, such a search may not necessarily invalidate a conviction due to "doctrines like independent source and inevitable discovery, . . . and especially harmless error." <u>Heck</u>, 512 U.S. at 487 n.7.

Plaintiff accepted a plea agreement for "the fourth degree crime of obstructing the administration of law." … A person commits this offense when they obstruct "a public servant from lawfully performing an official function." <u>N.J.S.A.</u> § 2C:29-1(a). This guilty plea required him to make the factual admissions that he refused to get out of his vehicle and roll down his window when asked by police to do so. …

Considering <u>Heck</u>'s application to the remaining viable causes of action, the <u>Heck</u> doctrine does not bar Plaintiff's claim for excessive force. Like in <u>Nelson v. Jashurek</u>, Plaintiff's argument is that Defendants could have "effectuated a lawful arrest in an unlawful manner," by way of excessive force. 109 F.3d 142, 145 (3d Cir. 1997). <u>Here, Plaintiff conceded in his plea agreement that he resisted arrest. However, he contends that the amount of force used to secure his arrest was nevertheless excessive. Id. at 145. These are not incompatible occurrences and the Heck doctrine therefore does not preclude Plaintiff's cause of action for excessive force.</u>

<u>Davis</u>, slip op. at 15-17 (emphasis added; footnotes omitted).  Just as Plaintiffs Capps and Joyce made guilty pleas in municipal court (the first subject to a civil reservation, latter other not), they both maintain that, regardless of the outcome of their court charges, the amount of force used against them was nevertheless excessive.

---

[6] <u>See</u> Exhibit 8.
[7] <u>See</u> Exhibit 9.

    *c.  Dixon Misapplies Cases Involving a*
       *Criminal Defendant's Assertion of Self-Defense.*

Dixon cites to various state court decisions in a footnote in his brief regarding a police

officer's justification for using force.  Dixon writes:

> … See, e.g., State v. Moriarty, 133 N.J. super. 563 (App. Div. 1975), reciting long-
> established, deeply rooted legal principles, at p. 573: It is recognized that "a private citizen
> may not use force to resist arrest by one he knows or has good reason to believe is an
> authorized police officer engaged in the performance of his duties, whether or not the arrest
> is illegal under the circumstances obtaining."  State v. Koonce, 89 N.J. Super. 169, 184
> (App. Div. 1965).  The duty imposed on the citizen to submit also obtains when the restraint
> by the police officer is for any lawful purpose.  State v. Mulvihill, supra.  If, however, the
> citizen resists, the officer is not only justified in but has the duty of employing **such force
> as is reasonably necessary** to overcome the resistance and accomplish the arrest.

See Dixon Br. at 10 n. 10 (bold in original).  He makes a similar argument in his motion brief in

the Joyce case.  See Dixon Br. in Joyce, at 7-8.  An actual reading of these case reveals that these

concepts have no application to the civil cases brought by Plaintiffs Capps and Joyce.  And an

actual reading of these cases reveals some further flaws in Dixon's analysis.  Moriarty dealt

fundamentally with whether a criminal defendant could raise "self-defense"; it was not a civil case.

Of note as well is the phrase that an officer's duty is to "use such force as is reasonably necessary."

Plaintiffs' basic allegation as to Dixon is that he clearly did not employ that reasonable quantum

of force, but instead went over the top.  He even admitted to doing so in open court and under oath.

    Additionally, it cannot be determined which Mulvihill decision Dixon is referring to in his

brief because the case name is not connected to a citation.  What can be discerned from the

Appellate Division's decision is that the court concluded that the trial court erred in declining to

charge the jury on the elements of self-defense.  State v. Mulvihill, 105 N.J. Super. 458, 462 (App.

