# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
### CAMDEN VICINAGE

AUDRA CAPPS,

                    Plaintiff,

      v.

JOSEPH DIXON, *et al.*,

                    Defendants.

Civil No. 19-12002 (RMB/AMD)

**OPINION**

TANIKA JOYCE,

                    Plaintiff,

      v.

JOSEPH DIXON, *et al.*,

                    Defendants.

Civil No. 20-01118 (RMB/AMD)

**OPINION**

**APPEARANCES:**

Louis Charles Shapiro
LOUIS CHARLES SHAPIRO, P.A.
1063 East Landis Avenue
Vineland, New Jersey 08362

      *On behalf of Plaintiffs*

Thomas B. Reynolds
REYNOLDS & HORN, P.C.
116 South Raleigh Avenue, Suite 9B
Atlantic City, New Jersey 08401

      *On behalf of Defendant Joseph Dixon*

A. Michael Barker
Greg Paul DiLorenzo
BARKER, GELFAND & JAMES, P.C.
210 New Road, Suite 12
Linwood, New Jersey 08221

*On behalf of Defendants Bryan Orndorf, the City of Millville, and Chief Jody Farabella*

**RENÉE MARIE BUMB, Chief United States District Judge:**

In these separate, but similar, cases, two women contend that a former officer of the Millville Police Department subjected them to excessive force during two different arrests. Some facts are undisputed. Faced with signs of resistance, the police officer slammed the women onto the ground in unapproved, jiu jitsu "takedown" maneuvers. As a result, both suffered injuries. In fact, the use of force against one of the women was so severe it broke her ribs and caused permanent nerve damage. Thereafter, the police officer was accused of assaulting the women and entered a guilty plea in New Jersey Superior Court as to two counts of third-degree aggravated assault. The women soon filed this action pursuant to 42 U.S.C. § 1983, claiming that the police officer's actions violated the Fourth and Fourteenth Amendments of the United States Constitution. They have also claimed that Millville maintained a custom of excessive force and an institutional culture of indifference among supervisors and that the Chief of Police is personally liable for Officer Dixon's use of force.

After the close of discovery, in early July 2023, Defendants Joseph Dixon ("**Dixon**" or "**Officer Dixon**"), Officer Bryan Orndorf ("**Orndorf**" or "**Officer Orndorf**"), Millville Police Department Chief Jody Farabella ("**Farabella**" or "**Chief Farabella**"), and the City of Millville ("**Millville**") (Orndorf, Farabella, and Millville together, the "**Millville Defendants**") filed Motions for Summary Judgment.[1] Officer

---

[1] [Dixon's Mot. Summ. J., Civil Case No. 19-12002 ("*Capps*") Docket No. 191 and Civil Case No. 20-01118 ("*Joyce*") Docket No. 174; Orndorf's Mot. Summ. J., *Capps* Docket

Dixon contends that his use of force was objectively reasonable under the circumstances of both arrests, notwithstanding his guilty plea to the contrary.[2] The Millville Defendants submit, among other things, that Chief Farabella cannot be liable under a theory of supervisory liability based on his lack of personal involvement in Officer Dixon's conduct and that the City of Millville had insufficient notice of a pattern of excessive force and appropriately supervised its officers in any case.[3] They argue that they are entitled to judgment as a matter of law.  Plaintiffs Audra Capps ("**Capps**") and Tanika Joyce ("**Joyce**") oppose summary judgment.[4]

On January 16, 2024, the Court held oral argument and conducted a *Daubert* hearing concerning the proposed testimony of Plaintiffs' expert witness, Dr. Jon M. Shane.  [*Capps* Docket No. 219.]  Following the parties' submissions, for the reasons articulated on the record, the Court indicated that it intended to enter an Opinion and Order **denying** Dixon's Motion for Summary Judgment, **without prejudice**, and

---

No. 193; Farabella's Mot. Summ. J., *Capps* Docket No. 194 and *Joyce* Docket No. 177; Millville's Mot. Summ. J., *Capps* Docket No. 195 and *Joyce* Docket No. 176.]

[2] [*See generally* Dixon's Br. in Supp. of Summ. J. in *Capps*, *Capps* Docket No. 191-1 ("**Dixon's Br. in *Capps***"); Dixon's Br. in Supp. of Summ. J. in *Joyce*, *Joyce* Docket No. 174-1 ("**Dixon's Br. in *Joyce***").]

[3] [*See generally* Orndorf's Br. in Supp. of Summ. J., *Capps* Docket No. 193-4 ("**Orndorf's Br.**"); Farabella's Br. in Supp. of Summ. J., *Capps* Docket No. 194-4 and *Joyce* Docket No. 177-4 ("**Farabella's Br.**"); Millville's Br. in Supp. of Summ. J., *Capps* Docket No. 195-4 and *Joyce* Docket No. 176-4 ("**Millville's Br.**").]

[4] [*See generally* Pls.' Br. in Opp'n to Dixon's Mots. Summ. J., *Capps* Docket Nos. 199-11 & 199-12 and *Joyce* Docket Nos. 181-11 & 181-12 ("**Pls.' Opp'n to Dixon**"); Pl.'s Br. in Opp'n to Millville Defs.' Mots. Summ. J., *Capps* Docket Nos. 200-11 & 200-12 and *Joyce* Docket Nos. 182-11 & 182-12 ("**Pls.' Opp'n to Millville Defs.**").]

**granting** Orndorf's Motion for Summary Judgment.[5]   The Court **reserved** as to Millville's Motion for Summary Judgment, which the Court will now **deny**.   The Court also indicated its intent to enter an Opinion and Order granting Chief Farabella's Motion for Summary Judgment, but after raising the issue of its jurisdiction *sua sponte*, in light of Chief Farabella's pending interlocutory appeal before the Third Circuit, this Court now holds that it has been divested of jurisdiction to address his Motion.   This Opinion supplements and modifies the Court's reasoning expressed on the record of January 16, 2024.

## I.   BACKGROUND

The Court only recites those material facts that are relevant to its disposition of the motions pending before it. [6]

---

[5] The Court's bench rulings become effective when they are expressed in an order pursuant to Federal Rule of Civil Procedure 58.   *See Spain v. Gallegos*, 26 F.3d 439, 445 n.9 (3d Cir. 1994) (suggesting that a court's oral rulings from the bench are not final until they are reduced to writing and set forth in a separate document).   This Opinion and accompanying Order set forth the Court's rulings.

[6] The undisputed material facts constituting the summary judgment record are distilled from the statements of material facts submitted by the parties.   [See Dixon's Statements of Material Facts, *Capps* Docket No. 191-4 ("**Dixon's SOMF in *Capps***") and *Joyce* Docket No. 174-2 ("**Dixon's SOMF in *Joyce***"); Orndorf's Statement of Material Facts, *Capps* Docket No. 193-3 ("**Orndorf's SOMF**"); Farabella's Statement of Material Facts, *Capps* Docket No. 194-3 and *Joyce* Docket No. 177-3 ("**Farabella's SOMF**"); Millville's Statement of Material Facts, *Capps* Docket No. 195-3 and *Joyce* Docket No. 176-3 ("**Millville's SOMF**"); Pls.' Responsive Statements of Material Facts (each, "**Pls.' RSOMF**"), *Capps* Docket Nos. 199, 199-1, 199-2, 200, 200-1, & 200-2 and *Joyce* Docket Nos. 181, 181-1, 181-2, 182, 182-1, & 182-2; and Pls.' Counterstatement of Material Facts, *Capps* Docket Nos. 199-2, 199-3, 199-4, 199-5, 199-6, 199-7, 199-8, 199-9, 199-10, 200-2, 200-3, 200-4, 200-5, 200-6, 200-7, 200-8, 200-9, & 200-10 and *Joyce* Docket Nos. 181-2, 181-3, 181-4, 181-5, 181-6, 181-7, 181-8, 181-9, 181-10, 182-2, 182-3, 182-4, 182-5, 182-6, 182-7, 182-8, 182-9, & 182-10 ("**Pls.' CSOMF**").]   The Court observes that the Statements of Material Facts submitted by the Millville Defendants appear to be the same.   [*Compare* Orndorf's SOMF, *with* Farabella's SOMF, *and* Millville's SOMF.]

3

Before doing so, however, the Court must make a few observations for the record.  This case has been litigated from day one with a counterproductive, "kitchen sink" approach.  In their Second Amended Complaint, Plaintiffs submitted nearly 400 paragraphs of "factual" allegations in support of their twelve claims for relief.  Plaintiffs' submission in opposition to Defendants' motions at the pleading stage was over 800 pages in length.  [See *Capps* Docket No. 67.]  This scattershot method required the Court to decipher Plaintiffs' claims and arguments from the muddle.  Resolving Defendants' motions at that stage, the Court cautioned Plaintiffs to avoid kitchen-sink pleading.  [*See* May 21, 2021, Op. at 25–26, *Capps* Docket No. 80 ("[W]e acknowledge that the practice of 'throwing in the kitchen sink' at times may be so abusive as to merit Rule 11 condemnation.") (quoting *Mary Ann Pensiero, Inc. v. Lingle*, 847 F.2d 90, 97 (3d Cir. 1988)).]

At summary judgment, Plaintiffs' submissions are just as chaotic as before.  For instance, the Court observes that Plaintiffs' Statements of Material Facts fail to comply with the requirements of Local Civil Rule 56.1.  Under that rule, each party must address the "material" facts that are (or are not) in dispute, and the statements are not to contain "legal argument or conclusions of law."  L. Civ. R. 56.1.  Plaintiffs' Responsive Statements of Material Facts—each inexplicably subdivided into separate docket entries—plainly contain legal argument, case citations, and other impertinent information.  [*See Capps* Docket Nos. 199, 199-1, 199-2, 200, 200-1, & 200-2 and *Joyce* Docket Nos. 181, 181-1, 181-2, 182, 182-1, & 182-2.]  Moreover, Plaintiffs' "Counterstatement" of Material Facts masquerades as a factual submission of material

4

facts while comprising, in actuality, the entire discovery record.  [*See Capps* Docket Nos. 199-2, 199-3, 199-4, 199-5, 199-6, 199-7, 199-8, 199-9, 199-10, 200-2, 200-3, 200-4, 200-5, 200-6, 200-7, 200-8, 200-9, & 200-10 and *Joyce* Docket Nos. 181-2, 181-3, 181-4, 181-5, 181-6, 181-7, 181-8, 181-9, 181-10, 182-2, 182-3, 182-4, 182-5, 182-6, 182-7, 182-8, 182-9, & 182-10.]  It is 780 paragraphs long, and it references over 2,000 pages of documents that are all titled "exhibit" on the docket.  [*See generally Capps* Docket No. 205 and *Joyce* Docket No. 186.]

Worse, Plaintiffs' Opposition Briefs fail to meaningfully engage with the discovery record or provide clarity on the material facts Plaintiffs believe to be in dispute.  Instead, as discussed further below, Plaintiffs merely gesture at factual issues, leaving it to the Court to fill in the blanks.  [*See, e.g.*, Pls.' Opp'n to Millville Defs. at 13 ("There was the avoidance of examining use of force incidents as part of the MVR [mobile video recording] policy used to train and supervise its officers.  There was the policy language itself.").]  Which MVR policy?  What language?  This familiar approach has required the Court (much like it did at the motion-to-dismiss stage) to devote substantial time to piece the factual record together from Plaintiffs' disparate and voluminous filings.  (Following the Court's January 8, 2024, Text Order, the Court acknowledges that Plaintiffs' counsel submitted a table of contents, [*Capps* Docket No. 197], which was of some help.)  In the end, rather than striking Plaintiffs' submissions, the Court undertook the laborious task of independently identifying the undisputed material facts to resolve Defendants' pending Motions.  The Court recites those facts as follows:

### A.      Arrest of Audra Capps

On February 25, 2018, at approximately 8:22 p.m., Millville Police Department ("**MPD**") Officers Orndorf and Dixon conducted a motor vehicle stop on State Highway 49 in Millville.  [Dixon's SOMF in *Capps* ¶ 1; Millville's SOMF ¶ 1; Pls.' RSOMF ¶ 1, *Capps* Docket Nos. 199, 200.]  Officer Dixon ordered Capps out of her vehicle on suspicion of driving under the influence of alcohol.  [Pls.' CSOMF ¶ 464.]  After administering field sobriety tests, which Capps failed, Officer Dixon began placing handcuffs on Capps.  [Millville's SOMF ¶¶ 2–4.]  As demonstrated by the mobile video recording, Capps took a step away "so as to not be handcuffed," and Officer Dixon immediately responded with a "takedown maneuver."  [Mobile Video Recording of Capps Arrest, Pls.' Ex. 1, *Capps* Docket No. 205 (Flash Drive File "Video_TS"); *see also* Dixon's SOMF in *Capps* ¶ 2; Millville's SOMF ¶¶ 5–6.]  He placed his left arm around Capps' neck in a headlock position, lifted her up by the neck and head, swung her over his hip, threw her to the ground, and fell on her with all his weight.  [Millville's SOMF ¶ 6; Pls.' CSOMF ¶¶ 473–74.]  Officer Dixon weighed approximately 230 lbs. and stood several inches taller, at 6 feet, 1 inch.  [Pls.' CSOMF ¶ 467.]  At the time, Capps was 50 years old, of "slim build," and weighed around 90 lbs.  [*Id.*]  After Officer Dixon landed on top of Capps, she stated, "I'm done" and "I think you broke my ribs."  [*Id.* ¶ 482.]  She asked to call her husband, and she said that she could not breathe.  Officer Dixon said, "if you can speak, you can breathe."  [*See*

*id.* ¶ 483.] Officer Dixon's takedown maneuver and arrest took less than 30 seconds to complete. [*See* Pls.' Ex. 1.]

Capps also claims that Officer Orndorf placed his knee on her back while she lay face-down on the concrete as Dixon completed the arrest. [Millville's SOMF ¶ 9; Pls.' RSOMF ¶ 9.] Officer Orndorf denies that he ever knelt on Capps' back. [Millville's SOMF ¶ 12; *see also* Orndorf Dep. at 98:8, Millville Defs.' Ex. 44, *Capps* Docket No. 193-48 ("I wasn't on top of her.").] The mobile video recording clearly shows Officer Orndorf squatting near Capps' body, but not placing his knee on her back. [Pls.' Ex. 1.] Moreover, the uncontested forensic report of Highlands Investigations & Consulting, LLC concluded that the "video evidence is inconsistent with Officer Dixon or Officer Orndorf putting their knees into the back of Ms. Capps while she was being handcuffed on the ground by both officers." [Highlands Investigations & Consulting, LLC Rpt. at 9, Millville Defs.' Ex. 5, *Capps* Docket No. 193-9 ("**Highlands Rpt.**"); *see also* Millville's SOMF ¶ 11.] As discussed below, this factual issue is not genuinely disputed.

After Capps was placed in handcuffs, Officer Dixon pulled Capps up from the pavement and placed her in the back of a patrol car. [Pls.' Ex. 1; Pls.' CSOMF ¶ 475.] The officers ignored Capps' statements in the patrol vehicle that she could not breathe, that her ribs were broken, and that she needed to go to the hospital. [Pls.' CSOMF ¶ 496.] They took her to the MPD station where she was charged with operating under the influence of alcohol and resisting arrest. [*Id.* ¶ 498.] She ultimately pled guilty to both charges in Millville Municipal Court. [Millville's SOMF ¶ 17; Pls.' RSOMF ¶

17, *Capps* Docket No. 200.]   After being processed at the station, she presented to a hospital and was diagnosed with a contusion.   [Millville's SOMF ¶ 16; Pls.' RSOMF ¶ 16, *Capps* Docket No. 200.]   Later, she underwent multiple surgeries, including a chest wall reconstructive surgery, and several treatments for broken ribs.   [Pls.' CSOMF ¶¶ 568–72.]   In fact, one of her ribs had to be removed.   [*Id.* ¶ 573.]   To this day, Capps suffers from nerve damage and persistent pain.   [*Id.* ¶¶ 574–82.]