Div. 1969).  The court further stated, inter alia, that the jury could have found, if charged with the

issue, that the police officer's actions constituted excessive force which were not reasonably

necessary for an officer attempting to detain an uncooperative suspect during an investigation of a violation of a municipal ordinance, and that defendant, on the basis of such conduct, reasonably feared serious bodily harm unless he defended himself by striking the officer. Id. The Appellate Division went on to state that, "It is settled that, even in the course of making an arrest, a police officer is not justified in using excessive force, and may be accountable for the wanton abuse of discretion in determining the amount of force reasonably necessary for that purpose." Id. Dixon's partial out-of-context citation to this Mulvihill decision, if this is what he intended, is not exactly helpful to his argument. Nor was the state Supreme Court's opinion in State v. Mulvihill, 57 N.J. 151 (1970), which unanimously affirmed the Appellate Division opinion below, which reversed the defendant's conviction and remanded for a new trial. Id. at 160. Once again, Dixon's argument misses the mark.

> d.   *Dixon Does Not Assist His Case By Trying to Reimagine the Reality of His Criminal Convictions.*

Dixon also makes the argument, citing the plea hearing and sentencing transcripts in his criminal case, that the powerful state agency known as OPIA was out to "get" him, and that he had no choice but to plead guilty in order to assure his freedom. See Dixon Br. at 10. The conspiracy theory -- propounded after the fact by a litigant who falsely did not check the "suspect injured" box on the February 25, 2018 use of force form, when he was clearly on notice to the contrary. Indeed, as Dixon wrote in his report, Plaintiff Capps began to limp and cry, and she apparently told her husband, Plaintiff Gibson, when he arrived at the MPD, "We need to go to the hospital," among other clear complaints about not being able to breathe and of having a broken rib, made on the MVR recording. Compare Millville/000003 and 000009, attached as exhibits to Dixon's brief.

Nevertheless, Dixon asks for fairness:

> ... There has been no fair, plenary hearing or adjudication of any of the claims against Dixon raised in this civil litigation, and Dixon is entitled, in the context of this litigation, to an objective analysis and determination, by this Court, of the particular relevant facts and circumstances in issue. If and when necessary, Dixon will apply to this Court for an order formally decreeing that Dixon's guilty plea be deemed inadmissible in this litigation, as Dixon, in this forum, should be afforded a level playing field to assert his defenses, <u>in the interests of justice and fairness.</u>

<u>Id.</u> at 10-11 (emphasis added). There is no citation to any authority for this sweeping proposition. Moreover, he asks for "level playing field" in the "interests of justice and fairness." Once again, Dixon's Brief in Joyce adopts a similar argument in an effort to run away from his criminal convictions. <u>See</u> Dixon Br. in Joyce case, at 8-9. Absent any legal support for these aspirational concepts, Dixon has no basis to ask for a "level playing field" or for "justice and fairness" when he afforded no such things to Barry Cottman, to Audra Capps, or to Tanika Joyce. Instead, he inflicted injuries with impunity, and for him to ask for a level playing field in the face of his criminal convictions is wholly without merit.

That aside, even if this issue could be the subject of a future motion, that does not help him here on his motion to dismiss, motion for judgment on the pleadings, or motion for summary judgment – whatever it is that he is presently filing. It is important to point out that, as to Dixon's two felony third-degree aggravated assault convictions as to Plaintiffs Capps and Joyce, there are certain things Dixon did not do. He did not go to trial. He pleaded guilty before indictment. His lawyer filed no motions challenging the admissibility of certain evidence. He did not file a motion to dismiss. He did not file an appeal of his conviction to the Superior Court, Appellate Division. He did not file a motion to withdraw his guilty plea either before or after sentencing under <u>State v. Slater</u>, 198 N.J. 145 (2009) He did not file a motion for post-conviction relief, alleging ineffective assistance of counsel. And he has not claimed that his lawyer forced him to take a plea deal over his objection.

The plea hearing transcript, attached to Dixon's brief as Exhibit "D," rather reveals that he was represented by competent counsel from a very influential law firm. Id., 11/20/19 plea transcript, at 3:10-13. The transcript further reveals that Dixon gave sworn testimony in court and agreed to the terms of the plea deal, agreed to a lifetime forfeiture of office, and waived his right to presentation of his case to the Grand Jury, and understood the probable loss of his "pension rights." Id., 3:22-4:15, 5:5, 5:6-7:17, 7:19-8:17. He further stated on the record that he was satisfied with the services of his attorney. Id. at 8:17-19.