Following the incident, Officer Dixon failed to note in his investigative report that Capps complained of broken ribs, and he indicated in his use-of-force report that no injuries occurred.   [*Id.* ¶ 484.]

### B.    Arrest of Tanika Joyce

On March 24, 2018, Joyce was at a Shop Rite in Millville with her minor child, C.B.   [Dixon's SOMF in *Joyce* ¶ 1; Millville's SOMF ¶ 19; Pls.' CSOMF ¶¶ 585–99.] The child was accused of shoplifting for eating food without paying for it.   [Pls.' CSOMF ¶ 587.]   Arriving on the scene, Officer Dixon directed Joyce to provide identification to release Joyce's child to her custody.   [Millville's SOMF ¶ 19; Pls.' CSOMF ¶¶ 585.]   She became argumentative (*i.e.*, "verbally combative") when she could not produce the identification requested.   [Millville's SOMF ¶ 19; Dixon's SOMF in *Joyce* ¶ 8.]   Officer Dixon told Joyce that she was under arrest and grabbed her arm.   [Millville's SOMF ¶ 19; Dixon's SOMF in *Joyce* ¶¶ 2–3.]   Joyce pulled away and asked why she was being arrested.   [Millville's SOMF ¶ 19; Dixon's SOMF in *Joyce* ¶ 3; Pls.' CSOMF ¶ 589.]   At this point, Officer Dixon implemented a "jiu jitsu

hip toss" maneuver that he learned outside of police training:  he flipped Joyce onto the floor and caused her to land on her hip and hit her head.[7]  [Millville's SOMF ¶ 19; Pls.' CSOMF ¶¶ 590, 599.]  A scuffle ensued, and Officer Dixon rolled Joyce onto her stomach and released a burst of pepper spray (*i.e.*, mace) in her face.  [Millville's SOMF ¶ 19; Pls.' CSOMF ¶ 592.]  She writhed in pain, complaining of eye, nose, and throat irritation.  [Millville's SOMF ¶ 19; Pls.' CSOMF ¶ 594.]  It is undisputed that Joyce suffers from asthma and diabetes.  [Pls.' RSOMF ¶ 4, *Capps* Docket Nos. 199, 200.]  She further stated that she could not breathe, complained that her hip was injured, and asked to go to the hospital.  [Pls.' CSOMF ¶ 594.]  Officer Dixon ignored these pleas.

It took over a minute to place handcuffs on Joyce.  [Dixon's SOMF in *Joyce* ¶ 4.]  After Officer Dixon completed the arrest with MPD Officer Albert Chard,[8] Joyce was transported to the MPD station where she met with emergency medical personnel who then transported her to Inspira Hospital in Vineland, New Jersey for treatment.  [Millville's SOMF ¶ 19; Dixon's SOMF in *Joyce* ¶ 5.]  It was determined that Joyce suffered bruising to her hip and elbow and burning eyes, but no other injuries.  [Dixon's SOMF in *Joyce* ¶ 5.]  At the time, Joyce was 40 years old, of "slim build," 5

---

[7] Though Plaintiffs' counsel twice submitted flash drives of the evidence not publicly available on the docket, the Court has not been able to review the Shop Rite video footage of the Joyce arrest, as the file submitted remains unreadable.  [See Pls.' Ex. 12 (Flash Drive File "FA_03_24_2018 U2(1)"), *Capps* Docket No. 205-7.]  Accordingly, the Court relies on the parties' undisputed factual representations of the incident.

[8] Officer Chard was sued in connection with a separate incident in which the court found that a reasonable jury could conclude he provided false grand jury testimony and authored false reports in violation of clearly established statutory or constitutional rights. *Carpenter v. Chard*, 492 F. Supp. 3d 321, 328–31 (D.N.J. 2020) (Rodriguez, J.).

foot, 8 inches tall, and weighed around 115 lbs.  [Pls.' CSOMF ¶ 587.]  She ultimately pled guilty to one count of resisting arrest.  [Millville's SOMF ¶ 21.]

### C.  Pattern and Practice Evidence of Excessive Force

Dixon began serving as an MPD police officer on August 27, 2012.  [Millville's SOMF ¶ 23.]  He completed his required police academy training on January 23, 2013, and entered active service as a patrolman thereafter.  [Pls.' RSOMF ¶ 23, *Capps* Docket No. 200-1.]  In his first year on the job, Officer Dixon used force frequently.  Officer Dixon used force 13 times in 2013, according to his use-of-force reports submitted via the Guardian Tracking system.  [Guardian Tracking MPD Incident List Rpt. for Joseph Dixon, Millville Defs.' Ex. 20, *Capps* Docket No. 195-24.]  MPD policy required police officers to report "all instances when physical, mechanical, or deadly force is used" by completing "any investigative document made necessary by the nature of the underlying incident" and a "Use of Force Report."  [Oct. 29, 2014, MPD Use of Force Policy at § VI.A, Millville Defs.' Ex. 19, *Capps* Docket No. 195-23 ("**October 2014 UOF Policy**"); *see also* Millville's SOMF ¶ 26.]  Though supervisors reviewed Officer Dixon's use-of-force reports prior to October 29, 2014, the October 2014 UOF Policy began requiring supervisory review of each use-of-force incident.  [Millville's SOMF ¶¶ 26–27; *see* October 2014 UOF Policy at § VI.D ("The employee's supervisor shall review the Use of Force report for accuracy and completeness and shall promptly address any issues as they may pertain to policy changes, training, weapons or equipment, or discipline.  The reviewing supervisor shall make a Guardian

tracking entry of the incident.  Recommendations to . . . apply discipline shall be thoroughly documented and forwarded through the chain of command."); *accord* Aug. 12, 2016, MPD Use of Force Policy, Millville Defs.' Ex. 18, *Capps* Docket No. 195-22.]  An MPD supervisor is listed on each use-of-force incident reported.  [Millville's SOMF ¶ 29; Millville Defs.' Ex. 11, *Capps* Docket No. 195-15 (Dixon's Guardian Tracking entries).]  However, the extent to which each incident was investigated is disputed.  [*Compare* Millville's SOMF ¶ 29, *with* Pls.' RSOMF ¶ 29, *Capps* Docket No. 200-1.]

Additionally, per MPD policy, complaints of excessive force were referred to the MPD's Internal Affairs Unit ("**IAU**") for investigation.  In his first two years on the job, Officer Dixon received four complaints of excessive use of force.  [Millville's SOMF ¶ 31.] None of these complaints was sustained.[9]  [*Id.*]  As reflected in an August 27, 2014, Guardian Tracking system entry, Lt. Michael Colon reviewed 13 incidents of force and reported having "concerns" about the amount of force Officer Dixon utilized in one instance.  [Millville's SOMF ¶ 29; Millville Defs.' Ex. 11, *Capps* Docket No. 195-15 (Guardian Tracking entries).]  The incident was referred to the Cumberland County Prosecutor's Office ("**CCPO**") for an independent review, but

---

[9] These four complaints were designated as "not sustained," "exonerated," or "unfounded."  [Millville's SOMF ¶ 31; Millville Defs.' Ex. 10, *Capps* Docket No. 195-14 (Officer Dixon's IAU complaint record).]  During the *Daubert* hearing, Dr. Shane testified that "not sustained" signifies that there is insufficient evidence to support the charge of excessive force, that "exonerated" signifies that the evidence shows that the officer used an appropriate amount of force, and that "unfounded" signifies that no evidence supported the charge.

the "conclusion of the incident was not sustained."  [Millville's SOMF ¶ 29; Millville

Defs.' Ex. 11 ("Officer Dixon will be monitored for any further incidents.").]

On October 1, 2014, the CCPO began monitoring and overseeing the MPD due

to serious operational deficiencies.  [May 16, 2016, Ltr. from Cumberland County

Prosecutor Jennifer Webb-McRae to Chief Farabella, at 1, Millville's SOMF, Ex. 9,

*Capps* Docket No. 195-13 ("**2016 CCPO Memo**").]  The CCPO appointed Detective

Ronald Tobolski to "review the process of how criminal investigations were received,

investigated, reviewed, and approved by the department." [*Id.*]  Among other things,

he was tasked with reviewing and evaluating policies, procedures, and protocols

"concerning all aspects of the department's operations." [*Id.*]  Upon arrival, Detective

Tobolski identified major concerns, including, for instance, an outdated mobile video

recording ("**MVR**") policy that addressed the review of VCR tapes that were no longer

in use.  [*Id.* at 3.]

On April 1, 2015, MPD Chief of Police Thomas Haas retired.  [Millville SOMF

¶ 30.]  Defendant Jody Farabella became the Chief of Police on September 1, 2015.[10]

[*Id.* ¶ 35.]  During the interregnum, the CCPO assumed interim responsibility for

overseeing the IAU and appointed CCPO Chief of Investigators Richard E. Necelis in

this regard.  [*Id.* ¶ 32.]  Chief of Investigators Necelis reviewed IAU investigations and

---

[10] The Court takes judicial notice of the fact that Chief Farabella retired on February 1, 2023.  See Joseph P. Smith, *Millville's Police Chief Is Retiring, and the Next One Will Be a Familiar Face*, Vineland Daily J. (Dec. 7, 2022), https://www.thedailyjournal.com/story/news/local/ 2022/12/07/millville-nj-police-chief-jody-farabella-retiring-captain-ross-hoffman-replacement/69703778007/[https://perma.cc/7F2H-NUKS].

provided recommendations for disciplinary action where appropriate.  [*Id.* ¶ 33; *see also* 2016 CCPO Memo at 5 (ensuring all investigations "were completed to a logical conclusion").]  Following Chief Farabella's promotion, he and Chief of Investigators Necelis continued to work collaboratively to ensure a "properly functioning internal affairs unit."  [2016 CCPO Memo at 5.]

On February 2, 2016, having reviewed Officer Dixon's IAU files, Chief of Investigators Necelis raised concerns that Officer Dixon received four complaints of excessive force during a two-year span.  Writing to Chief Farabella, he advised sending Officer Dixon to a training program in "verbal judo and/or handling emotionally disturbed persons."  [Millville's SOMF ¶ 38; Feb. 2, 2016, Ltr. from Chief Necelis to Chief Farabella, at 1, Millville Defs.' Ex. 12, *Capps* Docket No. 195-16 ("**Necelis Ltr.**").]  He explained that such training "may help [Officer] Dixon in being able to diffuse future situations so he doesn't have to use force," which would be advantageous "from a risk assessment point of view." [Necelis Ltr. at 1.]  Additionally, Chief of Investigators Necelis wrote to MPD Detective Brian Starcher on March 15, 2016, via e-mail, stating that, "[i]t is concerning to me that Off. Dixon keeps racking up complaints [of excessive force].  Has he ever been sent for a Fitness for Duty exam?  Please review his disciplinary history and make a recommendation if you believe he should be." [Pls.' Ex. 93.]   Chief Farabella was copied on this correspondence.  Detective Starcher responded: "I know Dixons [sic] complaints were just reviewed for same concern[;] however, I will look at it all again."  [Pls.' Flash Drive File No. 6015.]  On April 27, 2016, Officer Dixon completed the "verbal judo" program.  [Millville's

SOMF ¶ 39.]   On June 27 and December 26, 2017, Officer Dixon had additional complaints of excessive force lodged against him.   [Millville's SOMF ¶ 41; *see also* Millville Defs.' Ex. 10, *Capps* Docket No. 195-14 (Officer Dixon's IAU complaint record).]   Officer Dixon was exonerated as to each complaint.   [*Id.*]

On March 20, 2018, the New Jersey Office of the Attorney General issued Law Enforcement Directive No. 2018-3, which required applicable law enforcement agencies, like the MPD, to establish an "Early Warning System," or a "tool designed to detect patterns and trends in police conduct before that conduct escalates."   The Directive specified fifteen (15) performance indicators that each Early Warning System must track concerning officer conduct, such as (i) "internal affairs complaints against the officer," (ii) "[a]ny use of force by the officer that is formally determined or adjudicated . . . to have been excessive, unjustified, or unreasonable," and (iii) "[u]nexcused absences by the officer."   The Directive further provided that three separate occurrences of any of the specified performance indicators within a twelve-month period triggers an Early Warning System review of the officer's conduct and mandates the initiation of remedial action by assigned supervisory personnel.   It is undisputed that the MPD tracked certain of these indicators prior to the effective date of the Directive, but that the MPD did not have a formal early warning system before March 20, 2018.   [Millville's SOMF ¶ 45.]   In a letter dated July 22, 2019, Cumberland County Prosecutor Jennifer Webb-McRae wrote to Chief Farabella, observing that a June 24, 2019, "spot inspection" of the MPD by investigators revealed "no significant issues" concerning the policies implemented during the CCPO's oversight of the

MPD.  [July 22, 2019, Ltr. from Cumberland Cnty. Prosecutor Webb-McRae to Chief Farabella, at 1, Millville Defs.' Ex. 26, *Capps* Docket No. 195-30.]  Prosecutor Webb-McRae also noted that the MPD's Early Warning System appeared to be operating consistent with Law Enforcement Directive No. 2018-3.  [*See id.* at 2.]

The Early Warning System ultimately required by the Attorney General is not much different from the system that the MPD recognized and embraced.  The MPD adopted an early intervention policy in General Order 07-2012 that provided, in pertinent part, as follows:

> [U]tilize an early intervention policy for tracking and reviewing the indicators of increased risk and provide timely, non-punitive intervention consistent with best practices to augment the performance evaluation system.  The Early Intervention Policy is designed to detect patterns and trends before the conduct escalates into more serious problems.  The primary intent is to address potential problems through the use of appropriate management intervention strategies before negative discipline becomes necessary.  All levels of supervision, especially first line supervisors, are expected to recognize potentially troublesome employees, identify training needs and provide professional support in a consistent and fair manner.  Emphasis should be placed on anticipating employee problems before it results in improper performance or conduct.

[*See* Jon M. Shane Rpt., at 31–32, 36–40, Pls.' Ex. 2, *Capps* Docket Nos. 205, 205-1 ("**Shane Rpt.**") (quoting and discussing Early Warning Policy); Pls.' RSOMF ¶¶ 45/46/47, 49 (claiming that the MPD had an Early Warning System "in the form of GTS" that it did not use properly).[11]]  The Early Intervention Policy further provided

_____

[11] Here is another example of a topic that Plaintiffs insufficiently address in their submissions.  The Court was not furnished with a copy of the MPD's Early Warning Policy, and Plaintiffs' submissions hardly explain how the MPD failed to properly use its Early Warning System.  Rather, the Court had to independently review and consider Dr. Shane's discussion of the policy and system to discern what Plaintiffs' theory appears to be.  To the

that four (4) qualifying incidents in 90 days would prompt early intervention.  [Shane Rpt. at 36 (quoting Bates Millville/001371).]  It also required the Chief of Police to conduct an annual evaluation of the Early Intervention Policy to assess its effectiveness and to prepare a written report.  [*Id.* at 38 (quoting Bates Millville/001366).]  There is no evidence in the record that the MPD's Early Intervention Policy was reviewed annually.  The Early Intervention Policy is discussed further, below.