When asked for a factual basis for his guilty plea to committing third-degree aggravated assault as Capps on February 25, 2018, Dixon testified under oath as follows:

> … Q.  And during that arrest did you agree that you recklessly caused significant bodily injury to her?
> A.  Yes.
> Q.  In fact, she suffered broken ribs in the course of that arrest; correct?
> A.  Yes.
> Q.  And would you agree that you were – you used excessive force during the course of that arrest?  In other words, you could have used less force than you used in order to accomplish the arrest; correct?
> A.  Yes.

Id. at 10:1-11 (emphasis added).  It is worth remembering that Dixon argues in his Statement of Material Facts that "the cause, nature and extent of Capps' injury claims are disputed." See Dixon Stmt, of Material Facts, par. 18. Such an assertion is plainly undercut by the record made in open court.

When asked for a factual basis for his guilty plea to committing third-degree aggravated assault as to Joyce on March 24, 2018, Dixon testified under oath as follows:

> … Q.  And you would agree that in the course of that arrest that you recklessly caused significant bodily injury to her?
> A.  Yes.
> Q.  And during that arrest you took her to the ground; correct?
> A.  Yes.
> Q.  And you used pepper spray on her?

> A. Yes.
> Q. And would you agree that you used more force during the arrest than was necessary under the circumstances?
> A. Yes.
>
> * * *
>
> CROSS-EXMINATION BY MR. UZDAVINIS:
>> Q. Just to be clear with respect to both counts one and counts – I'm sorry, counts one and count two. In acting recklessly with regard to both counts, <u>you did so under circumstances manifesting extreme indifference to the value of human life as stated in the accusation you're pleading guilty to?</u>
>> <u>A. Yes.</u>
>> Q. And you – uh, you also acknowledged by pleading guilty to this accusation with respect, once again, to both counts one and two involving victims identified by initials A.C. and T.J. respectively that <u>in effectuating those arrests you did indeed use excessive force, meaning specifically force that was in excess of that which would have been reasonably necessary to effectuate that – those arrests?</u>
>> <u>A. Yes …</u>

Id. at 11:7-12:18 (emphasis added). Following this colloquy, the Superior Court Judge found that Dixon "knowingly, voluntarily, intelligently" waived his right to a Grand Jury presentation and his right to trial. Id. at 13:1-3. He made a "finding" that there was a factual basis as to both counts "in terms of the reckless indifference standard." Id. at 13:10-15.

The sentencing and motion transcript of January 17, 2020 is similarly unhelpful to Dixon's position. See Exhibit "F" to Dixon brief. It reveals that Dixon attempted to condition his plea on the entry of a civil reservation, but the State would not agree to it. Id. at 4:15-17. Thus, Dixon knew what he was getting into when he agreed to the plea. Yet with regard to sentencing, only his lawyer described Dixon as being "remorseful about what happened and he, by virtue of these guilty pleas, is accepting responsibility for what he did." Id. at 9:6-8. This is quite a contrast to Dixon's position in the present civil cases, in which he attempts to undercut his guilty pleas, shows no remorse, and is doing everything possible to deny responsibility for what he did to Plaintiffs Capps and Joyce. Indeed, his former colleague, Defendant Orndorf, suggests that Dixon pled guilty to something he did not do, which will be discussed further *infra*.

Even cities with major liability issues can sometimes say that they are sorry, in a manner of speaking.  See Article, June 25, 2020, Philadelphia Inquirer, "Philly Police Commissioner Danielle Outlaw, Mayor Jim Kenney  Apologize for Teargassing of Protesters on 676," https://www.inquirer.com/news/philadelphia-protests-676-teargas-mayor-jim-kenney-danielle-outlaw-20200625.html;[8] see also Article, CNN, August 22, 2020, "New Mexico city to pay $6.5 million to the family of a man who died in police custody," https://www.cnn.com/2020/08/22/us/las-cruces-police-officer-settlement-trnd/index.html (officer charged with second-degree murder and fired by police department in chokehold case resulting from traffic stop).[9]  The failure to accept responsibility, and the failure to accept reality, are striking here.  Dixon apparently can accept neither.