In late 2018, after a sixteen-month investigation, NJ Advance Media for NJ.com published a series entitled, "The Force Report," which provided comprehensive information on the police's use of force based on aggregate data drawn from local police departments.  [Pls.' CSOMF ¶ 613; *see also* Craig McCarthy & Stephen Stirling, *How We Built the Most Comprehensive Statewide Database of Police Force in the United States*, NJ Advance Media for NJ.com (Nov. 29, 2018) [Millville Defs.' Ex. 24, *Capps* Docket No. 195-28.]  A December 27, 2018, article reported that Dixon led the State of New Jersey in use-of-force incidents reported, representing an outlier in the State and at the MPD.  [*See* Blake Nelson, *This N.J. Cop Used More Force Than Anyone Else.  Is He Violent or Just Good at his Job?*, NJ Advance Media for NJ.com (Dec. 27, 2018) [Pls.' Ex. 240; Millville Defs.' Ex. 23, *Capps* Docket No. 195-27].]  During his first three-and-a-half years as an officer, he had twice as many use-of-force incidents

---

extent that these documents are buried in the record, they should have been clearly identified for the Court's review.

as the officer with the next highest total, former Officer Jeffrey Profitt[12] (*i.e.*, 36 incidents in five years).  [*See id.*]  Prior to the publication of these stories, NJ Advance Media contacted Cumberland County Prosecutor Webb-McRae regarding use of force by Vineland Police Department officers.  [*See* Millville's SOMF ¶ 52.]  At her request, Chief of Investigators Necelis prepared a memorandum, dated September 26, 2018, in which he addressed Officer Dixon's file, too.  [*Id.*]  He wrote:

> In reviewing Officer Dixon's internal complaint history, there was only one excessive use-of-force incident, which was not[]sustained.  The other excessive force complaints were found to be unfounded or he was exonerated.  My office's [Professional Standards Unit] does oversee each Internal Affairs Unit in each department [Millville, Vineland, and Bridgeton].  In regards to Officer Dixon, my office oversaw some of those investigations and was directly involved with investigating some of the complaints.

[Sept. 26, 2018, Memorandum from Chief Necelis to Cumberland Cnty. Prosecutor Webb-McRae, at 3 (¶ 11), Millville Defs.' Ex. 27, *Capps* Docket No. 195-31.]

Following publication of "The Force Report," the New Jersey Office of Public Integrity and Accountability ("**OPIA**") undertook an independent investigation into Dixon's record.  It reviewed Dixon's 80 use-of-force incidents reported during his career as an officer.  [Pls.' CSOMF ¶¶ 630, 634.]  After completion of its review, OPIA determined that further investigation was warranted into the Capps and Joyce incidents.  By letter dated September 5, 2019, OPIA notified Dixon that he was a target of a State Grand Jury investigation into allegations of official misconduct, assault, and

---

[12] Profitt pled guilty in New Jersey Superior Court to a third-degree aggravated assault charge in connection with an excessive force incident.  He agreed to a lifetime ban on public employment.

falsifying or tampering with public records during his employment as an officer of the MPD.  [*Id.* ¶ 633.]   At some point thereafter, a representative of the New Jersey Attorney General's Office offered Dixon a plea deal.

On October 19, 2019, Dixon resigned from the MPD.  He wrote Chief Farabella via e-mail: "As we last spoke about my current in going [sic] the deal offered to me is much worse than I could have imagined.  I want to thank you for always having my back and being a great Chief."  [Pls.' CSOMF ¶ 635; Pls.' Ex. 241A.]  On November 20, 2019, Dixon formally entered guilty pleas in New Jersey Superior Court as to two counts of third-degree aggravated assault based on the Capps and Joyce incidents. [Pls.' CSOMF ¶ 636.] He admitted that his use of force on both occasions was "excessive," that he could have used less force to accomplish the arrests, and that his conduct exhibited "extreme indifference to the value of human life."  [*Id.* ¶¶ 637–40; *see also* Pls.' Ex. 13.]  Dixon agreed to a lifetime ban on public employment.  [Pls.' CSOMF ¶ 641.]

It is undisputed that, at the time, Chief Farabella had no direct awareness of, or involvement in, the Capps and Joyce incidents.  [*Compare* Farabella's SOMF ¶¶ 18, 22, *with* Pls.' RSOMF ¶¶ 18, 22.]

### D.    Dr. Shane's Expert Report

Capps retained Dr. Jon Shane, Ph.D., to opine on (i) the use of force employed by Officer Dixon and (ii) the supervisory practices of the MPD.  Dr. Shane is an associate professor at John Jay College of Criminal Justice with an extensive background in law enforcement, including having previously served as a Newark

police officer and detective.  Reviewing available data and the discovery record of these cases, Dr. Shane concluded that Officer Dixon breached accepted industry standards in effect at the time of his use of force against Capps.  He also concluded that the MPD did not properly implement a personnel risk management program and supervisory practices consistent with accepted industry standards in effect at the time of the incidents.  In this vein, Dr. Shane adopted the following opinions, among others:

1. **Given the totality of the circumstances, Officer Dixon used excessive force because he did not have a justifiable reason to use the amount of physical force that he employed.**  His force was not proportionate to the threat faced, and his actions were inconsistent with accepted legal, policy, and industry-practice guidelines for using force.  He further explains that Capps was not engaged in a serious crime, that she was no more than passively resisting arrest, and that she presented no credible threat to either Officer Dixon or Officer Orndorf.  In such circumstances, Officer Dixon should have used less force to accomplish the arrests.

2. **The MPD also failed to implement supervisory and risk management practices consistent with accepted industry standards**.  Dr. Shane explains that MPD supervisors did not appropriately monitor Officer Dixon's use of force through the Guardian Tracking system because they did not conduct mandatory performance evaluations or mandatory MVR reviews prior to 2015, even though they knew that Officer Dixon had a propensity to use force, including striking individuals in the face (earning him the moniker, "glass hands," as he often injured his hands using force).  He also opines that the NJ.com reporting should have led to increased supervision of Officer Dixon, as he was reported to have led the State of New Jersey in number of use-of-force incidents.  Dr. Shane also claims that Officer Dixon used force disproportionately against people of color.  As to Chief Farabella's conduct, Dr. Shane states that he watered down the MVR review policy so that supervisors did not have to review MVR incident footage, but only on a randomized basis.  He contends that Chief Farabella was on notice of Officer Dixon's pattern of conduct because he received e-mails via the Guardian Tracking system notifying him of his use-of-force incidents, absences, MVR reviews, and other matters.  "The lack of intervention is tacit approval of his conduct; this means, the Millville Police Department does not regard Officer Dixon's use of force pattern as adverse," he claims.

[Jon M. Shane Rpt., at 11–13 (¶¶ 1, 4), Pls.' Ex. 2, *Capps* Docket Nos. 205, 205-1.]

While Plaintiffs have other expert witnesses, Dr. Shane appears to be the only liability expert.  As noted below, Defendants seek to preclude Dr. Shane's proposed testimony.

### E.    Relevant Procedural Background

Plaintiffs filed their Second Amended Complaint on September 16, 2020.  On Defendants' Motions to Dismiss, the Court pruned their asserted claims.  Defendant Chief Farabella sought reconsideration of the Court's decision to permit Plaintiffs' theory of supervisory liability to proceed.  The Court denied Chief Farabella's reconsideration motion and clarified its ruling.  Following the conclusion of discovery, Defendants filed their pending Motions for Summary Judgment.

### 1.    Remaining Claims

Capps and Joyce both maintain claims arising under 42 U.S.C. § 1983 that Officer Dixon's takedown maneuvers constitute excessive force in violation of their rights under the Fourth and Fourteenth Amendments of the United States Constitution.  Capps also claims that Officer Orndorf violated her Fourth and Fourteenth Amendments rights when he placed his knee on her back after she had been subdued.  Moreover, Capps maintains state law claims.  She contends that the actions of Dixon and Orndorf violate the New Jersey Civil Rights Act ("**NJCRA**"), N.J. Stat. Ann. § 10:6–2(c), (e), and (f), and Article I, Paragraph 7 of the New Jersey Constitution.  She also claims that their actions constitute assault, battery, and

negligence.  Joyce maintains a state law claim under the NJCRA, but no other state law claims.

Additionally, Capps and Joyce have asserted that Chief Farabella is personally liable for the excessive force of Officer Dixon and Officer Orndorf under a theory of supervisory liability.  Finally, they have asserted a *Monell* claim against the City of Millville for maintaining a custom of excessive force by police officers and an institutional culture of deliberate indifference by supervisors.

### 2.    The Court's Prior Opinions

On May 21, 2021, the Court granted, in part, and denied, in part, Defendants' Motions to Dismiss.  [*Capps* Docket No. 81.]  Relevant here is the Court's decision to permit Plaintiffs to pursue their supervisory liability claim against Chief Farabella.  As the Court noted, Plaintiffs were not permitted to establish § 1983 liability on a *respondeat superior* basis.  [Docket No. 80, at 16 (citing *Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 222 (3d Cir. 2015)).]  To the extent that Plaintiffs sought to hold some supervisors to account for Officer Dixon's use of force, the Court ruled that they failed to allege conduct that "directly caused" Officer Dixon's constitutional violations or "participation in or acquiescence to" Dixon's actions.  [*Id.*]  For this reason, the Court dismissed Ross Hoffman and other supervisors as defendants.

But the Court permitted Plaintiffs' "supervisory liability" theory to proceed against Chief Farabella because Plaintiffs had alleged a heightened level of Chief Farabella's personal involvement in Officer Dixon's conduct such that Plaintiffs might be able to prove knowledge and acquiescence under *Barkes v. First Corr. Med., Inc.*, 766

F.3d 307, 316 (3d Cir. 2014) ("a supervisor may be personally liable under [§] 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in the subordinate's unconstitutional conduct"), *rev'd on other grounds sub nom*, *Taylor v. Barkes*, 575 U.S. 822 (2015) (per curiam).  For instance, Plaintiffs had pled that Farabella spoke with Officer Dixon about his use-of-force practices, directly reviewed complaints of excessive force, and failed to take sufficient corrective measures.  Based on Plaintiffs' scattershot pleading and improper 147-page Brief in Opposition to Defendants' Motions to Dismiss, the Court discerned sufficient factual material to state a plausible claim.

Chief Farabella sought reconsideration of the Court's decision.  He argued that he was entitled to qualified immunity because *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), confirmed that a government official can only be liable for violating the Constitution through his or her own individual actions, not on a theory of vicarious liability.  Quoting *Tangreti v. Bachmann*, 983 F.3d 609, 618–19 (2d Cir. 2020), Chief Farabella stated that, in the Fourth Amendment context, "a plaintiff must establish a deliberate, intentional act on the part of the defendant to violate the plaintiff's legal rights."  He submitted that no precedent clearly establishes that a police chief can be personally liable for failing to supervise a subordinate who violates the Constitution.  For their part, Plaintiffs conceded that they could not prevail against Chief Farabella under a *respondeat superior* theory and lectured the Court:

> Plaintiffs SAC [sic] does not plead the kind of case we all learned about in first-year torts class – the master being automatically liable for the negligent acts of his or her servant because some customer slipped on a slice of lunch meat in the deli aisle.  Farabella is not sued because of his mere status as a supervisor of employees who happen to do wrong.

[Pls.' Br. in Opp'n to Farabella's Mot. for Recons., at 13–14, *Capps* Docket No. 75.]

Discerning no error in its prior decision, the Court was unperturbed.  The Court "clarified" that the Opinion should have expressed that Plaintiffs stated a claim for supervisory liability only based on "prong two" of the *Barkes* decision, but the Court explained that Plaintiffs could only prevail in any case by focusing on Chief Farabella's "direct and personal involvement with the alleged misconduct at issue."  [Docket No. 129, at 13–14.]  In this vein, the Court recognized that Chief Farabella was alleged to know about Officer Dixon's propensity to use excessive force, to have been involved in reviewing use-of-force incidents, to have failed to take adequate disciplinary actions, and to have "always [had] [Officer Dixon's] back."  Taking Plaintiffs' allegations together, the Court determined that they raised a plausible inference of Chief Farabella's knowledge of Officer Dixon's problematic conduct and acquiescence in the Capps and Joyce incidents.

### 3.   Summary Judgment Motions

Following the close of discovery, Defendants filed their pending Motions for Summary Judgment.  First, Officer Dixon contends that he is entitled to summary judgment because his uses of force against Capps and Joyce were not objectively unreasonable under the factors articulated in *Graham v. Connor*, 490 U.S. 386 (1989).  [Dixon's Br. in *Capps* at 3–4; Dixon's Br. in *Joyce* at 3–5.]  He further submits that he

is entitled to qualified immunity, arguing that there is no clearly established law providing that an officer cannot complete an arrest using a takedown maneuver. [Dixon's Br. in *Capps* at 4–7; Dixon's Br. in *Joyce* at 5–8.] To the contrary, he contends that *City of Escondido v. Emmons*, 139 S. Ct. 500 (2019), a case involving a § 1983 claim that an officer's takedown maneuver constituted excessive force, requires summary judgment of qualified immunity in his favor.  [*Id.*]  Finally, Officer Dixon seeks to discredit Dr. Shane's testimony that his use of force against *Capps* was unreasonable under applicable police guidelines.  [Dixon's Br. in *Capps* at 7–8.]

Second, Officer Orndorf seeks summary judgment as to the excessive force claim against him.  His argument is essentially twofold.  First, he claims that Capps' § 1983 and NJCRA claims should be dismissed because there is no genuine dispute that he did ***not*** place his knee on Capps' back while Officer Dixon completed his arrest. [Orndorf's Br. at 8–11.]  Second, even assuming *arguendo* that he did, Officer Orndorf submits that he is entitled to qualified immunity because no clearly established law provides that he cannot momentarily place his knee on the back of an individual who is resisting arrest in order to subdue her resistance.  [*Id.* at 11–15.]  He seeks dismissal of the state tort claims asserted against him as well.  [*Id.* at 16–19.]

Third, Chief Farabella seeks summary judgment for multiple reasons.  First, he claims that Plaintiffs cannot establish their underlying excessive force claims, so he cannot be liable in his supervisory capacity.  [Farabella's Br. at 4–5.]  Second, even assuming *arguendo* that Officer Dixon or Officer Orndorf used excessive force, he

24

contends that it is undisputed that he had no personal involvement in the two incidents sufficient to make him liable and that Plaintiffs have not adduced any evidence that his conduct resulted in an illegal custom of excessive force. [*Id.* at 5–6.] Third, he urges the Court to grant him qualified immunity to the extent it finds there to be a legally cognizable claim against him. [*Id.* at 7–8.]

Fourth, the City of Millville seeks summary judgment as to the *Monell* claims asserted against it. Millville principally argues that the undisputed record evidence fails to establish the existence of a custom, pattern, or practice of excessive use of force. [Millville's Br. at 19–25.] In support of this argument, Millville seeks to bar the report and preclude the testimony of Dr. Shane and to exclude "The Force Report," use-of-force reports, and statistics regarding use-of-force by MPD officers. [*Id.* at 25–33.] Finally, it contends that, even if Plaintiffs could prove a pattern or practice of excessive use of force, there is insufficient evidence that supervisors at the MPD were deliberately indifferent. [*Id.* at 33–40.]

## II.   LEGAL STANDARDS

### A.   Summary Judgment

A court should grant a motion for summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A fact is "material" only if it might impact the "outcome of the suit under the governing law." *Gonzalez v. Sec'y of Dep't of Homeland Sec.*, 678 F.3d 254, 261 (3d Cir. 2012). A dispute

is "genuine" if the evidence would allow a reasonable jury to find for the nonmoving party.  *Id.  See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding whether there is a genuine issue of material fact, the court must view all inferences, doubts, and issues of credibility in favor of the non-moving party.  *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999); *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995).  The movant has the initial burden of showing through the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits "that the non-movant has failed to establish one or more essential elements of its case." *Connection Training Servs. v. City of Phila.*, 358 F. App'x 315, 318 (3d Cir. 2009).  "If the moving party meets its burden, the burden then shifts to the non-movant to establish that summary judgment is inappropriate."  *Id.*

In the face of a properly supported motion for summary judgment, the non-movant's burden is rigorous.  The non-movant "must point to concrete evidence in the record"; mere allegations, conclusions, conjecture, and speculation will not defeat summary judgment.  *Orsatti v. N.J. State Police*, 71 F.3d 480, 484 (3d Cir. 1995); *accord Jackson v. Danberg*, 594 F.3d 210, 227 (3d Cir. 2010) (noting that "speculation and conjecture may not defeat a motion for summary judgment") (citing *Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 228 (3d Cir. 2009)).