At sentencing, the State took the position that during his relatively brief time as a police officer Dixon had a routine practice of using force during the course of arrests.  Id. 10:10-14.  "So much so," said the deputy attorney general, "that our review resulted in a decision to potentially charge and indict him with official misconduct, a pattern of official misconduct, additional aggravated assault charges, tampering with public records for not accurately describing everything that occurred during those arrests."  Id. 10:14-19.  The plea agreement, the State argued, was "generous," considering that Dixon was facing, if convicted, a mandatory minimum period in prison before parole of at least ten years.  Id. 10:20-24.  This is not reflective of the OPIA out to "get" Dixon, such that a court should re-examine his plea agreement.  Rather, it is reflective of the fact that Dixon put himself in this position by ruining the lives of others.

---

[8] See Exhibit 10.
[9] See Exhibit 11.

Indeed, the sentencing court recognized that the Plaintiffs "sustained injuries. No matter what sentence the Court imposes, it will not be sufficient for them. It never is." Id. at 17:1-3. In discussing the civil reservation issue, the sentencing court noted that Dixon "admitted to his responsibility" on the two counts to which he pleaded guilty. Id. at 19:7-8. The court did discuss Dixon's sentencing exposure, and the "Hobson's choice" he faced. Id. at 18:5-21:2. Yet this is no different than the "Hobson's choice" faced by every criminal defendant in state court who, by his own conduct, exposes himself to serious felony charges, particularly where the abuse of one's public office is alleged. But the court found no financial impact to Dixon, and denied the motion for a civil reservation without prejudice. Id. at 20:20-21:17.

Importantly, the sentencing court's denial of the civil reservation can and should be viewed as attempting to afford the Plaintiffs a remedy: "... That civil litigation can continue to go forward. That's probably the only thing that will make the victims – it will never make them whole, but that's the only remedy that they have at this point in time and I'm not gonna put any of this as a – as an impediment in their way right now." Id. at 21:11-16. Indeed, it certainly cannot be said that the criminal litigation could make the Plaintiffs whole. This is particularly true when one considers that the sentencing court entered a suspended sentence on a defendant who inflicted such serious injuries. Id. at 26: 11-12, 27:4-5, 20-21.[10]

---

[10] As an aside, the Superior Court Judge at Dixon's sentencing denied Dixon's motion for a civil reservation. The Municipal Court Judge entered a civil reservation – which is routinely granted in municipal court -- on Plaintiff Capps's convictions for resisting arrest and DWI. Civil reservations in Superior Court and in Municipal Court are subject to different standards under New Jersey's Rules of Court. See State v. LaResca, 267 N.J.Super. 411, 421, (App.Div.1993) (finding that the standard applicable to a determination whether to grant a request for a civil reservation under R. 7:6-2(a)(1) is "reduced" compared to the good cause requirement of R. 3:9-2). Thus, Capps's municipal court convictions are not evidentiary while Dixon's Superior Court third-degree aggravated assault convictions very much are in play.

*e. Dixon's Actions Were Not Reasonable Under the Circumstances.*

Dixon further urges the Court to look at the "totality of the circumstances" because Dixon, at the time of the February 25, 2018 incident with Capps, had no knowledge of Capps's intentions and had to make an "immediate decision" or a "split-second judgment" in "evolving circumstances." See Dixon Br.at 9, 10. This is essentially any appeal to an analysis under Graham v. Connor, 490 U.S. 386 (1989).

Under Graham, a plaintiff has the burden of showing that the amount of force directed at her by an arresting officer was constitutionally excessive. What is "excessive" is determined under all the circumstances then confronting the arresting officer, considering the Graham factors, among others, namely: "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396.

The Third Circuit expounded upon the Graham factors in Sharrar v. Felsing, 128 F.3d 810 (3d Cir. 1997), stating that [o]ther relevant factors include the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time. Sharrar, 128 F.3d at 822; see also Ribot v. Camacho, Civil No. 09-5888, slip op. at *6-7 (JAP) (D.N.J. June 25, 2012) (cited by Defendants) (To determine whether plaintiffs' excessive force and assault and battery claims can proceed past summary judgment, the court must first analyze the officers' conduct under the objective reasonableness standard) (citing, inter alia, Graham and Kopec v. Tate, 361 F.3d 772 (3d Cir. 2004) (concluding, inter alia, that genuine disputes of material fact existed whether the officers used excessive force upon plaintiffs).