### B.    42 U.S.C. § 1983 and the NJCRA

Plaintiffs' claims against Defendants are brought pursuant to 42 U.S.C. § 1983

and the NJCRA.  Section 1983 provides that,

> Every person who, under color of any statute, ordinance, regulation, custom,
> or usage, of any State or Territory or the District of Columbia, subjects, or
> causes to be subjected, any citizen of the United States or other person within
> the jurisdiction thereof to the deprivation of any rights, privileges, or immunities
> secured by the Constitution and laws, shall be liable to the party injured in an
> action at law, suit in equity, or other proper proceeding for redress[.]

42 U.S.C. § 1983.

To state a claim under § 1983, "a plaintiff must allege the violation of a right

secured by the Constitution and laws of the United States[] and must show that the

alleged deprivation was committed by a person acting under color of state law."  *West

v. Atkins*, 487 U.S. 42, 48 (1988) (citations omitted); *Nicini v. Morra*, 212 F.3d 798, 806

(3d Cir. 2000).  Modeled on § 1983, the NJCRA creates a private cause of action for

violations of civil rights secured under the New Jersey Constitution.  *Trafton v. City of

Woodbury*, 799 F. Supp. 2d 417, 443 (D.N.J. 2011).  Courts interpret the NJCRA

"analogously to § 1983." *Id.*

### C.    Qualified Immunity

The doctrine of qualified immunity "balances two important interests—the

need to hold public officials accountable when they exercise power irresponsibly and

the need to shield officials from harassment, distraction, and liability when they

perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  Under

this doctrine, government officials are immune from liability for civil damages so long

27

as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Taylor v. Barkes*, 575 U.S. 822, 825 (2015) (per curiam) (citation and internal quotation marks omitted). While a case "directly on point" is not required to find that a reasonable person violates clearly established law, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). The focus is on precedents that evince clearly established rights as of the date of the underlying events. *See Bryan v. United States*, 913 F.3d 356, 363 (3d Cir. 2019). Courts must take care not to define the clearly established right " 'at a high level of generality.' " *White v. Pauly*, 580 U.S. 73, (2017) (per curiam) (quoting *al-Kidd*, 563 U.S. at 742). Rather, "the clearly established right must be defined with specificity." *City of Escondido v. Emmons*, 586 U.S. ___, ___, 139 S. Ct. 500, 503 (2019). At the end of the day, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Taking these principles together, qualified immunity is analyzed in two distinct steps. First, the court asks whether the facts alleged, taken in the light most favorable to the plaintiff, makes out a violation of a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 200 (2001). Second, the court considers whether the right was clearly established at the time of the challenged conduct. *Id.* at 200, 202. Courts may tackle these steps

in the order they deem appropriate.  *Pearson*, 555 U.S. at 236; *Bland v. City of Newark*, 900 F.3d 77, 83 (3d Cir. 2018).

Where a defendant seeks qualified immunity, a ruling on that issue should be made as early as practicable "so that the costs and expenses of trial are avoided where the defense is dispositive."  *Saucier*, 533 U.S. at 200.  After all, qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation," not a mere defense to liability.  *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

## III.   DISCUSSION[13]

As noted above, Defendants seek summary judgment as to the remaining claims asserted, and Officer Dixon, Officer Orndorf, and Chief Farabella argue that they are entitled to qualified immunity.  Plaintiffs maintain that there are genuine disputes of fact precluding summary judgment.  They contend that Officer Dixon (and, in Capps' case, Officer Orndorf) employed excessive force in violation of the Fourth and Fourteenth Amendments, that Chief Farabella is personally liable in his supervisory capacity for acquiescing in Officer Dixon's conduct, and that the City of Millville is liable on a *Monell* basis for maintaining a custom, pattern, or practice of excessive force.  Each of these claims is discussed in turn.

---

[13] The Court exercises subject matter jurisdiction over Plaintiffs' § 1983 claims pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

## A.    Excessive Force

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures."  U.S. Const., amend. IV.  A free citizen's claim that a law enforcement officer used excessive force in the course of making an arrest, investigatory stop, or other "seizure" is analyzed under the Fourth Amendment's "objective reasonableness" standard.  *Graham v. Connor*, 490 U.S. 386, 388 (1989).  Under this standard, the question is whether the officer's conduct was objectively reasonable in light of the totality of circumstances, without regard to the underlying intent or motivation of the officer.  *Id.* at 397 (first citing *Scott v. United States*, 436 U.S. 128, 137–39 (1978); then citing *Terry v. Ohio*, 392 U.S. 1, 20–22 (1968)).  Factors relevant in making this determination include the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively or passively resisting arrest or attempting to evade arrest by flight.  *Id.* at 396 (citing *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)).  The Third Circuit has also instructed that the following factors may be considered:  "the possibility that the persons subject to the police action are violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time."  *Kopec v. Tate*, 361 F.3d 772, 777 (3d Cir. 2004) (citing *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997)).

Courts must be mindful that reasonableness should be judged "from the perspective of a reasonable officer on the scene" and not "with the 20/20 vision of

hindsight." *Graham*, 490 U.S. at 396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97.

### 1. Officer Dixon

Officer Dixon argues that his uses of force during the Capps and Joyce incidents were objectively reasonable under *Graham* and that he is entitled to qualified immunity in any case because Plaintiffs' claims do not set forth a violation of clearly established law. [Dixon Br. in *Capps* at 3–4; Dixon Br. in *Joyce* at 3–5.] He also suggests that the Court should not credit the testimony of Capps' expert, Dr. Shane, because his opinions regarding the objective reasonableness of his uses of force are "conclusory" and "unsupported" by the record evidence. [Dixon Br. in *Capps* 7–9.] The Court first addresses whether a reasonable jury could find that Officer Dixon's conduct violates the Fourth Amendment. *See Saucier*, 533 U.S. at 200.

Officer Dixon suggests that no reasonable jury could conclude that he employed excessive force. As to Capps, Officer Dixon emphasizes that he was justified in arresting her. Stopped on suspicion of driving under the influence of alcohol, Capps subsequently failed field sobriety tests. When Officer Dixon appropriately initiated an arrest, Capps resisted and took a step away. Officer Dixon contends that, at this point, his use of force to accomplish the arrest was permissible and "authorized by applicable law enforcement standards." He argues that the takedown maneuver—which took mere seconds to complete—was not clearly excessive. As to Joyce, Officer Dixon's

argument is the same in all material respects.  He notes that Joyce resisted arrest and exhibited "escalating combative and hostile behavior."  He thus claims that his takedown maneuver was warranted.  Because she was "squirming" on the ground and resisting being handcuffed, Officer Dixon claims that his application of pepper spray to her face was acceptable, too.

Capps' version of her arrest emphasizes different facts.  Though Capps admits that she was appropriately stopped and that she took a step back, she notes that she weighed less than 100 lbs. and, given Officer Dixon's weight and size, she posed no credible threat to the officers.  She also observes that Officer Dixon's force was sufficient to break her ribs and cause a contusion.  It is undisputed that she was unarmed, alone at the scene, and visibly impaired by the effects of alcohol.  Similarly, Joyce claims that she posed no credible threat to Officer Dixon based on her weight and size, which was significantly less than Officer Dixon's.  She appears to agree that she was verbally combative but not that she was actively resisting arrest.  She observes that Officer Dixon's use of force was an unauthorized jiu jitsu maneuver that he had learned outside of police training.  In sum, Plaintiffs submit that a reasonable jury could weigh the *Graham* factors, determine that Officer Dixon's uses of force were disproportionate to the degree of resistance faced, and conclude that Officer Dixon's conduct constitutes excessive force.

The Court agrees with Plaintiffs:  there is a triable issue concerning the reasonableness of Officer Dixon's actions.  *See Rivas v. City of Passaic*, 365 F.3d 181, 199 (3d Cir. 2004) (explaining that reasonableness of takedown was for jury's

determination where injured party emphasized facts suggesting that he presented no threat to arresting officers); *Helms v. Ryder*, 2017 WL 1356323, at *5 (D.N.J. Apr. 12, 2017) (Simandle, J.) (observing that step one of the qualified immunity analysis— whether there was a constitutional violation—is essentially a factual question "properly presented to a jury") (citations omitted); *accord Abraham v. Raso*, 183 F.3d 279, 290 (3d Cir. 1999) ("[R]easonableness under the Fourth Amendment should frequently remain a question for the jury."). Though it is undisputed that Capps and Joyce committed crimes justifying arrest by Officer Dixon, such crimes were far from severe, and Officer Dixon does not argue otherwise. Additionally, a reasonable jury could conclude that Capps and Joyce did not "pose[] an immediate threat to the safety of the officers or others," *see Graham*, 490 U.S. at 396, as both women dwarfed Officer Dixon in weight and size, and they were unarmed and unaided by others, *see Kopec*, 361 F.3d at 777 (explaining relevance of possibility that suspect may be armed and "the number of persons with whom the police officers must contend at one time").

Finally, the extent to which Capps and Joyce were "actively resisting arrest" is fiercely disputed. There is testimony supporting the proposition that their resistance was no more than passive. Given Plaintiffs' testimony, the video evidence, and Dr. Shane's expert opinions,[14] a reasonable jury, weighing the factors recited in *Graham*,

---

[14] Officer Dixon's arguments seeking to discredit Dr. Shane's opinions concerning the reasonableness of Officer Dixon's actions are a red herring. He submits that Dr. Shane's opinion that Capps was merely "passively resisting" should not be credited, given Defendants' experts' opinions that her resistance was "active." They also dispute Dr. Shane's testimony regarding proportionality and use of "minimum force necessary" to effectuate an arrest, contending that such "factors" would "impose unrealistic burdens." [Dixon Br. in *Capps* at

490 U.S. at 396, and *Kopec*, 361 F.3d at 777, could conclude that Officer Dixon employed excessive force.  Therefore, Plaintiffs have demonstrated that Officer Dixon is not entitled to summary judgment on the merits of their claims.  *See Noble v. City of Camden*, 112 F. Supp. 3d 208, 226–27 (D.N.J. 2015) (Simandle, J.) (denying summary judgment as to the merits of excessive force claims against police officers where parties disputed whether resistance to arrest occurred); *cf. Lankford v. City of Clifton Police Dep't*, 546 F. Supp. 3d 296, 313 (D.N.J. 2021) (Martini, J.) (finding that plaintiff had made out a prima facie case of excessive force where officer sat atop plaintiff and beat his legs with a baton to handcuff plaintiff where he had been actively resisting police efforts to arrest him for 10 minutes, though granting qualified immunity regardless).

Furthermore, Officer Dixon's guilty plea in New Jersey Superior Court to two counts of third-degree aggravated assault for using force against Capps and Joyce bolsters the conclusion to deny Officer Dixon's Motion for Summary Judgment.  The doctrines of judicial and collateral estoppel may permit the Court to prohibit Officer Dixon from arguing that his uses of force were reasonable where he admitted in state court that they were not.  During oral argument, Plaintiffs submitted that estoppel is warranted, as argued in their papers.  [*See* Pls.' Opp'n to Dixon at 30–34 (contending that judicial or collateral estoppel is appropriate yet asking the Court to deny summary judgment and remit the question of reasonableness to a jury).]

---

7–8.]  These arguments are not a legitimate basis for preclusion pursuant to the requirements of Federal Rule of Evidence 702 and *Daubert*.  Rather, they reveal that the extent to which Capps was resisting arrest is disputed.

Judicial estoppel prohibits a party from taking a legal position in one proceeding and later assuming a contrary position "simply because his interests have changed," "especially if it [would] be to the prejudice of the party who has acquiesced in the position formerly taken by him." *Davis v. Wakelee*, 156 U.S. 680, 689 (1895); *see also In re Kane*, 628 F.3d 631, 638 (3d Cir. 2010) ("Judicial estoppel is a fact-specific, equitable doctrine, applied at courts' discretion."). Three general considerations guide a court's invocation of judicial estoppel: (1) whether "a party's later position [is] clearly inconsistent with its earlier position"; (2) "whether the party has succeeded in persuading a court to accept the party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or second court was misled"; and (3) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *New Hampshire v. Maine*, 532 U.S. 742, 750–51 (2001) (internal quotations and citations omitted).

Under the doctrine of collateral estoppel, "once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a difference cause of action involving a party to the first case." *Allen v. McCurry*, 449 U.S. 90, 94 (1980); *see also United States v. Rigas*, 605 F.3d 194, 217 (3d Cir. 2010) ("The doctrine of collateral estoppel ensures that 'when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuits.' ") (quoting *Ashe v. Swenson*, 397 U.S. 436, 443 (1970)).  In determining whether to permit collateral

estoppel effect of a state proceeding, a federal court must apply the law of the state where the criminal proceeding occurred and "ascertain whether the party against whom the estoppel is asserted had a full and fair opportunity to litigate the issue decided in the state court." *Anela v. City of Wildwood*, 790 F.2d 1063, 1068 (3d Cir. 1986).

Here, Officer Dixon admitted in New Jersey Superior Court that he "recklessly caused significant bodily injury to" Capps and Joyce and that he "used excessive force," "more force during the arrest than was necessary under the circumstances." His position here is clearly inconsistent with his plea agreement. While courts in similar circumstances have prohibited an officer from taking a position that his use of force was reasonable, *see, e.g.*, *Jenkins v. District of Columbia*, 4 F. Supp. 3d 137, 145 (D.D.C. 2013) (granting partial summary judgment to injured arrestee against officer who was alleged to have used excessive force at police cruiser but denied such force was unreasonable despite pleading guilty to assault in state court), the rudimentary presentation of the issue to the Court counsels against a definitive finding at this posture. Because Officer Dixon seeks summary judgment (and not Plaintiffs) and Plaintiffs have not fully developed their argument in favor of estoppel, the prudent decision is to deny summary judgment and permit a jury to hear the relevant evidence that Officer Dixon entered a guilty plea as to both incidents. Other courts have pursued this course where an officer's guilty plea involved a related, but meaningfully different, crime from the claim before the court in the instant proceeding. *See, e.g.*, *Walker v. Wilburn*, 2018 WL 5848857, at *6 (N.D. Tex. Nov. 8, 2018) (denying

36

plaintiff's summary judgment motion of excessive force based on officer's guilty plea to recklessly discharging a firearm so jury could weigh *Graham* factors of objective reasonableness).  Accordingly, Officer Dixon's guilty plea is relevant and persuasive evidence countering his defense that he acted reasonably, but it is not conclusive proof.

Having concluded that there is a triable issue as to the reasonableness of Officer Dixon's use of force, the Court next addresses whether the takedown maneuvers would violate rights that were clearly established at the time of the Capps and Joyce arrests.  *See Saucier*, 533 U.S. at 200, 202 ("The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable office that his conduct was unlawful in the situation he confronted."). Officer Dixon contends the maneuvers did not violate clearly established law, so he is entitled to qualified immunity.  [Dixon Br. in *Capps* at 4–7; Dixon Br. in *Joyce* at 5–8.] He points to the Supreme Court's decision in *City of Escondido v. Emmons*, 139 S. Ct. 500 (2019), for the proposition that it is *not* a violation of clearly established law for a police officer to employ a takedown maneuver to effectuate an arrest.