An analysis of the totality of the circumstances reveals how unreasonable Dixon's use of force truly was. When Dixon assaulted Capps by placing her in a headlock, throwing her to the ground and landing on top of her with his full body weight, this was an unnecessary and disproportionate use of force given the resistance she offered. Dixon advised Capps that she was under arrest at 20:31:08 of the MVR video and began to place her into handcuffs. At 20:31:08, Capps began to pull away from Dixon, which continues until 20:31:16. At 20:31:16, Dixon grabbed Capps around the neck with his left arm and initiated the headlock. Dixon then escalated the force by throwing Capps to the ground, flipping her over his left hip and taking her to the ground and landing his body on top of her. At 20:31:19, Orndorf began to assist Dixon with placing Mrs. Capps custody. At 20:31:32, Capps was secured in handcuffs.

But before Dixon threw Capps to the ground, Capps had offered merely passive physical resistance. For instance, she Capps had not:

     i.     Attempted to disarm Officer Dixon or Officer Orndorf;

     ii.    Assaulted Officer Dixon or Officer Orndorf;

     iii.   Aggressively confronted Officer Dixon or Officer Orndorf in a fighting stance;

     iv.   Committed a violent crime;

     v.    Attempted to flee after  committing a crime;

     vi.   Armed herself or attempted to do so; or

     vii.  Assaulted or attempted to assault anyone in the general proximity.

Indeed, Capps did not offer any aggressive resistance. Nor did she display any precipitating actions that necessitated the disproportionate physical force used against her. Since Capps was not engaged in any conduct that necessitated such overwhelming force, the force Dixon

used was not necessary, was not proportionate to the resistance she offered, and it was greater than that required to compel her compliance.

When Dixon initiated force (20:31:16 of the MVR video), he immediately resorted to grabbing Capps by the neck/head area, which is an area of the body that is very susceptible to injury. As set forth in the Second Amended Complaints, police officers are taught that certain areas of the body are more vulnerable to injury than others.

After Dixon had Capps in a headlock, he then escalated the force by throwing her to the ground and landing his body on top of her body with the added weight of his duty belt and vest. Dixon made little (if any) effort to grab Capps by the arms or by the clothing to control her passive resistance, which was her pulling away from his grasp. Instead, he resorted to a dangerous headlock and throwing maneuver that was unnecessary and disproportionate to the resistance she offered.

Moreover, Dixon has not articulated an objectively reasonable basis that Capps posed an imminent danger to himself, to the public or to his colleague, Officer Orndorf, that necessitated him placing her in a headlock, throwing her to the ground and landing his body weight on top of her. There is nothing in the MVR video that suggests Dixon, Orndorf, or a member of the public was facing an imminent threat that necessitated such a level of force. As directed by the AG UFP, police officers are obligated to exercise the "utmost restraint." That did not occur in the instant case.

At the time of the February 25, 2019 motor vehicle stop with Plaintiff Capps, there were numerous factors which were absent, which would have justified the application of the extreme level of force he used against Plaintiff Capps:

        i.    There was no evidence Capps assaulted or attempted to assault any of the officers, which necessitated using force. Neither Officer Dixon, nor Officer

Orndorf articulated any evidence how Capps went from passive resistance (i.e., pulling away from Officer Dixon's grasp) to suddenly turning aggressive toward Officer Dixon. The MVR video of the encounter does not support any inference that Capps was attacking the officers, attempting to disarm one of the officers, or posed an imminent threat to anyone's safety;

ii.   There is no evidence Capps was engaged in violence with anyone in the general proximity, which necessitated using force;

iii.  There is no evidence Capps was damaging or destroying property, which necessitated using force;

iv.   There is no evidence Capps was violent, dangerous or posing an imminent threat to anyone, which necessitated using force;

v.    There is no evidence the officers heard Capps threaten anyone with death or serious bodily injury, which necessitated using force. The MVR recorded Capps's verbal statements and does not indicate she threatened anyone;

vi.   There is no evidence Capps was advancing or charging any of the officers indicating an assault was imminent that necessitated using force;