In *City of Escondido*, a police officer responded to a domestic violence incident at an apartment to conduct a welfare check.  139 S. Ct. at 501.  After some time, a man opened the apartment door and came outside.  A lone police officer standing outside directed the man not to close the door.  The man attempted to brush past the officer and withdraw inside, but the officer "stopped the man, took him quickly to the ground, and handcuffed him."  *Id.* at 502.  Video evidence showed that the man was not in any visible or audible pain as a result of the takedown.  *Id.*  The man sued the officer

pursuant to § 1983 for excessive force, and the lower court denied qualified immunity, stating that the man had a Fourth Amendment right "to be free from excessive force." *Id.* at 503. The Supreme Court reversed and remanded for consideration of whether the officer's takedown maneuver violated clearly established law defined with greater specificity. *Id.* at 504. The Supreme Court did not hold, as Officer Dixon would seem to suggest, that the officer was entitled to qualified immunity. *See id.*

Accordingly, Officer Dixon's original proposition is too broad, as a general matter. Though law enforcement officers are clearly entitled to use force to effectuate a lawful arrest, *Graham*, 490 U.S. at 396, their privilege to do so is not *carte blanche* to exercise whatever degree of force desired.

Rather, it is clearly established that the disproportionate use of force against an individual who does not pose a credible threat and who engages in merely passive resistance violates the Fourth Amendment. *See Estate of Smith v. Marasco*, 430 F.3d 140, 151–53 (3d Cir. 2005) (applying *Sharrar* factors and explaining that, while initial use of force did not violate clearly established law, later decision to storm house and shed with flash-bang grenades and tear gas was escalation of force inappropriately calibrated to need such that officer was not entitled to qualified immunity); *see also Hanks v. Rogers*, 853 F.3d 738, 747 (5th Cir. 2017) ("[C]learly established law demonstrated that an officer violates the Fourth Amendment if he abruptly resorts to overwhelming physical force rather than continuing verbal negotiations with an individual who poses no immediate threat or flight risk, who engages in, at most, passive resistance, and whom the officer stopped for a minor traffic violation.");

38

*Castellani v. City of Atlantic City*, 2017 WL 3112820, at *9 (D.N.J. July 21, 2017) (citing

*Hanks*, 853 F.3d at 747, for same proposition); *Gravelet-Blondin v. Shelton*, 728 F.3d

1086, 1093 (9th Cir. 2013) ("The right to be free from the application of non-trivial

force for engaging in mere passive resistance was clearly established prior to 2008.");

*Davis v. Clifford*, 825 F.3d 1131, 1137 (10th Cir. 2016) ("[I]t is, and was at the time of

Davis' arrest, clearly established law that the use of disproportionate force to arrest an

individual who has not committed a serious crime and who poses no threat to herself

or others constitutes excessive force."). Based on this body of relevant law, the Court

finds that the contours of Plaintiffs' rights were sufficiently clear to place Officer Dixon

on notice that his use of force must be proportionate to legitimate law enforcement

objectives.[15]   In these circumstances, Officer Dixon would have known that his

takedown maneuvers against Capps and Joyce could result in a finding that he acted

unreasonably.  *See Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("[O]fficials can still be on

---

[15] Plaintiffs contend that Officer Dixon's takedown maneuvers were so obviously contrary to law that *Graham* provides the relevant basis to deny qualified immunity.  It is true that *Graham* and *Garner* can supply the "clearly established law" to place government officials on notice as a general matter in an "obvious" case of misconduct, *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam) (citing *Hope v. Pelzer*, 536 U.S. 730, 738 (2002)); *see also James v. N.J. State Police*, 957 F.3d 165, 169 (3d Cir. 2020) ("In rare cases, a plaintiff may show that a right is clearly established if the 'violation is obvious.'") (citing *Brosseau*, 543 U.S. at 199) (cleaned up), but these cases are few and far between.  Here, Officer Dixon had a legitimate basis to arrest Capps and Joyce, and some degree of force to accomplish the arrests was no doubt warranted.  The issue is that Officer Dixon immediately resorted to overwhelming force.  A reasonable jury could conclude such force was excessive, but it may not.  That the issue is disputed suggests that the Capps and Joyce incidents are not obvious cases of excessive force, placing to the side, of course, that Officer Dixon entered a guilty plea as to two counts of aggravated assault.

notice that their conduct violates established law even in novel factual circumstances.").

Therefore, the Court concludes that Officer Dixon is not entitled to qualified immunity, and his Motion for Summary Judgment will be denied accordingly.

### 2.    Officer Orndorf

Next, the Court considers Capps' claim of excessive force against Officer Orndorf.   Capps contends that Officer Orndorf violated clearly established law by kneeling on her back after she had been subdued.   Officer Orndorf denies doing so and submits that the video evidence is clear.   [Orndorf Br. at 6–11.]   Further, even assuming that he did place his knee on Capps' back, Officer Orndorf claims that he would be entitled to qualified immunity.   [*Id.* at 11–15.]   Given the undisputed facts of record, these arguments do not merit especially lengthy treatment.

An officer's continued application of force to an arrestee after she has been subdued can violate clearly established law.   *See, e.g.*, *Keller v. Crawford*, 465 F. Supp. 3d 472, 481 (E.D. Pa. 2020) (finding that "force of an officer pressing their body weight through the force of their knee into the back of a handcuffed person lying face down on the pavement" violates an arrestee's clearly established right to be free from excessive force if arrestee is subdued and no longer resisting) (citing cases); *McCue v. City of Bangor*, 838 F.3d 55, 64 (1st Cir. 2016) ("Even without particular Supreme Court and First Circuit cases directly on point, it was clearly established in September 2012 that exerting significant, continued force on a person's back while that person is in a face-down prone position after being subdued and/or incapacitated constitutes

excessive force.") (cleaned up) (citation omitted).   However, momentarily placing a knee on an arrestee for a lawful purpose does not violate clearly established law.   *See Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 7 (2021) (per curiam) (distinguishing facts of *LaLonde v. Cnty. of Riverside*, 204 F.3d 947 (9th Cir. 2000), and finding that officer's placement of knee on back of arrestee for no more than eight (8) seconds to disarm arrestee of knife and effectuate lawful arrest did not violate a clearly established right).

Here, with the benefit of a full discovery record, the Court finds that no reasonable jury could determine that Officer Orndorf employed excessive force against Capps.   There is no genuine dispute that Capps was resisting arrest to some degree when Officer Dixon initiated his takedown maneuver, that it took less than thirty (30) seconds to complete the arrest, and that it took less than sixteen (16) seconds for Officer Dixon and Officer Orndorf to finish handcuffing her, together.   [Orndorf's SOMF ¶¶ 4–5; Pls.' RSOMF ¶¶ 4–5; Pls.' Ex. 1; *see also* Orndorf's Br. at 10 (acknowledging that it took "approximately 16 seconds" between the takedown and the moment she was placed in handcuffs).[16]]   The mobile video recording clearly shows that Officer Orndorf was kneeling next to Capps' body for less than fourteen (14) seconds and that he did not place his knee on her back at any point.   [*See* Pls. Ex. 1.]   With Capps' back fully visible in the mobile video recording, there is no place on her back that Officer Orndorf

---

[16] As Plaintiffs do not accept or reject the factual assertion that it took no more than sixteen (16) seconds for Officer Dixon and Officer Orndorf to finish handcuffing Capps, the Court considers the assertion undisputed. *See* Fed. R. Civ. P. 56(3)(2).

could have placed his knee that would not have been displayed in the recording.[17] Because the video evidence clearly contradicts Capps' testimony, the Court need not credit her version of the incident. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) (explaining that where a party's version of the facts is "blatantly contradicted by the record" (*i.e.*, video evidence), a court should not adopt it merely for the purpose of ruling on a motion for summary judgment). In this regard, Plaintiffs' argument that the video evidence is sufficiently obstructed to preclude summary judgment, [Pls.' Opp'n to Millville Defs. at 32–33], is not persuasive. Accordingly, because the video evidence clearly shows that Officer Orndorf did not exercise force against Capps, he cannot be liable for violating her Fourth and Fourteenth Amendment rights.

Even if the Court were to credit Capps' version of the facts and assume that Officer Orndorf placed his knee on her back, other undisputed facts fail to establish a violation of clearly established law. It is undisputed that Capps had initially resisted

---

[17] The Highlands Investigations & Consulting, LLC, Report makes this point:

> After Officer Dixon completed his takedown of Ms. Capps, he moved to a kneeling position on both knees on the ground to the right of Ms. Capps. Officer Orndorf also assumed a partial kneeling position on one knee on the ground to the left of Ms. Capps. Those areas of Ms. Capps['] back visible in the video as she lay face down on the ground are clearly not beneath but adjacent to both a kneeling Officer Dixon and Officer Orndorf as they attempted to gain control of both her right and left arms to complete the handcuffing procedure. Therefore[,] to a reasonable degree of professional certainty[,] at no time does it appear that either Officer Dixon or Officer Orndorf had their knees in the back of Ms. Capps.

[Highlands Rpt. at 9.] Plaintiffs do not contest the factual basis for the Highlands Report; rather, they suggest that it is a "garbage opinion" seeking to "dress[] up" video evidence in the form of expert testimony. [Pls.' Opp'n to Millville Defs. at 33.] Plaintiffs' unsupported argument does not provide a legitimate basis to exclude the Highlands Report, nor does it persuade the Court to view the mobile video recording differently.

arrest to some degree, [Orndorf's SOMF ¶¶ 4–6; Pls.' RSOMF ¶¶ 4–6]; that Officer Dixon was engaged in the completion of a lawful arrest, [Orndorf's SOMF ¶ 1; Pls.' RSOMF ¶ 1]; and that it took less than sixteen (16) seconds for Officer Dixon and Officer Orndorf to finish handcuffing Capps, [Pls.' Ex. 1; Orndorf's Br. at 10; *see supra* note 16].  Officer Orndorf's alleged use of force could not have lasted more than fourteen (14) seconds.  [*See* Pls.' Ex. 1; Orndorf's Br. at 10; *supra* note 17.]  This conduct—momentarily using minimal force to effectuate a lawful arrest of a resisting arrestee—does not violate a clearly established right.  *See Rivas-Villegas*, 595 U.S. at 7.

And Plaintiffs do not cite any precedent to the contrary.  Indeed, the cases that Plaintiffs cite all involve significant use of force, longer application of force, severe injury (or death), use of force against an arrestee or detainee who had already been subdued, or all of the above.  *See McCue*, 838 F.3d at 64 ("[I]t was clearly established in September 2012 that exerting significant, continued force on a person's back 'while that [person] is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force.' ") (citation omitted); *Weigel v. Broad*, 544 F.3d 1143, 1152, 1155 (10th Cir. 2008) (explaining that application of pressure to detainee's back for "about three minutes" after detainee's hands and feet had been restrained—it becoming clear that the "pressure was unnecessary to restrain him"—created a significant risk of positional asphyxiation that violated clearly established right); *Abdullahi v. City of Madison*, 423 F.3d 763, 765–66, 775 (7th Cir. 2005) (reversing grant of qualified immunity to officer where he "placed his right knee and shin on the back of [resisting arrestee's] shoulder area and applied his weight to keep him from

43

squirming or flailing" for "approximately 30–45 seconds" and arrestee stopped breathing); *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1061 (9th Cir. 2003) (finding that police officers violated clearly established law where they "crushed" arrestee, "pressing their weight on his neck and torso, and continuing to do so despite his repeated cries for air, and despite the fact that his hands were cuffed behind his back and he was offering no resistance").

These cases are not persuasive here because Orndorf's alleged use of force was indisputably minimal and brief, and it was allegedly performed while Officer Dixon finished handcuffing Capps where she had been resisting arrest. As soon as he did so, Officer Orndorf stood up, and Capps was lifted from the ground. [See Pls.' Ex. 1.] Such conduct does not violate any clearly established law. Accordingly, a finding of qualified immunity would be warranted in the alternative.

Therefore, the Court concludes that Officer Orndorf is entitled to summary judgment on the merits, and his Motion will be granted accordingly.[18]

---

[18] In Plaintiffs' Opposition Brief, Capps contends that Officer Orndorf ignores other theories of liability that preclude summary judgment at this stage. [See Pls.' Opp'n to Millville Defs. at 35–38.] For instance, she contends that Officer Orndorf failed to provide Capps with immediate medical treatment when she informed the officers that her ribs were broken and that she could not breathe, and that Officer Orndorf failed to report Officer Dixon's use of force such that he can be liable for "assisting and covering up a civil rights violation." [*Id.* at 35.] Capps is mistaken. She never pled these "theories of liability" as separate and identifiable claims, [*see generally* Second Am. Compl., *Capps* Docket No. 58], **and her scattershot submissions throughout this litigation failed to provide the Court (and her adversaries) with sufficient clarity**. *Cf. DeShields v. Int'l Resort Properties Ltd.*, 463 Fed. App'x 117, 120 (3d Cir. 2012) ("Judges are not like pigs, hunting for truffles buried in briefs.") (quoting *United States v. Starnes*, 583 F.3d 196, 216 (3d Cir. 2009)). The Court never recognized these "theories of liability" in its Opinion addressing Defendants' Motions to Dismiss either. [*See generally* May 21, 2021, Op., *Capps* Docket No. 80.] Accordingly, as Officer Orndorf persuasively

B.    **Supervisory Liability**

Next, the Court turns to Chief Farabella's Motion for Summary Judgment. Chief Farabella submits three arguments in favor of judgment as a matter of law. First, he contends that Plaintiffs cannot establish their underlying excessive force claims, so he cannot be liable in his supervisory capacity. [Farabella's Br. at 4–5.] Second, Chief Farabella submits that he cannot be liable for excessive force because he was not personally involved in Officer Dixon's misconduct. [*Id.* at 5–6.] Third, he asks the Court to grant him qualified immunity based on the contention that Plaintiffs' claims "are essentially failure to train and supervise" for which he cannot be liable in his personal capacity. [*Id.* at 7–8.] Offering these arguments in support of summary judgment, Chief Farabella impliedly invoked the Court's jurisdiction to resolve them.

Discerning some confusion about the theory of supervisory liability that the Court permitted to proceed beyond the pleadings, the Court engaged the parties at oral argument on January 16, 2024. The Court rearticulated its rulings and emphasized that the theory of supervisory liability that it recognized required evidence establishing Chief Farabella's direct and personal involvement in Officer Dixon's misconduct. [*See also* Jan. 13, 2022, Op. at 14.] Concluding that Plaintiffs had not adduced such evidence, the Court indicated its intention to enter an Opinion and Order accordingly. During the proceeding, the parties advised the Court of the pendency and status of an

---

argues, [Officer Orndorf Reply Br. at 1–6, *Capps* Docket No. 210], the Court finds that Capps has forfeited these "claims" at this juncture.

appeal before the Third Circuit concerning the Court's denial of Chief Farabella's Motion to Dismiss and his contention that he was entitled to qualified immunity based on the facts initially pled, [*see also, e.g.*, Farabella Br. at 1 n.2]; however, none of the parties disputed this Court's jurisdiction to resolve Chief Farabella's Motion for Summary Judgment.

In finalizing its opinion, the Court questioned whether it had, in fact, been divested of jurisdiction to resolve Chief Farabella's Motion for Summary Judgment due to the pendency of Chief Farabella's interlocutory appeal and whether it had been improper to entertain oral argument as to such motion.  Raising the issue with the parties *sua sponte* during a conference call the next day (*i.e.*, January 17, 2024), the Court advised the parties of its intention not to enter a decision regarding Chief Farabella's Motion for Summary Judgment if it lacked the jurisdiction to consider it. [*See* Tr. of Telephone Conference at 13:10–15, *Joyce* Docket No. 201, *Capps* Docket No. 224 (explaining that if the Court had been divested of jurisdiction, it would be an inappropriate interference in the appellate process to accord any further relief to Chief Farabella at this juncture).]  Having been placed in the awkward position to resolve a motion for summary judgment with an interlocutory appeal still pending, the Court requested further briefing on the jurisdictional issue.  [*Id.*]

On January 22, 2024, Plaintiffs filed a letter arguing that the Court had been divested of jurisdiction to consider Chief Farabella's Motion for Summary Judgment. [Jan. 22, 2024, Ltr. from Pls., *Capps* Docket No. 222.]  Plaintiffs cite several decisions from outside the Third Circuit for the proposition that a district court is divested of

jurisdiction to consider those aspects of a case affected by an interlocutory appeal, so long as the court does not certify the appeal as frivolous or dilatory.  [*Id.* at 2–5.] Though Plaintiffs' counsel submits that "the undersigned [he] advised the Court of the existence of Farabella's interlocutory appeal, and that counsel for the parties had appeared for oral argument before the Third Circuit in early December of 2023," [*id.* at 2], the Court again observes that ***no party*** questioned its jurisdiction to resolve Chief Farabella's Motion for Summary Judgment—in their summary judgment papers, in a letter duly filed on the docket thereafter, or during oral argument—until the Court raised the issue on its own initiative.