vii.  There is no evidence Capps issued direct or indirect imminent threats to kill any of the officers, or that she assumed a fighting stance against the officers (e.g., boxing, wrestling, karate, mixed martial arts), which necessitated using force;

viii. There is no evidence the officers possessed any information about Capps's reputation for violence before their encounter, which heightened their caution and necessitated using force;

ix.     There is no evidence the officers possessed any information about Capps's
        mental health history, or diminished capacity (other than possible intoxication)
        leading to her instability or propensity for violence before or during their
        encounter, which heightened their caution and necessitated using force;

x.      There is no evidence that Capps was irrational or agitated due to some
        combination of erratic movements, incoherent statements, excited utterances or
        responses to questions and facial expressions (e.g., staring/gazing, laughing or
        crying when inappropriate) which heightened their caution and necessitated
        using force;

xi.     There is no evidence Capps was armed, and the officers did not fear she was
        armed, which might have necessitated using force;

xii.    There is no evidence that Capps attempted to lure the officers into a potential
        ambush situation, which heightened their caution and necessitated using force;

xiii.   There is no evidence Capps gestured that she was armed (e.g., concealing her
        hands inside her jacket, inside her pants pockets, inside her waistband, reaching
        for an object that was out of the officers' view, or assuming a shooting stance),
        which necessitated using force;

xiv.    There is no evidence Capps was speaking a different language so as to conceal
        the conversation from the officers or to summon assistance from someone that
        led to more vulnerability for the officers, which necessitated using force;

xv.     There is no evidence Capps committed any violent crime, which necessitated
        using force;

xvi.     There is no evidence Capps fled from the officers as if to conceal her identity, interfere with their investigation, remove or destroy evidence from the scene or escape from committing a crime, which necessitated using force;

xvii.    There is no evidence any of the officers were injured, which increased their vulnerability leading to use of force;[11]

xviii.   There is no evidence any of the officers were unable to react properly because they were dazed or semi-conscious from an assault, from a fall, or from striking their heads against the ground leading to increased vulnerability, which necessitated using force;

xix.     There is no evidence any of the officers lost radio communication leading to increased vulnerability, which necessitated using force;

xx.      There is no evidence Officer Dixon's attention divided (such as from bystanders, a crowd, police radio transmissions, pedestrian or vehicular traffic, or other officers) leading to increased vulnerability, which necessitated using force;

xxi.     There is no evidence Officer Dixon was separated from Officer Orndorf for some reason that led to increased vulnerability, which necessitated using force;

xxii.    There is no evidence the officers' visibility was limited due to poor lighting and they could not adequately observe Capps's movements thus leading to a heightened state of caution or vulnerability, which necessitated using force;

---

[11] Officer Dixon submitted a use of force report, which indicated he was not injured (see Millville/000003), attached to Dixon's brief.

xxiii.    There is no evidence the officers were at a physical or environmental disadvantage (e.g., isolated area, uneven physical surface, elevated surface) leading to increased vulnerability, which necessitated using force;

xxiv.    There is no evidence the officers were exposed to adverse environmental conditions such as an elevated surface, poor lighting, a wet surface, or an isolated area leading to a heightened state of caution or vulnerability, which necessitated using force;

xxv.    There is no evidence the officers observed any weapons or contraband (except for some open beer cans in her vehicle), which would lead to a heightened state of caution or vulnerability, which necessitated using force;

xxvi.    Additionally, Capps was outnumbered by the officers 2 to 1, which did not lead to the officers' increased vulnerability;

xxvii.    Capps also was physically mismatched in height, weight, muscularity and arm reach by Officer Dixon who was physically much larger than she was, which did not lead to the officers' increased vulnerability.

The MVR footage in Capps is more susceptible to an analysis under Graham. In the Joyce case, the Shop Rite store surveillance footage is somewhat harder to see, and there is no audio component. This is also due in part to the fact that, as Plaintiff Joyce alleges in her Second Amended Complaint, her daughter was prevented from filming the incident. See Joyce Second Am. Compl., at par. 63. Nevertheless, what can be seen in the store surveillance is a maneuver by Dixon which bears no proportionality to the situation presented to Dixon on March 24, 2018. Dixon used unnecessary and excessive force in the context of a woman not giving her personal information and whom Defendants might characterize as verbally uncooperative. As such, under

the authorities previously cited in this section, the authorities that will be cited in the next sections of this brief, and given Dixon's guilty plea to committing third-degree aggravated assault against Joyce, Dixon's various motions should be denied in her case.