Additionally, the Court must observe that Plaintiffs' counsel inappropriately wages an attack against Chief Farabella's counsel, that is, that he has ulterior motives in moving for summary judgment while his interlocutory appeal remains pending. Specifically, Plaintiffs accuse Chief Farabella's counsel of seeking to confirm the Court's jurisdiction to resolve his Motion for Summary Judgment because Plaintiffs anticipate that the Third Circuit will rule against him.  [*See id.* at 7–8.]   He presumptuously cites a colloquy between Chief Farabella's counsel and two judges of the Third Circuit panel assigned to these matters, suggesting that "Farabella might be concerned about his prospects on his own appeal."  [*Id.* at 7, 7–8.]  It is a remarkable insinuation, and one that demeans the legal profession.  Plaintiffs never questioned this Court's jurisdiction, and given the absence of Third Circuit precedent on point, it was not obvious to counsel that a district court cannot resolve a claim at summary judgment on a defendant's motion, on the factual record adduced, even though a

question of law is pending before the Third Circuit.  There is no reason for Plaintiffs' counsel to attack the integrity of his adversary; this behavior has no place in these proceedings.

On January 23, 2024, Chief Farabella ultimately conceded that the Court was likely divested of jurisdiction to address his Motion for Summary Judgment, and he urged the Court to "withhold" its ruling until after the Third Circuit resolves his interlocutory appeal.  [Jan. 23, 2024, Ltr. from Farabella at 2–3, *Capps* Docket No. 223.]  He indicated that, while it is not clear whether a court in the Third Circuit can resolve a summary judgment motion on the merits where, as here, a purely legal issue is the subject of an interlocutory appeal, "prudential considerations" counsel in favor of withholding judgment.  [*See id.* at 3–5.]

As the parties recognize, a district court's decision rejecting an official's claim of qualified immunity is immediately appealable pursuant to 28 U.S.C. § 1291 under the "collateral order doctrine," so long as the issue is purely legal.  *Ashcroft v. Iqbal*, 556 U.S. 662, 672 (2009); *Behrens v. Pelletier*, 516 U.S. 299, 307 (1996); *Mitchell v. Forsyth*, 472 U.S. 511, 526, 530 (1985); *see also Oliver v. Roquet*, 858 F.3d 180, 188 (3d Cir. 2017) (observing that a decision which implicitly rejects a qualified immunity defense can be appealable as a collateral order).  Here, when the Court denied Chief Farabella's Motion to Dismiss, it rejected his assertion to qualified immunity, finding it sufficiently clear that a supervisor could be personally liable for a subordinate's misconduct under *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 316 (3d Cir. 2014), *rev'd on other grounds sub nom*, *Taylor v. Barkes*, 575 U.S. 822 (2015) (per curiam). [*See* May

48

21, 2021, Op. at 15–17, *Capps* Docket No. 80; Jan. 13, 2022, Op. at 11–14, *Capps* Docket No. 129.]  Chief Farabella filed an interlocutory *Forsyth* appeal on February 10, 2022.  [Notice of Appeal, *Capps* Docket No. 134 and *Joyce* Docket 118.]

"The filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal."  *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982) (per curiam).  This is so because "a federal district court and a federal court of appeals should not attempt to assert jurisdiction over a case simultaneously."  *Id.*  The divestiture rule is "a judge[-]made rule originally devised in the context of civil appeals to avoid confusion or waste of time resulting from having the same issues before two courts at the same time."  *United States v. Claiborne*, 727 F.2d 842, 850 (9th Cir. 1984).

Accordingly, an interlocutory appeal from an order denying a motion to dismiss on qualified immunity grounds generally divests the district court of jurisdiction to proceed with the action against the appealing party.  *Walker v. City of Orem*, 451 F.3d 1139, 1145–47 (10th Cir. 2006).  In this context, the divestiture is considered to be "automatic," unless the district court certifies in writing that the interlocutory appeal was frivolous or forfeited.  *See Chuman v. Wright*, 960 F.2d 104, 105 (9th Cir. 1992) ("Because the district court did not certify this interlocutory appeal as frivolous or forfeited, the district court is automatically divested of jurisdiction to proceed with trial."); *see also BancPass, Inc. v. Highway Toll Admin., L.L.C.*, 963 F.3d 391, 400 (5th

49

Cir. 2017); *Yates v. City of Cleveland*, 941 F.2d 444, 449 (6th Cir. 1991); *Stewart v. Donges*, 915 F.2d 572, 577 (10th Cir. 1990); *Apostol v. Gallion*, 870 F.2d 1335, 1339 (7th Cir. 1989). *But see Rivera-Torres v. Ortiz Velez*, 341 F.3d 86, 96 (1st Cir. 2003) (rejecting the written certification procedure but observing that appellant's "patently meritless" notice of appeal failed to divest district court of jurisdiction to proceed with trial). As this Court is not aware of any Third Circuit precedent addressing this exact issue, it finds *Walker* to be particularly instructive here.

In *Walker*, police officers raised qualified immunity as a defense to Fourth Amendment claims in a motion to dismiss, but the district court denied their motion, finding that the Fourth Amendment right was clearly established at the time of the incident. 451 F.3d at 1145. The officers filed an interlocutory appeal, asserting that the district court erred in concluding that the right allegedly violated was clearly established. *Id.* at 1145–46. Before the appellate court resolved the issue, the officers renewed their argument at summary judgment, and the plaintiffs claimed that the district court was divested of jurisdiction. *Id.* The district court concluded (much like counsel for Chief Farabella initially argued) that, because the appeal concerned whether the right was clearly established, it retained jurisdiction to determine whether the officers had violated the plaintiffs' constitutional rights. *Id.* It concluded, for summary judgment purposes, that they had not. *Id.*

The Tenth Circuit vacated the district court's decision for lack of jurisdiction. *Id.* at 1147. It explained that the district court did not retain the power after the appeal was filed to rule in favor of the officers on qualified immunity, following the ordinary

rule that filing a notice of appeal "divested the district court from granting further relief concerning the issues on appeal." *Id.* at 1146 (citing *Griggs*, 459 U.S. at 58).  Moreover, it explained that where an appealing officer believes that the discovery record warrants summary judgment in the officer's favor, the officer need not wait for the appellate court to rule:  "[a]n appealing party in that situation may seek to abate the appeal while requesting that [the appellate court] remand to the district court for consideration of a summary judgment motion." *Id.* at 1147.

Still, Federal Rule of Civil Procedure 62.1, adopted in 2009, permits a district court, if presented with a motion for relief that it lacks authority to grant because of the pendency of an appeal, to (1) defer considering the motion, (2) deny the motion, or (3) "state either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue."  Fed. R. Civ. P. 62.1.  At least one commentator has described the Rule 62.1 procedure as a more efficient method to the remand procedure acknowledged by the court in *Walker* to address a pending summary judgment motion where an interlocutory appeal on qualified immunity grounds remains pending.  *See* 15A Edward H. Cooper (Wright & Miller), Fed. Prac. & Proc. § 3914.10.8 (3d ed. 2023).  In these circumstances, the same commentator encouraged a trial court to proceed with the merits:

> But it would be still better to adopt by analogy the practice that permits a district court to proceed with the merits pending an interlocutory injunction appeal.  This practice better protects a defendant who wishes to continue in the trial court pending appeal.  All that is needed to protect the court of appeals's authority is a rule prohibiting district court revision of the very order on appeal, subject to invoking Rule 62.1.

*Id. See also* 16 Edward H. Cooper (Wright & Miller), Fed. Prac. & Proc. § 3921.2 (3d ed. 2023) (discussing the power of trial court to proceed with case on the merits, notwithstanding inability to "act on the very order that has been appealed").

Here, this Court concludes, appreciative of Chief Farabella's counsel's good-faith argument, that the prudent course is to deny the Motion for Summary Judgment for lack of jurisdiction.  An interlocutory *Forsyth* appeal remains pending before the Third Circuit as to the Court's refusal to dismiss Chief Farabella on qualified immunity grounds at the pleading stage of this litigation.  Chief Farabella has not yet sought an abatement of the appeal, with instructions to remand for consideration of his Motion for Summary Judgment.  [*See* Jan. 23, 2024, Ltr. from Farabella at 2, *Capps* Docket No. 223.]  Moreover, there is no suggestion that the interlocutory appeal is frivolous or has been forfeited, nor will the Court make such a finding on its own accord.  Finally, the parties agree that the Court should not resolve Chief Farabella's Motion for Summary Judgment at this point, [see *Capps* Docket Nos. 222, 223], and no party has raised Rule 62.1 as a procedure for the Court to provide an "indicative ruling" on the Motion.  The Court concludes that it would be an inappropriate interference with the appellate process to grant Chief Farabella any further relief until the Third Circuit rules or Chief Farabella seeks an abatement.  *See Walker*, 451 F.3d at 1146–47.

Accordingly, Chief Farabella's Motion for Summary Judgment will be denied for lack of jurisdiction at this juncture.

### C.    Municipal Liability

Finally, the Court addresses the City of Millville's Motion for Summary Judgment as to Plaintiffs' *Monell* and analogous NJCRA claims.  Millville first argues that Plaintiffs cannot establish their underlying excessive force claims, so there can be no municipal liability.  Because the Court rejected this contention, see *supra* Sections IV.A.1 & 2, it does not address it any further here.  Millville next argues that Plaintiffs have not set forth any facts to establish a policy, custom, or practice that was the "moving force" behind the unconstitutional conduct.  Relatedly, Millville seeks to exclude the testimony of Dr. Shane pursuant to Federal Rule of Evidence 702 and *Daubert*, contending that his opinions regarding a pattern and practice of excessive force and supervisors' deliberate indifference stem from an unreliable methodology.[19] The Court addresses these two arguments together.

In *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), the Supreme Court decided that municipalities could be liable under § 1983 for constitutional rights violations, but not under a theory of *respondeat superior*.  *Id.* at 690–92.  To prevail on a *Monell* claim, a plaintiff must demonstrate that a municipality's policy or custom caused the deprivation of constitutional rights.  *Id.* at 690–91.  A municipality's liability is established "when the policy or custom itself violates the Constitution or when the

---

[19] Though Millville did not file a separate motion to preclude Dr. Shane's testimony, the parties submitted briefing on the issue, and the Court held a *Daubert* hearing.  During the hearing, the parties proceeded as if Millville had separately filed a notice of motion. Accordingly, the Court considers Millville's request in connection with its summary judgment arguments.

policy or custom, while not unconstitutional itself, is the 'moving force' behind the constitutional tort of its employees." *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 222 (3d Cir. 2014) (internal quotation marks and citation omitted).

"Not all state action rises to the level of a custom or policy." *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 584 (3d Cir. 2003). A "policy" exists "when a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues a final proclamation, policy[,] or edict." *Kneipp v. Tedder*, 95 F.3d 1199, 1212 (3d Cir. 1996) (citation omitted). A "custom" is an act "that has not been formally approved by an appropriate decisionmaker," but that is "so widespread as to have the force of law." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997).

Where, as here, a plaintiff's identified policy or custom "concerns a failure to train or supervise municipal employees, liability under section 1983 requires a showing that the failure amounts to 'deliberate indifference' to the rights of persons with whom those employees will come into contact." *Carter v. City of Phila.*, 181 F.3d 339, 357 (3d Cir. 1999) (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bryan Cnty.*, 520 U.S. at 410 (cleaned up). A pattern of similar unconstitutional conduct by subordinate employees is typically necessary to show deliberate indifference for failure to train or supervise. *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (citing *Bryan Cnty.*, 520 U.S. at 409). "Without notice that a course of training is deficient in a particular respect,

54

decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.* Municipal decisionmakers' "continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action—the 'deliberate indifference'—necessary to trigger municipal liability." *Bryan Cnty.*, 520 U.S. at 407.

In *City of Canton*, the Supreme Court recognized a class of cases where the need for training "can be said to be 'so obvious' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights" even without a pattern of constitutional violations. 489 U.S. at 390 n.10. It provided an example: because "city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons," if the city arms its officers with firearms, "the need to train officers in the constitutional limitations on the use of deadly force" is "so obvious" that a failure to do so can result in municipal liability in a single-incident scenario. *Id.* Liability for a single-incident turns on "[t]he likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights." *Bryan Cnty.*, 520 U.S. at 409. A municipality cannot escape liability when the constitutional violation is a "highly predictable consequence" of the alleged supervisory or training deficiency. *Id.*

In addition to deliberate indifference, a failure to train theory of liability against a municipality requires that "the identified deficiency in the training program [] be closely related to the ultimate constitutional injury." *City of Canton*, 489 U.S. at 391

55

(cleaned up). In other words, a plaintiff must show that the unlawful municipal practice actually caused the unconstitutional misconduct. *Thomas*, 749 F.3d at 226. "As long as the causal link is not too tenuous, the question whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury." *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990) (citing *Black v. Stephens*, 662 F.2d 181, 190–91 (3d Cir. 1981), *cert. denied*, 455 U.S. 1008 (1982)).

Here, Millville first argues that Plaintiffs "have no facts to establish a pattern or practice of excessive force" among MPD officers. [Millville Br. at 23.] Because instances of force cannot be equated with instances of *excessive* force, Millville submits that Plaintiffs have not introduced evidence that a pattern of excessive force emerged sufficient to place the municipality on notice that Officer Dixon's alleged constitutional violations were likely to occur. [*See id.* at 23–24.] In opposition, Plaintiffs gesture at a variety of facts that they believe a jury could weigh to conclude that the MPD was aware of an "obvious problem" and failed to supervise Officer Dixon accordingly. [*See* Pls.' Opp'n to Millville Defs. at 12–15; *see also id.* at 14–15 ("Both in policy, custom, usage, and in practice—whatever terms one wishes to use— the MPD was a police department that, faced with known obvious problems surrounding the use of force—buried its head in the sand.").]

The Court begins with Officer Dixon's own conduct. Plaintiffs have introduced undisputed evidence that, in his first three-and-a-half years as a police officer, Officer Dixon submitted more use-of-force reports than any other officer in the department (and, indeed, in the State of New Jersey). [Pls.' CSOMF ¶ 614.] Officer Dixon's use

of force was so extensive and well-known that he earned the moniker, "glass hands," for routinely injuring his hands striking arrestees.  [*See* Pls.' CSOMF ¶¶ 718, 721.]  In a June 2017 incident, Officer Dixon beat a jaywalking suspect for failing to provide identification, though Chief Farabella expressed no concerns about Officer Dixon's use of force in such case.[20]  [Pls.' CSOMF ¶¶ 390–419.]  There is also evidence that MPD supervisors spoke to Officer Dixon about his use of force, including on one occasion when Chief Farabella advised him that his conduct was not the "image of a police officer."  [Pls.' CSOMF ¶ 735; Pls.' Ex. 215; *see also* Shane Rpt. at 31 n.48.] Ultimately, Officer Dixon filed over 80 use-of-force reports[21] and had at least 8 complaints of excessive force lodged against him during his career as a police officer. [Pls.' CSOMF ¶ 634; *see* Millville Defs.' Ex. 10, *Capps* Docket No. 195-14 (Officer Dixon's IAU complaint record).]  Based on this evidence and more, Dr. Shane also opines that "the Millville Police Department knew or should have known that [Officer Dixon] was exhibiting behavior that required intervention."  [Shane Rpt. at 44.]