Finally, the Third Circuit has said that "[t]he reasonableness of the use of force is normally an issue for the jury." Rivas v. City of Passaic, 365 F.3d 181, 198 (3d Cir. 2004) (citing Abraham v. Raso, 183 F.3d 279, 290-91 (3d Cir. 1999). The court further cautioned that "it is generally unwise to venture into a qualified immunity analysis at the pleading stage as it is necessary to develop the factual record in the vast majority of cases." Newland v. Reehorst, 328 Fed. App'x. 788, 791 n. 3 (3d Cir. 2009). See Exh. 12. At the very least, and in light of this analysis of the totality of the circumstances, and because Dixon is not entitled to qualified immunity, Plaintiffs' cases should go to a jury.

**B. Defendant Bryan Orndorf's Motion to Dismiss As to Plaintiff Audra Capps (1:19-cv-12002-RMB-AMD, ECF Doc. 62)**

1. Orndorf Is Not Entitled to Dismissal On Capps's Excessive Force Claim.

Defendant Bryan Orndorf, an officer who, among other things, covered up a civil rights violation, accuses Plaintiff Capps of mischaracterizing the video footage of the February 25, 2018 incident in her case. Orndorf Br. at 1. He calls Plaintiff's description of it "disingenuous." Id. at 1-2. But as Orndorf recognizes soon after making these statements in his brief, there is a link to the MVR video footage in the Second Amended Complaint. Id. at 1. As such, regardless of whatever mileage Orndorf seeks to gain by criticizing a badly injured victim, the simple fact of the matter is that the footage is specifically referred to in the Second Amended Complaint, and the Court can see it for itself. Indeed, as Orndorf himself urges in his brief, "when reviewing a motion to dismiss, to the extent that the video is referenced in and relied upon in the complaint and played in open Court as part of oral argument, the Court will view the events shown in the videotape in

the light depicted by the videotape." Adelman v. Jacobs, No. 18-607, 2019 U.S. Dist. LEXIS 65485, at *4 n.2 (W.D.Pa. Apr. 17, 2019) (citied in Orndorf Brief at 5). In other words, the Court does not have to take the Plaintiff's word for it, in terms of what the video depicts. The parties are not at the summary judgment stage after full discovery. Orndorf's motion is filed under Federal Rule of Civil Procedure 12(b)(6). The Court also does not need to take Orndorf's word for it (or credit his inserted commentary on the still photos) in regard to what the footage depicts.

What Orndorf describes as "obvious and clear" – his claim that he did not have his knee on Plaintiff's back -- is at the same time qualified by phrases such as: (1) "although the video is obstructed so that the precise location of Orndorf's knee cannot be ascertained"; (2) "the still photographs that precede the one copied below are not quite as clear"; and (3) "it may be difficult to determine where the back of Capps begins and ends." Moreover, Orndorf states that "deductive reasoning makes it blatantly clear" that at no time did Orndorf have his knee on Plaintiff's back. See discussion id. at 9-10. But something cannot be "blatantly clear" if one has to use "deductive reasoning" to get there.

And because it is not so "blatantly clear," Orndorf is forced to argue in the alternative that "if Orndorf did place his knee on the back of Capps, there is nothing objectively unreasonable about doing so for a brief period of time in order to effect the arrest of a resisting arrestee." Id. at 10. There certainly would be something objectively unreasonable, if a jury finds that Orndorf's added pressure on Capps's back compounded the damage to the multiple ribs belonging to the Plaintiff that Dixon broke by slamming Plaintiff to the hard surface below.

Where there is video footage related to the claims, a court will not draw inferences that are "blatantly" inconsistent with the video evidence. Scott v. Harris, 550 U.S. 372, 380-381 (2007) ("the facts [should be viewed] in the light depicted by the videotape."; accord Castellani v. City of