---

[20] The incident resulted in litigation.  See *Cottman v. Farabella*, 2021 WL 2651036 (D.N.J. June 28, 2021) (Hillman, J.) (denying motion to dismiss filed by City of Millville and Chief Farabella, finding that plaintiff Barry Cottman pled sufficient facts to support claim that they "had notice and 'consciously disregarded an obvious risk that the officers would subsequently inflict a particular constitutional injury,' and this deliberate indifference caused the officers to use excessive force on [Cottman]") (quoting *Bryan Cnty.*, 520 U.S. at 411), *appeal docketed*, Case No. 22-1724 (3d Cir. Apr. 28, 2022).

[21] Dr. Shane refers to 81 use-of-force reports involving 82 individuals between March 23, 2013 and May 2, 2019, [*see, e.g.*, Shane Rpt. at 33], while the parties refer to 80 use-of-force reports total, citing OPIA's investigation report, [see Millville's SOMF ¶ 84; Pls.' RSOMF ¶ 84, *Capps* Docket No. 200-2; Pls.' CSOMF ¶ 634].

The City of Millville emphasizes that none of this evidence establishes that Office Dixon exhibited a custom or pattern of excessive force. [*See* Millville's Reply Br. at 10–12, *Capps* Docket No. 209.] They repeat that Plaintiffs have not introduced evidence that any of Officer Dixon's other uses of force was adjudicated as excessive, or that any of the excessive force complaints should have been sustained. [*Id.*] Citing *Beam v. Twp. of Pemberton*, 2023 WL 2496460 (D.N.J. Mar. 2023) (Slomsky, J.), and *Merman v. City of Camden*, 824 F. Supp. 2d 581 (D.N.J. 2010) (Hillman, J.), Millville contends that Plaintiffs must show why Officer Dixon's prior incidents deserved discipline and how the misconduct in those situations was similar to the Capps and Joyce incidents. [Millville Br. at 23–24.] As noted, they also seek to preclude the testimony of Dr. Shane, principally for basing his conclusions on Officer Dixon's use-of-force reports without addressing why any particular force incident was excessive. [Millville's Br. at 25–28.] Before turning to Millville's *Daubert* challenge, the Court must address whether Plaintiffs' *Monell* claim fails because they have not introduced evidence that Officer Dixon repeatedly employed force that was adjudicated as, or confirmed to be, excessive.

As was explored at the oral argument, it is true that "use of force" and "excessive force" are not categorically equivalent, and regrettably Plaintiffs' counsel has, at times, conflated the two. Even "The Force Report" series acknowledges that "[u]sing force is a normal and necessary part of policing" and that it does not purport to be a "database of police misconduct" because "[a] high number of uses of force does not necessarily indicate wrongdoing." [Craig McCarthy & Stephen Stirling, *How We*

58

*Built the Most Comprehensive Statewide Database of Police Force in the United States*, NJ Advance Media for NJ.com (Nov. 29, 2018) [Millville Defs.' Ex. 24, *Capps* Docket No. 195-28 (p. 1830)].]  Moreover, the same article that reported on Officer Dixon's use of force observed the limitations of its methodology.  [*See* Blake Nelson, *This N.J. Cop Used More Force Than Anyone Else.  Is He Violent or Just Good at his Job?*, NJ Advance Media for NJ.com (Dec. 27, 2018) ("A high number of uses of force does not necessarily indicate wrongdoing, and numbers can fluctuate based on location or assignment.") [Pls.' Ex. 240; Millville Defs.' Ex. 23, *Capps* Docket No. 195-27 (p. 698)].]

However, Plaintiffs' *Monell* claim does not depend on proving that Officer Dixon's prior use-of-force incidents each amounted to excessive force.  Placing to the side the other evidence, discussed below, that a jury could weigh to conclude that a pattern of similar constitutional violations emerged at the MPD, there is sufficient evidence for a jury to conclude that the Capps and Joyce incidents were the "highly predictable consequence" of failing to disrupt Officer Dixon's conduct.  In *Canton*, the Supreme Court acknowledged that in certain situations, the need for appropriate training and supervision can be described as "so obvious" that a failure to do so could result in municipal liability even without a pattern of constitutional violations.  489 U.S. at 390 n.10.  Under the so-called "single-incident" theory, municipal liability turns on "[t]he likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights."  *Bryan Cnty.*, 520 U.S. at 409.

59

In *Thomas v. Cumberland County*, 749 F.3d 217 (3d Cir. 2014), the Third Circuit considered a single-incident case. There, an injured inmate argued that the Cumberland County Correctional Facility (CCCF) was deliberately indifferent "when 'patently obvious' standards, widely-accepted national standards and training relevant to inmate safety were disregarded, at the same time their Corrections Officers were confronting a combustible jail." *Id.* at 225 (cleaned up). The court concluded that the risk of the inmate's injury occurring from a prison fight was a "highly predictable consequence" of the CCCF's failure to provide de-escalation and intervention training for corrections officers. *Id.* It explained that, even though regularly occurring prison fights did not result in a pattern of constitutional violations, a reasonable jury could conclude "based on the frequency of fights and the volatile nature of the prison that the 'predictability that an officer lacking de-escalation and intervention training to handle that situation will violate rights' and the 'likelihood that the situation will recur' demonstrate deliberate indifference on the County's part." *Id.* (quoting *Bryan Cnty.*, 520 U.S. at 409) (cleaned up). The *Thomas* court also observed that the inmate had provided expert testimony that "the failure to provide conflict de-escalation and intervention training was a careless and dangerous practice not aligned with prevailing standards." *Id.* The *Monell* claim should have survived summary judgment and proceeded to a jury, the court concluded. *Id.* at 226.

Here, the gravamen of Plaintiffs' contention is that Officer Dixon's conduct as a police officer, although not revealing a pattern of constitutional violations necessarily, should have placed his supervisors on notice that a future violation was

60

highly likely, and should have warranted heightened supervision. [*See* Pls.' Opp'n to Millville Defs. at 13 ("There was the 2016 recognition that Dixon was a problem waiting to happen."); *id.* (There were the mounting numbers of UOF forms being filled out by Dixon along the way.").] A reasonable jury could so conclude. Just as evidence concerning the volatile nature of a prison and frequent fights among inmates can establish that an undertrained officer is likely to violate constitutional rights and result in municipal liability, *see Thomas*, 749 F.3d at 225, here, evidence that Officer Dixon led the State of New Jersey in reported force incidents, accrued repeated complaints of excessive force, earned a reputation for having "glass hands" for injuring himself striking arrestees in the face, and garnered "concerns" from supervisors throughout his career as an officer, among other evidence, can demonstrate that the City of Millville was on notice that a future constitutional violation was likely. The need to disrupt an officer's proclivity to immediately resort to force can thus be described as plainly obvious, *see Canton*, 489 U.S. at 390 n.10, and lack of evidence that Officer Dixon sustained prior excessive force ***violations***, while relevant evidentiarily, is not fatal to Plaintiffs' claim.

Millville's cases are not to the contrary. For instance, in *Merman*, the court indicated that, "Rather than reciting a number of complaints or offenses, a plaintiff must show why those prior incidents deserved discipline and how the misconduct in those situations was similar to the present one." 824 F. Supp. 2d at 591 (cleaned up) (internal quotation marks and citation omitted). To do so, the plaintiff introduced a sample of civilian complaints of excessive force and argued, pursuant to *Beck v. City of*

*Pittsburgh*, 89 F.3d 966 (3d Cir. 1996), that Camden's investigatory process was "sterile and shallow." *See Merman*, 824 F. Supp. 2d at 591.   Reviewing the complaints and internal affairs memoranda and recognizing the plaintiff's substantiated allegation that investigators used any perceived weakness in a civilian complaint as a pretext to credit the officer's version, the court concluded that a jury could reasonably decide that Camden's investigatory process was a façade. *Id.* at 591–92.  The plaintiff in *Merman* thus situated the "sheer number of civilian complaints" in context, without proving that each underlying incidents was, in fact, excessive.  *See id.*

In *Beam*, the court granted summary judgment to the Township of Pemberton on a *Monell* claim based on a variety of theories—failure to train, supervise, and investigate.  *Beam*, 2023 WL 2496460, at *14–16.  Unlike here, the court concluded that there was no evidence to support the plaintiffs' failure-to-supervise claim.  *Id.*  It determined that credible evidence did not support their conclusory allegations concerning the "laxness" of the Township's investigatory procedure, *id.* at *14, and it noted that there were not any statistics or comparisons regarding excessive force or other violations by its police officers, *id.* at *15.  Further, there were no "lawsuits, notices of claim, complaints previously filed, and judicial ruling[s] suppressing evidence and finding officers incredible as a matter of law."  *Id.* (internal quotation marks omitted).

Here, by contrast, Plaintiffs have introduced evidence, beyond summary statistics, to show that MPD supervisors were on notice that an excessive force

violation could likely result from Officer Dixon's conduct. For instance, as noted, Officer Dixon earned a reputation for striking arrestees in the face; he was called "glass hands" for how often he injured himself doing so. [Pls.' CSOMF ¶¶ 718, 721.] Also, supervisors who reviewed Officer Dixon's use-of-force reports at times documented "concerns." Lt. Colon reported having "concerns" about the amount of force Officer Dixon employed in one instance during his first two years on the job. [Millville Defs.' Ex. 11, *Capps* Docket No. 195-15 (Aug. 27, 2014, Guardian Tracking entry).] Chief of Investigators Necelis also raised concerns on February 2, 2016, that Officer Dixon had received four complaints of excessive force during a two-year span. [Necelis Ltr. at 1.] He advised sending Officer Dixon to a "verbal judo" program, observing that complaints were dangerous from a "risk assessment point of view." [*Id.*] As discussed below, Dr. Shane identified concerning patterns in Officer Dixon's use-of-force reports.

Still, as Chief of Investigators Necelis reported in 2018, after reviewing Officer Dixon's internal complaint history, Officer Dixon was exonerated on most of the excessive force complaints lodged against him (or that such complaints were determined to be "unfounded"); "there was only one . . . [that] was not[]sustained." [Sept. 26, 2018, Memorandum from Chief Necelis to Cumberland Cnty. Prosecutor Webb-McRae, at 3 (¶ 11), Millville Defs.' Ex. 27, *Capps* Docket No. 195-31; *see also supra* note 9 (explaining the difference between "not sustained," "exonerated," and "unfounded").] Moreover, following its own review, OPIA concluded that none of Officer Dixon's use-of-force incidents required further investigation, except for the

Capps and Joyce arrests.  [Millville's SOMF ¶ 84; *see also* Millville Defs.' Ex. 31.]  This suggests that Officer Dixon's other use-of-force incidents would not have placed the MPD on notice of a pattern of excessive force.

Considering the dueling inferences raised by this evidence, the Court determines that there is a genuine dispute whether Officer Dixon's conduct placed MPD supervisors on notice of a likelihood of a future excessive force incident, in the absence of a pattern of constitutional violations.  *See Connick*, 563 U.S. at 62 ("Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights.").  Having so concluded, the Court turns to Millville's challenge to Dr. Shane's testimony.

Where a party offers an expert to provide opinion testimony, it is a court's "gatekeeping" function to ensure the expert is appropriately qualified and will offer an opinion based on the scientific, technical, or other specialized knowledge that would help the trier of fact to understand or determine a fact in issue.  *See* Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590, 592 (1993).  The Third Circuit has described Rule 702 as embodying a " 'trilogy of restrictions on expert testimony: [1] qualification, [2] reliability, and [3] fit.' "  *Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 321 (3d Cir. 2003) (quoting *Schneider v. Fried*, 320 F.3d 396, 405 (3d Cir. 2003)).  As relevant here, for testimony to be "reliable," it must be based on the "methods and procedures of science," rather than on "subjective belief or unsupported speculation."  *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 (3d Cir. 1994) (citing

64

*Daubert*, 509 U.S. at 590).[22]   The inquiry is "a flexible one" focusing "solely on the principles and methodology, not on the conclusions that they generate."  *Daubert*, 509 U.S. at 595.  The question is whether the expert's opinions "could reliably flow from the facts known to the expert and the methodology used."  *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 153 (3d Cir. 1999).  Reliability prohibits "too great a gap between the data and the [expert] opinion proffered."  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Here, Dr. Shane opines that Officer Dixon's "frequent" use of force was likely to "amount to excessive force and potentially criminal assault" and that "the Millville Police Department knew or should have known that [Officer Dixon] was exhibiting behavior that required intervention."   [Shane Rpt. at 44, 47.]   He adopts these conclusions having reviewed Officer Dixon's use-of-force reports, the complaints of excessive force lodged against him, and his Guardian Tracking files, among other evidence.  [*Id.*  at 33 & Tbl. 4, 45 & Tbl. 10.]  He also bases his opinions on evidence tending to show that supervisors were concerned about Officer Dixon's use of force.  [*See, e.g., id.* at 31 n.48 ("Chief Farabella spoke to Officer Dixon a few times about his

---

[22]   The Third Circuit has identified several factors that guide the reliability determination:

>   (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*In re Paoli*, 35 F.3d at 742 n.8.

use of force and told him, using the type of force he does is not the image of a police officer.").] Moreover, Dr. Shane documents certain patterns in the data. For instance, he reports that Officer Dixon's non-white arrestees were hospitalized at a higher percentage than white arrestees (three times as often). [*Id.* at 35–36.] He identifies that Officer Dixon was reporting a use of force, on average, every 28 days. [*Id.* at 33.]

However, as he testified during the *Daubert* hearing, Dr. Shane did not provide any benchmarks to compare Officer Dixon's data against that of other officers at the MPD or elsewhere. Additionally, he only reviewed the complaints of excessive force themselves (*i.e.*, the civilian "cards" documenting each complaint), and not the MPD's accompanying investigatory memoranda. (The memoranda were apparently outside the scope of his review.) Ultimately, he did not determine that any of Officer Dixon's prior force incidents was unreasonable or that any of the complaints lodged against Officer Dixon should have been sustained as excessive force. [*See generally* Shane Rpt.]

Having reviewed the parties' submissions and Dr. Shane's report and proffered testimony, the Court determines that his opinions are genuinely disputed, but not unreliable. It is not a basis to exclude Dr. Shane because he relied on Officer Dixon's use-of-force reports and excessive force complaints to conclude that MPD supervisors should have known that intervention was required. As he noted in his report, MPD policy provides for supervisory review of each use-of-force incident, whether or not a complaint of excessive force was lodged. [Shane Rpt. at 30 n.46 (citing MPD Gen. Order 06-2012 (effective Aug. 10, 2012) regarding the Guardian Tracking software system).] This suggests that the MPD "prioritized use of force as a performance

66

indicator, regardless of the type of force employed and notwithstanding any internal affairs complaint, or the outcome of an internal affairs investigation." [*Id.*] In any case, as the Court explained above, Plaintiffs have introduced other evidence to demonstrate that the Capps and Joyce incidents were the "highly predictable consequence" of the MPD's failure to supervise Officer Dixon. Thus, it is not fatal to their *Monell* claim that Officer Dixon does not have a documented pattern of constitutional violations, nor is it fatal to Dr. Shane's analysis that he does not testify that Officer Dixon's prior uses of force were excessive.

While Millville has set forth a legitimate argument that Dr. Shane could have performed a qualitative analysis comparing Officer Dixon's figures against that of other officers to provide the jury with benchmarks, Millville's criticism goes to the weight of his testimony, and not the reliability of his methodology. Dr. Shane permissibly testifies to certain patterns in Officer Dixon's use of force, and he credits supervisors' documented concerns in concluding that the MPD was aware of a high risk of excessive force. As a result, he has a legitimate basis, using his prior experience, to qualitatively analyze the sufficiency of the MPD's response, including their compliance with applicable policies.

Ultimately, none of Millville's criticisms of Dr. Shane's expert report or proffered testimony provide a persuasive basis for preclusion on reliability grounds. Dr. Shane's conclusions "could reliably flow from the facts known to [him] and the

methodology [he] used." *Heller*, 167 F.3d at 153.  None of the other arguments raised

merit discussion here.[23]

Next, the Court considers Plaintiffs' contention that other evidence, beyond

Officer Dixon's conduct, establishes that MPD supervisors were on notice of a custom

of excessive force.  Plaintiffs argue that Officer Profitt's guilty plea of aggravated

assault for slamming an arrestee's head onto the concrete floor of the MPD station

demonstrates a systemic problem—"shock and awe" tactics in the department.  [Pls.'

Opp'n to Millville Defs. at 13–14.]  They also refer to a case involving Officer Edmund

Ansara from 2014.  [*Id.*]  Further, Plaintiffs cite a separate incident in which another

MPD patrolman, Officer Chard, was sued in connection with providing false grand

jury testimony and authoring a false report.  [*Id.* at 15–20.]  They cite to *Carpenter v.*

*Chard*, 492 F. Supp. 3d 321 (D.N.J. 2020) (Rodriguez, J.), the litigation that stemmed

from the incident.  There, the court denied summary judgment as to the plaintiff's

*Monell* claim based, in part, on the Capps incident and the assault that ultimately

---

[23] Still, the Court must observe that Plaintiffs' arguments in opposition to Millville's request to preclude Dr. Shane's testimony, [see Pls.' Opp'n to Millville Defs. at 22–31], fundamentally misunderstand the purpose of a *Daubert* challenge under Rule 702. Unhelpfully, Plaintiffs devote several pages of their Opposition characterizing the rebuttal opinion of Dr. William Terrill, [Millville Defs.' Ex. 22, *Capps* Docket No. 195-26], as a "peer review bonanza," demonstrating "ivory tower criticism."  [Pls.' Opp'n to Millville Defs. at 28, 31.]  They focus on the purported difference between an "academic police expert" and a "practitioner police expert," ostensibly like Dr. Shane, ignoring the pertinent issue before the Court: whether Dr. Shane's methodology is unreliable.  [*Id.* at 24–25.]  Also, they do not seek to challenge the testimony of Dr. Terrill.  The Court's conclusion to permit Dr. Shane to testify should not be construed as a basis to prohibit Dr. Terrill to testify.  To the extent that Dr. Shane's analysis is deficient in any respect, as Dr. Terrill identifies, it is the Court's determination that such deficiencies go to the weight of Dr. Shane's testimony, and not the reliability of his methodology.

barred Officer Profitt from public office. *See Chard*, 492 F. Supp. 3d at 332. The *Chard* court determined that a reasonable jury could conclude that Chief Farabella, as the relevant policymaker, was deliberately indifferent to "his officers' custom of using shock and awe tactics." *Id.* at 333.

In its Reply Brief, Millville claims that the Ansara and Profitt incidents resulted in thorough investigations, which led to their termination as police officers and criminal prosecutions thereafter. [Millville Reply Br. at 12–13, *Capps* Docket No. 209.] Millville contends that its conduct was "the opposite of deliberate indifference." [*Id.*] Putting that contention to the side, the Court observes that Millville ignores whether the incidents provided notice of a custom of excessive force. Additionally, Millville seeks to distinguish the court's decision in *Chard*. [*Id.* at 14–17.] It argues that the court impermissibly focused its attention on dissimilar actions by police officers, misclassified together as "shock and awe tactics." [*Id.* at 15.]

This Court is not persuaded. Given the disputed issues here, evidence tending to show that other MPD police officers employed a disproportionate amount of force while Dixon was an officer is especially persuasive to show that Chief Farabella and other supervisors were aware of a custom of excessive force. Moreover, as the *Chard* court examined, the "lack of consequence" to Officer Chard, despite an investigation into the Carpenter incident, is relevant to whether complaints were meaningfully investigated. In sum, this Court concludes that Plaintiffs have identified sufficient evidence to raise a factual dispute regarding whether the conduct of Officers Ansara, Profitt, and Chard reveal the existence of a custom of excessive force during the time

Dixon was a police officer.  *Accord Chard*, 492 F. Supp. 3d at 333, 334 (denying summary judgment motion filed by Millville because there were disputed issues of fact concerning "whether Chief Farabella was deliberately indifferent to his officers' custom of using shock and awe tactics" and whether there was "a custom of protecting the officers who exercise their authority in an excessive manner") (cleaned up).

Next, the Court addresses whether MPD supervisors were deliberately indifferent to a risk that Officer Dixon would employ excessive force.  "[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."  *Bryan Cnty.*, 520 U.S. at 410.  When city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program.  *Connick*, 563 U.S. at 61 (citing *Bryan Cnty.*, 520 U.S. at 407).  "The city's 'policy of inaction' in light of notice that its program will cause constitutional violations 'is the functional equivalent of a decision by the city itself to violate the Constitution.' "  *Id.* at 61–62 (quoting *Canton*, 489 U.S. at 395).  As noted above, a city can be liable when a constitutional violation is a "highly predictable consequence" of a deficiency in the municipality's training and supervision program that leaves an officer incapable of handling a recurring situation.  *See Bryan Cnty.*, 520 U.S. at 409 ("The likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision not to train the

70

officer reflected 'deliberate indifference' to the obvious consequence of the policymakers' choice.").

Here, Millville argues that there is no evidence that it was deliberately indifferent to Officer Dixon's use of force. [*See* Millville Br. at 24–25, 33–40.] To the contrary, it argues that the evidence demonstrates that its supervisors raised concerns, when appropriate. [*See, e.g.*, *id.* at 36 (describing e-mail from Chief of Investigators Necelis, recommending "verbal judo" training program).] It contends that during much of the time that Officer Dixon was an officer, the CCPO jointly oversaw the IAU with Chief Farabella, and that the evidence demonstrates that the MPD conducted "meaningful investigations into civilian complaints of excessive [] force." [*Id.* at 25.] Millville also contends that Chief Farabella implemented whatever policy changes the CCPO directed at that time. [*Id.*] In addition, Millville maintains that it adhered to its policies requiring supervisory review of use-of-force reports and implementation and use of an early warning system.[24] [*Id.* at 35.] Millville disputes Dr. Shane's conclusions in this regard. [*Id.* at 35–37.]

---

[24] The Court does not accept Millville's alternative contention that it cannot be held liable for failing to abide by its own policies because its policies go "beyond what federal law requires." [Millville Br. at 34 (citing *Burgos v. City of Phila.*, 439 F. Supp. 3d 470, 485 n.67 (E.D. Pa. 2020)).] This is an exercise in misdirection. First, Millville has not proven that its internal policies hold its officers to a "higher standard that that required by the Constitution," so Millville is not entitled to summary judgment on this basis. Second, a reasonable jury could find that Millville exhibited "deliberate indifference" to a risk that Officer Dixon would employ excessive force against arrestees if a jury credits the suggestion that supervisors failed to abide by the very policies designed to detect and disrupt a pattern of excessive force. The cases Millville cites are not to the contrary. In *Burgos*, for instance, the court granted summary judgment in favor of the City of Philadelphia as to a pretrial detainee's *Monell* claim because, while he alleged that the City failed to adopt a scabies policy (and scabies "can spread easily under crowded conditions where close body and skin contact is common," such as prisons),

In their Opposition, Plaintiffs point to a handful of actions to suggest that the issue of deliberate indifference is disputed.  For instance, Plaintiffs claim that the IAU tended to sustain procedural rules violations against officers, but avoided findings of excessive force.  [Pls.' Opp'n to Millville Defs. at 13, 21–22.]  Because none of the excessive force complaints lodged against Officer Dixon was ever sustained, Plaintiffs suggest that the MPD's investigatory system was a sham.  [*See id.*]  Additionally, Plaintiffs claim that Chief Farabella "watered down" the MPD's MVR review policy in 2015, embracing randomized review of dash-cam footage.  [*Id.* at 21–22.]  They maintain that this practice allowed patrolmen such as Officer Dixon to escape meaningful supervision, and they appear to argue that this change in policy reveals Chief Farabella's deliberate indifference to a pattern of excessive force by his officers. [*See id.*[25]]

Plaintiffs also seem to rely on Dr. Shane's analysis to identify and explain the deficiencies in the MPD's supervision and training of Officer Dixon.  For example, Dr. Shane elaborates on Chief Farabella's revision to the MPD's MVR review policy. The original policy, embodied in Mobile Video and Audio Recording Equipment,

---

the pretrial detainee had not introduced any evidence to show that the need for such a policy was "obvious," such as evidence of a prior scabies outbreak.  *Burgos*, 439 F. Supp. 3d at 485. Here, the same cannot be said.

[25] As previously observed, Plaintiffs' Opposition is not particularly helpful.  It fails to meaningfully engage with the discovery record, often resorting to conclusory statements.  [*See, e.g.*, Pls.' Opp'n to Millville Defs. at 14 ("This is not just a case about training.  It is very significantly one about supervision and discipline.  It is also a case about keeping officers on the force at all costs until doing so became untenable.").  Such vacuous submissions required the Court to engage the record on its own.

General Order 02-02, required lieutenants to periodically review at least two "randomly selected" videotapes and recordings for their subordinate supervisees. [See Shane Rpt. at 40.]  The policy continues:

> At least one of these randomly selected videotapes and recordings shall include a motor vehicle stop involving one or more of the following law enforcement procedures:  orders or requests any occupant out of a vehicle, conducts a frisk or search of any occupant or the vehicle, summons a canine, requests an occupant for consent to search, conducts a consensual or non-consensual search of the vehicle, makes a seizure or arrest, or uses force.  The review will assist the supervisor in assessing the officer's job performance in these areas and will help determine whether MVR equipment is being fully and properly used.  Material that may be appropriate for training may also be identified.

> NOTE: reviews will be conducted weekly.  All reviews will be documented utilizing a report to the Chief of Police of the determination of the review.

[See Shane Rpt. at 40–41.]

As Dr. Shane explains, use of the word "or" in the policy enabled supervisors to avoid reviewing use-of-force incidents by choosing other law enforcement procedures.  [*Id.*]  In 2015, Chief Farabella issued an order that superseded General Order 02-02 and removed use-of-force incidents from the list of law enforcement procedures supervisors could review.  [*Id.* at 43.]  He opines that this policy change enabled the MPD to avoid accountability for use-of-force incidents.  [*Id.*]  Specifically, he claims that Officer Dixon's quarterly MVR reviews bear this out:  none involved use-of-force incidents, only traffic stops and calls for service.  [*Id.* at 43 & n.59.] Finally, Dr. Shane identifies that there is no evidence that lieutenants documented their MVR reviews and reported to the Chief of Police on a weekly basis, as specified

in the pre-2015 policy. "The cumulative shortcomings in the MVR review policy demonstrate deliberate indifference toward supervision." [*Id.* at 44.]

Dr. Shane also addresses Officer Dixon's use-of-force reports in the Guardian Tracking system. Although it is undisputed that supervisors are listed as having reviewed each force incident reported, Dr. Shane provides a basis to doubt the extent to which each use-of-force report was reviewed. For example, as reflected in an August 27, 2014, Guardian Tracking system entry, Lt. Colon reviewed 13 incidents of force and reported having "concerns" about the amount of force Officer Dixon utilized. [Millville's SOMF ¶ 29; Millville Defs.' Ex. 11, *Capps* Docket No. 195-15 (Guardian Tracking entries).] He also indicated that "Officer Dixon will be monitored for any further incidents." [*Id.*] Dr. Shane explains that there is no evidence in the record of further monitoring. Moreover, Officer Dixon's Guardian Tracking records contain few entries by supervisors, despite their obligation to have reviewed all 80 use-of-force incidents. A jury could reasonably conclude that supervisors generally ignored use-of-force reports; it could also reasonably conclude that supervisors, such as Lt. Colon, acted appropriately.

Ultimately, the Court finds that the issue of deliberate indifference is genuinely disputed, and Plaintiffs have pointed to just enough evidence to preclude summary judgment. A jury could find that Chief Farabella's amendments to the MVR review policy demonstrate deliberate indifference to the risk posed by Officer Dixon's conduct. Indeed, a jury could reasonably find that the Capps and Joyce incidents were the "highly predictable consequence" of failing to disrupt Officer Dixon's pattern of

force with enhanced supervision.  *See Bryan Cnty.*, 520 U.S. at 409.  Of course, a jury could also reject that contention, given other record evidence, such as the fact that Chief of Investigators Necelis recommended Officer Dixon complete the "verbal judo" program and that it reduced Officer Dixon's uses of force thereafter.  [*See* Millville's SOMF ¶¶ 39–41.]  A jury may also doubt the extent to which Officer Dixon's use-of-force reports were reviewed by MPD supervisors. *See Beck v. City of Pittsburgh*, 89 F.3d 996, 973 (3d Cir. 1996) (explaining that a "sterile and shallow" investigatory system—that routinely fails to sustain complaints of excessive force—can establish deliberate indifference).  There is no evidence to suggest that lieutenants prepared weekly MVR reports for the Chief of Police, as required by MPD policy, and Officer Dixon's Guardian Tracking entries contain limited documentation from supervisors, despite "concerns" regarding his performance.  As a result, a jury could find that supervisors were not closely monitoring Officer Dixon's performance.  Genuine factual disputes preclude summary judgment and, alternatively, the Court concludes that Millville has not persuasively demonstrated that it is entitled to judgment as a matter of law at this juncture.  *See Anchorage Assocs. v. Virgin Islands Bd. of Tax Rev.*, 922 F.2d 168, 175 (3d Cir. 1990) (explaining that, even where the non-moving party has failed to establish a triable issue of fact, summary judgment will only be granted if "appropriate," *i.e.*, where the movant has established that it is entitled to judgment as a matter of law); *see also* Fed. R. Civ. P. 56(a).

Finally, the Court observes that, although Plaintiffs and Millville fail to provide any meaningful argument regarding causation, there appear to be issues of fact that

75

preclude summary judgment. "As long as the causal link is not too tenuous, the question whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury." *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990) (citing *Black v. Stephens*, 662 F.2d 181, 190–91 (3d Cir. 1981), *cert. denied*, 455 U.S. 1008 (1982)).

In sum, there are genuinely disputed issues of material fact that preclude summary judgment as to Plaintiffs' *Monell* claims against the City of Millville. Moreover, Millville has not persuasively demonstrated that it is entitled to judgment as a matter of law. As a result, the Court will deny Millville's Motion for Summary Judgment.

### D.    Other State Law Claims

As noted above, Capps maintains assault, battery, and negligence claims against Officer Orndorf. Capps and Joyce also maintain NJCRA claims that are analogous to their § 1983 claims. These claims rise and fall on the foregoing analysis. Because the Court concludes that Officer Orndorf is entitled to qualified immunity, it finds that he is not liable for any state tort pursuant to the New Jersey Tort Claims Act. As a public employee, he cannot be liable for causing injury to a person who is resisting arrest so long as he acts in good faith in the execution or enforcement of law. *See* N.J. Stat. Ann § 59:5–2(b)(3) and 59:3–3. That being so, the Court will enter summary judgment in Officer Orndorf's favor as to the remaining state law claims asserted against him.

## IV.    CONCLUSION

For the reasons set forth above, the Court will **deny** Dixon's Motion for Summary Judgment, **grant** Officer Orndorf's Motion for Summary Judgment, and **deny** the City of Millville's Motion for Summary Judgment.  The Court will **deny** Farabella's Motion for Summary Judgment for lack of jurisdiction, without prejudice. An Order shall issue separately.  Fed. R. Civ. P. 58(a).

<u>**s/Renée Marie Bumb**</u>
RENÉE MARIE BUMB
Chief United States District Judge

DATED:  <u>**January 30, 2024**</u>